**No. 24-5205**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

KALSHIEX LLC,
*Plaintiff-Appellee*,

*v.*

COMMODITY FUTURES TRADING COMMISSION,
*Defendant-Appellant*,

On Appeal from the U.S. District Court for the District of Columbia
No. 23-cv-03257-JMC

## OPPOSITION TO DEFENDANT-APPELLANT'S
## MOTION FOR STAY PENDING APPEAL

<table>
<tr>
<td>
Joshua B. Sterling<br>
MILBANK LLP<br>
1850 K St. N.W.<br>
Washington, DC 20006<br>
(202) 835-7537<br>
<br>
Samuel V. Lioi<br>
JONES DAY<br>
901 Lakeside Avenue<br>
Cleveland, Ohio 44114-1190<br>
(216) 586-3939
</td>
<td>
Yaakov M. Roth<br>
John Henry Thompson<br>
JONES DAY<br>
51 Louisiana Avenue N.W.<br>
Washington, DC 20001<br>
(202) 879-3939<br>
yroth@jonesday.com<br>
<br>
Amanda K. Rice<br>
JONES DAY<br>
150 W. Jefferson Avenue,<br>
Suite 2100<br>
Detroit, MI 48226<br>
(313) 733-3939
</td>
</tr>
</table>

*Counsel for Plaintiff-Appellee KalshiEx LLC*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................... 1

BACKGROUND .................................................................... 4

      A.   Event Contracts Are Established Tools for Hedging Risks and Aggregating Information.............. 4

      B.   Congress Allows Regulated Exchanges To List Event Contracts, Subject to a Narrow List of Exceptions. ................................................................... 5

      C.   Kalshi Proposes Congressional Control Contracts, But the CFTC Prohibits Them. ...................................... 6

      D.   The District Court Vacates the CFTC's Order and Denies a Stay Pending Appeal. ..................................... 7

ARGUMENT ....................................................................... 8

    I.   THE CFTC IS NOT ENTITLED TO A STAY PENDING APPEAL. ..... 8

      A.   The CFTC Is Unlikely To Succeed on the Merits......... 9

         1.   *These contracts do not involve unlawful activity.* ............................................................ *10*

         2.   *These contracts do not involve gaming.* ............. *14*

      B.   The CFTC Faces No Irreparable Harm and the Public Interest Strongly Disfavors a Stay. ................. 19

      C.   Granting a Stay Would Irreparably Harm Kalshi. .... 23

CONCLUSION ................................................................... 25

## INTRODUCTION

KalshiEx LLC (Kalshi) is a CFTC-regulated exchange that offers event contracts—financial products that allow traders to hedge risks by buying contracts that pay out if a contingent event occurs. In June 2023, Kalshi sought to list event contracts contingent on which party controls the Senate and the House after the November 2024 election. Similar products are already available on *unregulated* exchanges, but Kalshi seeks to list these instruments in a regulated environment. The CFTC, however, issued an order prohibiting Kalshi from listing them.

Kalshi challenged that order. The Commodity Exchange Act (CEA) allows the CFTC to review (and potentially ban) *only* event contracts that "involve" "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity" designated by regulation. 7 U.S.C. § 7a-2(c)(5)(C)(i). "Elections" are not on that list. And contrary to the CFTC's reasoning, the contracts here involve neither "unlawful activity" (elections are not illegal) nor "gaming" (elections are not games). After full merits briefing and oral argument, the District Court (Cobb, J.) agreed with Kalshi and vacated the CFTC's order in a thorough and thoughtful 27-page opinion. ECF 51 (Op.).

In a transparent bid to run out the clock, the CFTC now asks this Court to keep its unlawful order in effect pending appeal, rendering these time-limited contracts worthless. The Court should deny that request, as the District Court did below. In denying a stay after a hearing, Judge Cobb found that the critical factors—likelihood of success on the merits and irreparable harm—"strongly weigh" against relief. ECF 54 (Tr.) 27:21. This Court should reach the same result for the same reasons.

On the merits, the Commission has not shown a likelihood that this Court will reverse the District Court's judgment. Election contracts do not "involve … unlawful activity," and adopting the CFTC's contrary position would upend the statute's structure (and render the other enumerated activities meaningless) by empowering the agency to ban *any* event contract. Nor do Kalshi's contracts "involve … gaming." This category requires a predicate "game," and elections are anything but. And once again, the Commission's contrary interpretation sweeps *every* event contract into a single exception. The CFTC's indefensible reading is no more likely to persuade this Court than it did the District Court. As Judge Cobb aptly observed, it "just cannot be right." Op.17.

On the equities, the District Court found that the CFTC failed to establish that it faces any injury from the trading of these contracts. The Commission worries that these contracts would create incentives (or be used as a vehicle) to spread electoral misinformation. But other election-prediction markets (including Polymarket and PredictIt) are operating *right now* outside of any federal oversight, and are regularly cited by the press for their predictive data. So a stay would accomplish nothing for election integrity; its only effect would be to confine all election trading activity to *unregulated* exchanges. That would harm the public interest. It would also harm Kalshi—a heavily regulated exchange that has made an enormous investment in these time-limited markets.

In short, having unlawfully blocked Kalshi's contracts for over a year, the CFTC seeks months of additional delay to destroy their value and withhold them from the public. This Court should not play along. The CFTC had every opportunity to make its case, and it lost fair and square on the law after careful consideration below. The District Court also correctly recognized that there is no basis in the record for a stay pending appeal. This Court should deny the CFTC's motion.

## BACKGROUND

### A.   Event Contracts Are Established Tools for Hedging Risks and Aggregating Information.

Derivatives are tools to mitigate risk.  *See* AR.37, 101.  This case concerns "event contracts," a form of derivative whose payoff is based on a specified event.  Op.3.  Businesses and individuals use event contracts to hedge against risk.  Op.2-3.  And the market price of event contracts can help clarify the likelihood that an event will occur.  Op.3.

Political events carry vast economic consequences, and thus present risks that can be hedged through these financial instruments.  AR.2990-93; *see also* AR.1551 (former Chairman of President Obama's Council of Economic Advisors discussing these benefits).  In addition, political event markets provide real-time and accurate data that traditional polls often cannot replicate, benefiting the public at large.  AR.1452-53, 1556.

Markets for political event contracts are widespread.  PredictIt, for example, "is a futures market for politics" that allows trading on electoral outcomes. *Clarke v. CFTC*, 74 F.4th 627, 633 (5th Cir. 2023).  CFTC staff have permitted it to operate under a no-action letter issued in 2014.  *Id.* at 633-44.  Similar markets have long existed around the world.  *See, e.g.*, AR.1416.  And unregulated markets like Polymarket—which lack the

safeguards of regulated exchanges—provide analogous services today. *See* AR.1752, 1822.  While Polymarket is technically forbidden to allow trading by U.S. persons, it has been widely reported that thousands of Americans are in fact trading on that platform today.  *See infra* at 20.

### B. Congress Allows Regulated Exchanges To List Event Contracts, Subject to a Narrow List of Exceptions.

Under the CEA, "[e]vent contracts" are regulated as "agreements, contracts, transactions, or swaps in excluded commodities."  7 U.S.C. § 7a-2(c)(5)(C)(i).  While products like "wheat, cotton, rice, corn, [and] oats" are the most familiar commodities, the CEA defines "excluded commodities" to include *events*—in statutory parlance, any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties" and "associated with" economic consequences.  *Id.* § 1a(9), (19).

An entity must receive CFTC designation as a regulated exchange to offer event contracts or other derivatives for public trading.  *Id.* §§ 2(e), 7(a); 17 C.F.R. § 38.100.  Exchanges are subject to comprehensive oversight by the CFTC and must comply with numerous regulatory requirements.  *Id.* § 7(d); 17 C.F.R. pt. 38.

Event contracts are presumptively lawful.  7 U.S.C. § 7a-2(c)(5)(B). Congress amended the CEA in 2010 to allow the CFTC to review and

potentially prohibit a limited class of event contracts that fall within certain narrow categories.  *Id*. § 7a-2(c)(5)(C)(i)-(ii).  Specifically, the CEA authorizes CFTC review *only* of contracts that "involve": "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined … by rule or regulation, to be contrary to the public interest."  *Id*. § 7a-2(c)(5)(C)(i).

### C.    Kalshi Proposes Congressional Control Contracts, But the CFTC Prohibits Them.

Kalshi is a CFTC-regulated exchange that allows the public to buy and sell event contracts.  Op.7.  This case involves Congressional Control Contracts, which enable buyers to take positions on which political party will control the House or Senate on a future date.  *See* Op.7-8.  On June 12, 2023, Kalshi certified that these contracts comply with applicable law.  *Id*.  But, on a 3-2 vote, the Commission chose to initiate a review of the contracts, so Kalshi duly delayed their listing.  Op.8-9.

On September 22, 2023, the CFTC issued an order prohibiting Kalshi from listing the contracts.  AR.1-23 (Order).  Over dissent, the Commission determined that the contracts were reviewable because they "involve" two enumerated activities: "gaming" and "unlawful" activity.

6

The Commission did not (and could not) determine that elections themselves constitute gaming or unlawful activity. Rather, it reasoned that an event contract "involve[s]" those activities if *trading on the contract* would *amount to* gaming or unlawful activity. *See* Order 5-7. The CFTC then declared that trading these contracts would amount to both, relying primarily on state statutes that define "gambling" to include wagering on the outcome of a "game, contest, or contingent event." Order 8. The CFTC proceeded to determine that the contracts are "contrary to the public interest" and so prohibited their listing. Order 13-23.

### D.   The District Court Vacates the CFTC's Order and Denies a Stay Pending Appeal.

Kalshi sued to vacate the CFTC's Order as exceeding the agency's statutory authority. Op.12. After full merits briefing and oral argument, the District Court granted summary judgment to Kalshi. ECF 47, 51. In a careful opinion focused on the statute's text, context, and history, Judge Cobb explained that Kalshi's contracts involve "elections, politics, Congress, and party control" but not "illegal or unlawful activity." Op.26. Nor do the contracts "bear any relation to any game—played for stakes or otherwise." *Id.* Accordingly, the contracts are beyond the Commission's statutory authority to prohibit. *Id.*

7

The CFTC repeatedly sought to stay the District Court's ruling. After granting a temporary administrative stay to allow for briefing and a hearing, Judge Cobb denied a stay pending appeal—as well as the agency's motions for "reconsideration" and for a further administrative stay. Tr.29:15-33:5. In so doing, Judge Cobb found that the two most important stay factors (success on the merits, and irreparable harm to the CFTC and the public) weigh "strongly" against a stay. Tr.27:25.

Some 15 months after Kalshi's original certification—and after both the CFTC and Judge Cobb acknowledged that Kalshi was free to list its contracts (Tr.33:5-34:3)—Kalshi did so. They traded for about eight hours on September 12, before this Court entered an administrative stay to consider the CFTC's renewed stay motion on appeal.

## ARGUMENT

### I.    THE CFTC IS NOT ENTITLED TO A STAY PENDING APPEAL.

A stay pending appeal is an "exceptional" remedy. *CREW v. FEC*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam). This Court considers "(1) whether the [movant] has made a strong showing that [it] is likely to succeed on the merits; (2) whether the [movant] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially

injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). When the movant is a federal agency, the second and fourth factors merge. Mot.12. As Judge Cobb concluded after a hearing, there is nothing "in the record from which" a court "could make the finding that these factors warranted a stay." Tr.28:4-6.

## A.    The CFTC Is Unlikely To Succeed on the Merits.

The first "critical" consideration is whether the party seeking a stay "has made a strong showing that [it] is likely to succeed on the merits." *Nken*, 556 U.S. at 434; *see also In re NTE Connecticut, LLC*, 26 F.4th 980, 987 (D.C. Cir. 2022). Failure to make that showing is "arguably fatal" to a stay request. *CREW*, 904 F.3d at 1019. The CFTC's failure to do so is fatal here.

The question in this case is whether the Commission acted lawfully when it banned Kalshi's Congressional Control Contracts. That inquiry boils down to whether election event contracts "involve" either "unlawful" activity or "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i)(I), (V). After full briefing from the parties and *amici* and an oral argument probing their positions, the District Court correctly held that the answer is "no."

9

This Court is likely to reach the same conclusion. Proper statutory interpretation begins with the text—and "end[s] there if the text is clear." *Force v. Islamic Republic of Iran*, 610 F. Supp. 3d 216, 222 (D.D.C. 2022). Moreover, statutory structure and context are crucial to any interpretive exercise. *See, e.g.*, *United States v. Slatten*, 865 F.3d 767, 807 (D.C. Cir. 2017). These principles doom the CFTC's assertions that event contracts contingent on election results "involve" unlawful activity or "gaming." Neither argument squares with the CEA's text. Each transforms a narrow exception into a default rule that would allow the Commission to prohibit *all* event contracts. The Commission's motion barely engages with Judge Cobb's careful reasoning on these points. It certainly has not shown a likelihood of reversal.

### 1. *These contracts do not involve unlawful activity.*

The Commission may review an event contract that "involves … activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). As the District Court held based on the statute's text and context, an event contract "'involves' an enumerated activity where the underlying event constitutes or relates to that activity." Op.19; *contra* Mot.13-15 (ascribing to the court a narrower, straw-man interpretation).

So an event contract "involves" unlawful activity if the event relates to an illegal act (*e.g.*, a contract on whether a piece of art will be stolen). Kalshi's "contracts involve elections (and politics, congressional control, and other related topics)"—"not illegal activities."  Op.14, 19.

The District Court adopted this event-focused interpretation of the statute in part because that is the *only* interpretation that works for the neighboring enumerated activities—terrorism, assassination, and war. Op.21.  A contract that "involves" terrorism, assassination, or war can only be one contingent on an *event* related to terrorism, assassination, or war.  For instance, a contract on whether a landmark will be bombed "involve[s] … terrorism," and a contract on whether Ukraine's military will acquire certain munitions by 2025 "involve[s] … war."

The "unlawful activity" category must work the same way.  *See Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) (holding that "a *single* [statutory] formulation" must be read "the same way each time it is called into play"); *see also* Op.21.  Indeed, when a single term "applies without differentiation to" a set of "categories," construing it to perform different work as to "each category would … invent a statute," not "interpret one." *Clark v. Martinez*, 543 U.S. 371, 378 (2005).  The District Court thus

11

properly refused to "invite ambiguity into a statutory framework that is otherwise clear by construing the relationship between 'involve' and the unlawful activity … differently" than for "the others."  Op.21-22.

The Commission never bothers to grapple with this basic—and dispositive—point.  All it offers is that the statute refers not to contracts alone, but also to "agreements, contracts, *transactions*, or swaps."  Mot.13 (emphasis added).  Emphasizing "transactions" does not advance the ball, however, because it remains true that the only way an event-contract "transaction" can "involve" war, assassination, or terrorism is if its *underlying event* relates to those activities.  Accordingly, as the District Court recognized, only an "event-focused reading of the word 'involve' makes sense in the context of this provision."  Op.19.

The Commission's reading also creates other "glaring issue[s]." Op.16.   On its view, an event contract involves unlawful activity if *trading the contract* would violate state law.  But that makes no sense, because any state law that prohibits trading in event contracts would be preempted by the Commission's exclusive jurisdiction over derivatives markets.  Op.24; 7 U.S.C. § 2(a)(1)(A); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.).

Trying to square the circle, the Commission suggests the unlawful-activity exception applies whenever trading a contract *would be* illegal, *but for* federal preemption.  Mot.18.  That does not work either.  At least 29 States prohibit staking money on *any* contingent event.[1]  So under the Commission's reading, *all* event contracts "involve" unlawful activity.  By subjecting every event contract to review, the Commission's reading would render the other enumerated activities surplusage, and "swallow the special rule's provisions authorizing the CFTC to review only event contracts that relate to specific, enumerated topics."  Op.24.  That "would also effectively undo the Congressional amendment to the CEA that eliminated the CFTC's across-the-board review."  *Id.*  As the District

---

[1] Ala. Code § 13A-12-20(4); Alaska Stat. Ann. § 11.66.280(3); Ariz. Rev. Stat. § 13-3301(6); Colo. Rev. Stat. Ann. § 18-10-102; Conn. Gen. Stat. Ann. § 53-278a; Haw. Rev. Stat. § 712-1220; Idaho Code § 18-3801; Ind. Code § 35-45-5-1(d); Iowa Code § 725.7(1)(b); Kan. Stat. Ann. §§ 21-6403(a)(1), 6404(a)(1); Me. Rev. Stat. tit. 17-A, § 952; Mich. Comp. Laws § 750.301; Minn. Stat. Ann. §§ 609.75; Miss. Code Ann. § 97-33-1; Mo. Rev. Stat. § 572.010; Mont. Code Ann. § 23-5-112(14)(a); Neb. Rev. Stat. § 28-1101(4); N.H. Rev. Stat. Ann. § 647:2; N.J. Stat. § 2C:37-1; N.M. Stat. Ann. §§ 30-19-1, 30-19-2(A); N.Y. Penal Law § 225.00(2); N.D. Cent. Code Ann. § 12.1-28-01; Okla. Stat. Ann. tit. 21, §§ 981, 982; Or. Rev. Stat. § 167.117(7); Tenn. Code Ann. § 39-17-501; Va. Code Ann. § 18.2-325(1); Wash. Rev. Code § 9.46.0237; Wis. Stat. Ann. §§ 945.01, 945.02(1); Wyo. Stat. Ann. § 6-7-101.

Court recognized, that "just cannot be right." Op.17. The Commission's efforts to evade this logic below were not "coherent." Op.24 n.15. Its efforts on appeal (Mot.17-18) are no better.

In sum, "[t]he only formulation of the interaction between 'involve' and 'unlawful activity' that actually works … is if the contract or transaction's underlying event relates in some way to activity that is illegal—not if the act of staking money on the contract's underlying would be unlawful under any state law." Op.24. Elections are not illegal, and the partisan affiliation of the Speaker of the House or President Pro Tempore of the Senate does not relate to unlawful activity. Thus, as the District Court correctly held, the CFTC exceeded its powers by subjecting Kalshi's contracts to review under the "unlawful activity" exception.

### 2. *These contracts do not involve gaming.*

For similar reasons, the Congressional Control Contracts do not "involve … gaming" either. This, too, is a purely legal question reviewed *de novo* using traditional tools of statutory interpretation. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261-66 (2024). "After considering the text of the CEA, the statute's structure and context, and the Parties' arguments," the District Court said it "must agree" with Kalshi. Op.15.

14

The proper interpretation is simple: "'gaming,' as used in the special rule, refers to playing games or playing games for stakes." Op.19. A contract thus involves "gaming" if it is contingent on a game or a game-related event. Op.15. For example, contracts on which team will win the Super Bowl, which horses will place at the Kentucky Derby, or which golfer will prevail at the Masters "involve … gaming," because their events relate to activities "engaged in for diversion or amusement." *Game*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020). Indeed, those examples are drawn verbatim from the statute's only legislative history, *see* 156 Cong. Rec. S5907 (daily ed. July 15, 2010), which thus strongly corroborates Kalshi's interpretation (Op.25).

This reading also aligns with the ordinary meaning of "gaming." Op.15, 17, 25. As dictionaries attest, "gaming" requires a *game*.[2] State

---

[2] *See, e.g.*, *Gaming*, CONCISE OXFORD ENGLISH DICTIONARY (11th ed., rev. 2008) ("playing at games of chance for money"); *Gaming*, Merriam-Webster.com ("playing games for stakes"); *Game*, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010) ("games of chance for money"); *Gaming*, CAMBRIDGE DICTIONARY OF AMERICAN ENGLISH (2d ed. 2008) ("industry in which people gamble by playing cards and other games in casinos"); *gaming contract*, CHAMBERS DICTIONARY (13th ed. 2014) ("a wager upon any game (eg a horse race or football match)"); *Gaming*, BOUVIER LAW DICTIONARY (2011 ed.) ("[a] contract to enter a game of skill or chance that one might win or lose"; parties "play a game with certain rules").

15

and federal statutes point the same way, as they routinely use "gaming" to refer to betting on games.[3]  Indeed, many States distinguish broader terms like "gambling" or "wagering" from the narrower, *game*-focused concept of "gaming."[4]  *Accord* Op.15.

An election is not a game.  It is not staged for entertainment or for sport.  And, unlike the outcome of a game, the outcome of an election carries vast extrinsic and economic consequences.  *See* Op.25.

The Commission again offers an entirely different understanding of what it means for a contract to "involve" the relevant activity.  Mot.14-15.  Rather than ask whether *a contract's event* involves "gaming," it asks whether *trading the contract amounts to* "gaming."  But this argument suffers from the same flaws as the CFTC's unlawful-activity theory.  For

---

[3] *See, e.g.*, 25 U.S.C. § 2703(6)-(8) (defining "gaming" classes in Indian Gaming Regulatory Act); Iowa Code § 725.7(1) ("illegal gaming" means "[p]articipat[ing] in a game for any sum"); Mass. Gen. Laws ch. 23K, § 2 ("gaming" is "dealing, operating, carrying on, conducting, maintaining or exposing any game for pay").

[4] *Compare* Colo. Rev. Stat. Ann. § 18-10-102 ("gambling"), *with id.* § 44-30-103(22) ("gaming"); *compare* Miss. Code Ann. § 97-33-1 ("wagering or betting"), *with id.* § 75-76-5(*l*) ("gaming"); *compare* N.M. Stat. Ann. § 30-19-2 ("gambling"), *with id.* § 60-2E-3 ("gaming"); *compare* N.Y. Penal Law § 225.00(2) (criminal "gambling"), *with* N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1301(19)-(20) ("gambling," "gaming," "game").

one, that reading of the statute is nonsensical as applied to the war, assassination, and terrorism categories. For another, if a contract counts as "gaming" whenever trading it would qualify as gambling under state-law definitions, the exception has again swallowed the rule. After all, anyone who trades an event contract, *by definition*, stakes money on a contingent event—which is a standard state-law definition of gambling. Op.16. Once again, such an interpretation "just cannot be right." Op.17.

Recognizing the problem, the CFTC tries to conjure a Goldilocks exception just broad enough to reach Kalshi's contracts, but just narrow enough not to swallow the rule. Specifically, the Commission asserts that "gaming" reaches betting on "games" *plus* "staking something of value on a *contest of others*"—but not wagers on other future events. Mot.16. But there is no reason why this contrived-for-litigation definition, with no dictionary, statutory, or other support, "should displace the plain and ordinary meaning of gaming." Op.17. Ultimately, "[t]he CFTC cannot have it both ways: it cannot synonymize gaming with gambling, but simultaneously argue that only some gambling is gaming." *Id.* This is transparent gerrymandering, not statutory interpretation.

The Commission tries to distract by citing news articles that refer to event contracts as "betting" or "gambling."  Mot.2 & n.2.  But the media regularly refer to all sorts of legitimate financial instruments in similar terms.  *E.g.*, Michael Mackenzie, *Bond Market's Bet on a Half-Point Fed Cut This Month Is Over*, BLOOMBERG (Sept. 11, 2024).  As Justice Holmes observed long ago, it is "extraordinary and unlikely" that "the great market for future sales" is "to be regarded as mere wagers."  *Bd. of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236, 249 (1905).

In the end, "definitions of 'gambling' that are untethered to the act of playing a game are much too broad" for this statute, which uses the word "gaming," not "gambling," in any event.  Op.15.  Kalshi's contracts are not contingent on a game, so they do not fall within this exception.

Congress could have listed *elections* as an activity that triggers public-interest review.  It did not.  And despite the CFTC's interpretive cartwheels, the Congressional Control Contracts do not involve "unlawful activity" or "gaming" any more than they involve "war," "assassination," or "terrorism."  Nor has the CFTC even tried to promulgate a regulation deeming elections to be "similar" to the enumerated activities.  Op.6 n.4. The District Court got this right, and this Court will likely affirm.

### B.    The CFTC Faces No Irreparable Harm and the Public Interest Strongly Disfavors a Stay.

Beyond success on the merits, the Commission must demonstrate that it "will be irreparably injured absent a stay," which in this context merges with the "public interest." *Nken*, 556 U.S. at 434-35. The Court must "test" a movant's alleged harms "for substantiality, likelihood of occurrence[,] and adequacy of proof." *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 977 (D.C. Cir. 1985). Thus, the CFTC cannot rest on "speculative and hypothetical" harms, *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 675 (D.C. Cir. 1985), or events that were "already" happening even before the lower court acted, *Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389, at \*2 (D.C. Cir. Dec. 22, 2017) (emphasis omitted).

The CFTC will not be harmed by the District Court's order pending this appeal, nor would a stay serve the public interest. Most importantly, Congress did not empower the Commission to prohibit event contracts on electoral outcomes. And "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021). "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F. 3d 1, 12 (D.C. Cir. 2016).

19

Ignoring that point, the Commission asserts that Kalshi's contracts will imperil American democracy by incentivizing misinformation or by using the markets themselves to distort electoral perceptions. Mot.19. But, as Judge Cobb found, election-prediction markets are "happening in an unregulated way" already. Tr.27:1-4. Indeed, PredictIt has operated for a decade, with reported volumes of hundreds of millions of dollars.[5] Polymarket is trading *nearly a billion dollars* in U.S. election-prediction markets *right now*—and is widely known to be used by U.S. traders, even if such uses are technically forbidden (Mot.10). *See* Lydia Beyoud & Sridhar Natarajan, *US Traders Flock to an Election-Betting Site They're Banned From*, BLOOMBERG (Aug. 1, 2024); *see also* www.polymarket.com.

The longstanding, continuing operation of other election-prediction markets means a stay would do nothing to advance the Commission's goals. Traders will continue to stake money on U.S. elections, and voters will continue to be exposed to predictive market data. The only difference is whether all of this will happen solely on *unregulated* exchanges, or

---

[5] The CFTC responds by pointing to Kalshi's higher position limits, but the limit it cites is only for large-scale institutional-type investors who have demonstrated a hedging need; the default position limit for an individual trader is $125,000. AR.32-33.

whether consumers will also have access to a transparent market that is subject to comprehensive regulation and CFTC oversight (including access to the identity of all traders), and that is limited to participation by U.S. persons, as Kalshi's exchange is (*contra* Mot.21). The CFTC tries to spin that fact by objecting that Kalshi has a "mantle of respectability." Mot.23. It is truly backwards to contend that shifting trading activity to a regulated market somehow *impairs* the public interest.

In addition, the longstanding existence of these election-prediction markets (and others around the world) makes the Commission's failure to identify any evidence of actual harm to election integrity very telling. The CFTC nevertheless demands deference to its "predictive" judgments (Tr.14:12), but whatever weight that may deserve in an arbitrary-and-capricious challenge, it cannot substitute for real evidence of harm in the context of a stay request.[6] More fundamentally, given the huge incentives that already exist in the political sphere and the vast sums of

---

[6] There are also good reasons to doubt the CFTC's predictive abilities. It told the District Court that suspending trading would be "disruptive," even a short period of trading would hurt election integrity, and it needed 14 days to decide on an appeal. Tr.8:12. In fact, trading went smoothly yesterday, was promptly suspended on entry of the administrative stay, and the CFTC filed its appeal and stay motion within five hours.

money spent on elections, the notion that a market in Kalshi's contracts would meaningfully increase the risk of election manipulation or voter misinformation (Mot.19) beggars belief. *Accord* AR.1429-31, 1448-49.

Of course, a trader in any derivative can try to manipulate short-term pricing by spreading falsehoods. But there is no reason to think (and every reason to doubt) that those attempts are likely to succeed, particularly on a robust, regulated exchange. Tellingly, the *only* example the CFTC offers concerns an attempted manipulation that *failed*. Mot.20 n.12. And that was on an *unregulated* exchange with no deterrent threat of CFTC enforcement action. The CFTC has thus cited zero evidence in the record of actual manipulation—despite active political event contract markets both in this country and abroad. Moreover, the CFTC regulates myriad derivatives markets involving a wide array of commodities, and regularly flexes its regulatory muscle by "supervis[ing] market activity and market participants" and "hold[ing] wrongdoers accountable by investigating and prosecuting violations of the CEA." CFTC, *Holding Wrongdoers Accountable*. It has ample authority to enforce the CEA against fraudsters and manipulators. *See* 7 U.S.C. §§ 6b, 6c, 9(c), 13; 17 C.F.R. §§ 180.1-180.2. The agency can use the same tools here.

For these reasons, a stay would actually *impair* the public interest. As academics, investors, former CFTC officials, human-rights activists, businesses, and nonprofits have all explained, these contracts carry great economic and informational value.[7]  A stay would deprive the public of this valuable resource, while perpetuating the dominance of unregulated entities open to foreign actors.  That public-interest consideration is a further strike against the extraordinary relief the Commission seeks.

## C.    Granting a Stay Would Irreparably Harm Kalshi.

Kalshi would suffer substantial—indeed, irreparable—harm from a stay.  Financial harm is "irreparable where no adequate compensatory or other corrective relief will be available at a later date."  *In re NTE Conn.*, 26 F.4th at 990-91 (cleaned up).  And "economic injury caused by federal agency action is" necessarily "unrecoverable because the APA's waiver of sovereign immunity does not extend to damages claims."  *D.C. v. Dep't of Agric.*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020).  Here, Kalshi faces harms that, as Judge Cobb found, the CFTC has not "rebutted."  Tr.27:26.

---

[7] *See, e.g.*, AR.1312-23, 1348, 1375-76, 1378-79, 1380-82, 1386-87, 1388-1403, 1404-05, 1413-41, 1443-45, 1448-53, 1474-75, 1477-81, 1527-29, 1532, 1533, 1537-38, 1539-40, 1541-45, 1549-52, 1555-57, 1558-60, 1573-78, 1584-85, 1590–91, 1597, 1602, 1613, 1616-23, 1744, 1745-46, 2277-345, 2991-93, 3367.

*First*, a stay will deny Kalshi significant revenue derived from trading these contracts. Indeed, a stay would strip the Congressional Control Contracts of any value derived from the current election cycle—which will be over long before this appeal concludes. In effect, a stay would allow the CFTC to win in practice even though it lost in court.

*Second*, a stay would preclude Kalshi from recouping the millions of dollars it invested in developing and marketing these contracts. Mansour Decl. ¶ 8. Kalshi was willing to take those risks because it was confident a court would conclude that its contracts are consistent with the law. Now that the District Court has vindicated that view, it would be perverse to block Kalshi from recovery of its investment.

*Third*, while Kalshi has worked to vindicate its rights in court, it has watched unregulated competitors like Polymarket accrue market share at Kalshi's expense. *See* Sean Carter, *From Presidential Races to Popcorn Flicks: How Polymarket Predicts the Future*, FORBES (July 25, 2024) (noting that "more than $380 million in bets have been placed on the outcome of the U.S. presidential election alone" on Polymarket). A stay would perpetuate that harm, irreparably damaging Kalshi's ability to carve out a competitive niche. *See* Mansour Decl. ¶ 9.

24

## CONCLUSION

The District Court reached a considered judgment that is correct on the merits. The CFTC cannot explain (beyond unfounded speculation) why it or the public would suffer cognizable irreparable harm without a stay. These factors "strongly" weigh against any stay, as Judge Cobb rightly found. Tr.27:25. By contrast, a stay would impair Kalshi's now-vindicated interests, inflict irreparable injuries, deprive the public of the ability to trade these lawful contracts on a regulated exchange, and likely moot the contracts for the 2024 election cycle. For all these reasons, the Commission has not carried its burden of proving entitlement to this "extraordinary" remedy. *CREW*, 904 F.3d at 1019. This Court should therefore deny the Commission's motion for a stay pending appeal.

Dated: September 13, 2024

Joshua B. Sterling
MILBANK LLP
1850 K St. N.W.
Washington, DC 20006
(202) 835-7537

Respectfully submitted,

/s/ *Yaakov M. Roth*
Yaakov M. Roth
John Henry Thompson
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
(202) 879-3939

Amanda K. Rice
JONES DAY
150 W. Jefferson Avenue,
Suite 2100
Detroit, MI 48226
(313) 733-3939

Samuel V. Lioi
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
(216) 586-3939

*Counsel for Plaintiff*
*KalshiEx LLC*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to Circuit Rule 27(a)(4), counsel for Kalshi certifies as follows:

**A.    Parties**

All parties, intervenors, and *amici* appearing before the district court and in this court are listed in the Motion of Defendant-Appellant.

**B.    Rulings Under Review**

References to the rulings at issue appear in the Motion of Defendant-Appellant.

**C.    Related Cases**

Related cases are listed in the Motion of Defendant-Appellant.


September 13, 2024                              */s/ Yaakov M. Roth*
                                               Yaakov M. Roth

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, KalshiEx LLC makes the following disclosures:

KalshiEx LLC is a limited liability corporation organized under the laws of Delaware with its principal place of business in New York. KalshiEx LLC's parent organization (and the only company that owns ten percent or more of its stock) is Kalshi Inc.

September 13, 2024                                    /s/ *Yaakov M. Roth*
                                                       YAAKOV M. ROTH

28

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 5133 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted using the word-count function on Microsoft Word software.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook Std font.

September 13, 2024                    */s/ Yaakov M. Roth*
                                     YAAKOV M. ROTH

29

## CERTIFICATE OF SERVICE

I hereby certify that, on this 13th day of September, 2024, I electronically filed the original of the foregoing document with the clerk of this Court by using the CM/ECF system, which will serve the counsel for all parties at their designated electronic mail addresses.


September 13, 2023                                     */s/ Yaakov M. Roth*
                                                      YAAKOV M. ROTH