# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 19, 2024        Decided October 2, 2024

No. 24-5205

KALSHIEX LLC,
APPELLEE

v.

COMMODITY FUTURES TRADING COMMISSION,
APPELLANT

———

On Emergency Motion for Stay Pending Appeal and
Immediate Interim Relief
(No. 1:23-cv-03257)

———

*Robert A. Schwartz*, General Counsel, U.S. Commodity
Futures Trading Commission, argued the cause for appellant.
With him on the emergency motion for stay pending appeal and
immediate interim relief and the reply was *Anne W. Stukes*,
Deputy General Counsel.

*Yaakov M. Roth* argued the cause for appellee. With him
on the opposition to the emergency motion for stay pending
appeal and immediate interim relief were *Joshua B. Sterling*,
*John Henry Thompson*, and *Amanda K. Rice.*

Before: MILLETT, PILLARD, and PAN, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:  KalshiEx LLC, a commodities exchange regulated by the Commodity Futures Trading Commission, seeks to offer "Congressional Control Contracts" that would allow persons within the United States to place money on the outcome of the November 2024 congressional elections.  The Commission prohibited Kalshi from listing the Congressional Control Contracts on its regulated exchange on the ground that they amount to gaming or election gambling, which many States outlaw.     Kalshi challenged that determination in federal court under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C).  The district court found that the Commission erred in categorizing the Congressional Control Contracts as involving either gaming or gambling and vacated its decision.  The Commission now seeks a stay of the district court's judgment while it pursues an appeal.  Because the Commission has failed at this time to demonstrate that it or the public will be irreparably injured absent a stay, we deny its motion without prejudice to renewal should more concrete evidence of irreparable harm develop during the pendency of this appeal.

I

A

The Commodity Futures Trading Commission ("Commission" or "CFTC") is an independent federal agency charged under the Commodity Exchange Act with regulating derivative markets.  7 U.S.C. § 2(a).[1]  This case concerns a

---

[1]  A derivative is a "financial instrument" or contract, such as a future, option, or swap, the price of which is "directly dependent

3

subset of derivative contracts known as "event contracts." An event contract is a derivative contract for which the "payoff is based on a specified event, occurrence, or value"—for example, the level of snowfall from a certain storm or the dollar amount of hurricane damage. CFTC, *Contracts & Products: Event Contracts*, https://perma.cc/4FPT-L2SN. Businesses and individuals can use event contracts to hedge against economic risk. *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 23-cv-3257 (JMC), 2024 WL 4164694, at *2 (D.D.C. Sept. 12, 2024). For example, a beachfront property owner might purchase an event contract predicting that a hurricane will reach landfall in her area to offset the risk of losing rental income from the storm. *Id.*

Under the Commodity Exchange Act, only federally regulated exchanges, known as "Designated Contract Markets" ("Designated Markets"), can offer event contracts. 7 U.S.C. §§ 2(e), 7a-2(c)(5)(C)(i); *see also* 7 U.S.C. § 1a(19)(iv). Designated Markets can self-certify to the Commission that the contracts comply with the Commodity Exchange Act and the Commission's regulations and start trading the contracts the following business day. 7 U.S.C. § 7a-2(c)(1), 17 C.F.R. § 40.2.

However, the Commodity Exchange Act includes a "Special Rule" under which the Commission can review and prohibit specific types of event contracts if it determines those contracts are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule provides:

---

upon (i.e. derived from) the value of one or more underlying securities, equity indices, debt instruments, commodities, other derivative instruments, or any agreed upon pricing index or arrangement[.]" CFTC, *Futures Glossary: A Guide to the Language of the Futures Industry*, https://perma.cc/4V5S-8P5H.

4

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency * * * by a designated contract market * * *, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

(I) activity that is unlawful under any Federal or State law;
(II) terrorism;
(III) assassination;
(IV) war;
(V) gaming; or
(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Id.*

By regulation, the Commission has 90 days to determine whether to prohibit a Designated Market's proposed event contract under the Special Rule.  17 C.F.R. § 40.11(c).  During this review, the Designated Market cannot list or trade the contract.  17 C.F.R. § 40.11(c)(1).

**B**

On June 12, 2023, Kalshi submitted to the Commission a self-certification for event contracts it termed "Congressional Control Contracts."  Kalshi Opp. at 6; *see* J.A. 26.  These contracts allow buyers to put down money based on a prediction as to which political party will control the U.S. House of Representatives or Senate on a future specified date.

5

They are "yes/no" contracts that pose the question: "Will <chamber of Congress> be controlled by <party> for <term>?" J.A. 26.

Kalshi is not the first company to invite individuals and entities to lay down money based on electoral prognostications. In 1993 and again in 2014, the Commission issued "No Action" letters to two non-profit exchanges run by academic institutions—the Iowa Electronic Markets operated by the University of Iowa and PredictIt operated by the Victoria University of Wellington—that offer contracts tied, among other things, to election outcomes in the United States. Letter from Vincent McGonagle, Dir., Div. of Market Oversight, U.S. Commodity Futures Trading Comm'n, to Neil Quigley, Deputy Vice-Chancellor, Rsch., Victoria Univ. of Wellington (Oct. 29, 2014), https://perma.cc/YD43-UPX4. These exchanges limit the number of users in each election market to 2,000 (Iowa Electronic Markets) and 5,000 (PredictIt) and cap individual investments at $500 (Iowa Electronic Markets) and $850 (PredictIt). *Id.*; J.A. 164, 505. A third exchange, Polymarket, which became operational in 2020, also offers political contracts, but it never registered as a Designated Market with the Commission. J.A. 506. In a settlement the Commission announced in January 2022, Polymarket agreed to pay a civil penalty of $1.4 million and to restrict its contracts to non-U.S. investors. J.A. 506. Whether Polymarket has complied with the latter limitation is in question. Kalshi Opp. at 3; Commission Reply at 12–13.

On the record before us, Kalshi's Congressional Control Contracts would be materially different in multiple ways. To start, Kalshi's contracts would be the first election-event contracts offered on a licensed commodities exchange, subject to the regulatory supervision of the Commission. In addition, while Kalshi says it would allow only United States persons to

6

invest, the Commission worries that the contracts could be used by foreign persons or governments directly or indirectly to manipulate the election-contract market. Commission Mot. at 21; Kalshi Opp. at 21. Lastly, while PredictIt and Iowa Electronic Markets limit both the number of investors and the amount they can spend, Kalshi places no cap on the number of investors and would allow individuals and entities to invest, in some cases, up to $100 million per contract. J.A. 33–35.

On June 23, 2023, the Commission commenced a 90-day review of the Congressional Control Contracts and requested that Kalshi suspend trading on the contracts during that period. J.A. 145. That same day, the Commission opened a 30-day public comment period on the proposed contracts. J.A. 146–149. On September 22, 2023, the Commission issued a final order prohibiting Kalshi from listing the contracts. J.A. 23.

The Commission grounded its decision on four findings. First, it determined that, by using the word "involve" in the Special Rule, Congress intended to capture both contracts whose underlying event is one of the enumerated categories (*i.e.*, terrorism, assassination, or war) and contracts with a "different connection" to the enumerated activities "because, for example, they 'relate closely' to, 'entail,' or 'have as an essential feature or consequence' one of the enumerated activities." J.A. 7. Second, the Commission determined the Congressional Control Contracts involved "gaming," within the meaning of the Special Rule, because that term "includes betting or wagering on elections[.]" J.A. 8. Third, the Commission found the contracts were unlawful under state law because many States prohibit betting or wagering on elections. J.A. 11–12. Finally, the Commission determined the contracts were not in the public interest for two reasons. One, they were unlikely to be used for commercial-risk "hedging" or "price basing"—the "public interest[s] that transactions subject to the

7

C[ommodity] E[xchange] A[ct] are intended to serve." J.A. 14. Two, the contracts could threaten election integrity by, for example, creating monetary incentives for voters to support particular candidates or incentivizing the spread of misinformation. J.A. 20.

### C

In November 2023, Kalshi filed suit in federal court challenging the Commission's final order as arbitrary and capricious, contrary to law, and in excess of the Commission's authority under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C). *See KalshiEx*, 2024 WL 4164694, at *6. Kalshi objected to the Commission's reading of the words "involve," "gaming," and "activity that is unlawful under any * * * State law" in the Special Rule and alleged that the Commission's public interest determination was unreasonable. Kalshi Complaint ¶¶ 88–91.

The district court subsequently granted Kalshi's motion for summary judgment. *KalshiEx*, 2024 WL 4164694, at *13. The court reasoned that, within the meaning of the Special Rule, "gaming" must refer to the "act of playing a game" or "playing games for stakes." *Id.* at *8, 10. Because elections are not games, the court concluded that the category does not apply to election contracts. *Id.* at *8–10. The district court also ruled that the term "involve" refers to the "event being offered and traded" under a contract, not the contract itself. *Id.* at *13. Thus, because the underlying events in the Congressional Control Contracts—"elections, politics, Congress, and party control"—are not themselves unlawful under state law, the contracts did not "involve" "illegal or unlawful activity." *Id.*

The district court entered a brief administrative stay, and then denied the Commission's motion for a stay pending appeal

8

on September 12, 2024.  The Commission promptly appealed to this court.  That same day, Kalshi listed its Congressional Control Contracts, and they traded for approximately eight hours, Kalshi Opp. at 8, until this court granted an administrative stay to consider the Commission's motion for a stay pending appeal.

## II

A stay pending appeal is an "extraordinary" remedy. *Citizens for Resp. & Ethics in Washington v. Federal Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam). To obtain such exceptional relief, the stay applicant must (1) make a "strong showing that [it] is likely to succeed on the merits"; (2) demonstrate that it will be "irreparably injured" before the appeal concludes; (3) show that issuing a stay will not "substantially injure the other parties interested in the proceeding"; and (4) establish that "the public interest" favors a stay.  *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

## III

While the question on the merits is close and difficult, the Commission cannot obtain a stay at this time because it has not demonstrated that it or the public will be irreparably harmed while its appeal is heard.  That failure is fatal to the Commission's stay request because a showing of irreparable harm is a necessary prerequisite for a stay.  *See Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("We believe that analysis of the second factor disposes of the[] [stay] motions and, therefore, address only whether the petitioners have demonstrated that in the absence of a stay, they will suffer irreparable harm."); *cf. Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's

9

failure to show any irreparable harm is [] grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").

The Commission broadly claims that irreparable harm will occur because Congressional Control Contracts "could potentially be used in ways that would have an adverse effect on the integrity of elections, or the perception of integrity of elections[.]" J.A. 20; *see also* Commission Mot. at 19. The Commission marshals five more specific harms it anticipates, but none amounts to irreparable injury at this time. Several are not cognizable harms. The other concerns, if realized, certainly could hurt the public interest. But the Commission has failed to demonstrate that those harms are likely to occur. That falls short of the mark because "[i]rreparable harm must be 'both certain and great[,]' and 'actual and not theoretical.'" *Citizens for Resp. & Ethics in Washington*, 904 F.3d at 1019 (quoting *Wisconsin Gas Co.*, 758 F.2d at 674).

*First*, according to the Commission, Congressional Control Contracts would "create monetary incentives to vote (including as an organized collective) for particular candidates," Commission Mot. at 19, "even when such votes may be contrary to a voter's * * * preferences[,]" J.A. 20. Paying someone to vote is, of course, illegal. *See, e.g.*, 18 U.S.C. § 597. But the Commission's concern is different—it worries that voters might develop a financial motivation to vote. Yet voters already commonly consider their own financial interests when voting, whether based on business interests or family economics. The Commission has made no showing that allowing voters to hedge against an electoral outcome that they believe would be contrary to their financial interests would have any untoward impact on voting decisions. Nor has the Commission explained why it lacks such evidence, even though unregistered markets like Iowa Electronic

10

Markets, PredictIt, and Polymarket have allowed individuals to place money on election outcomes for decades.

*Second*, the Commission claims that markets for Congressional Control Contracts could "incentivize the spread of misinformation by individuals or groups seeking to influence perceptions of a political party or a party candidate's success." J.A. 20. In particular, the Commission points to the phenomenon of "fake poll[s]." Commission Reply at 10. The Commission then offers a single example: In July 2017, the firm Delphi Analytica created an apparently fake poll that showed the musician Kid Rock leading Senator Debbie Stabenow 30 percent to 26 percent in the November 2018 U.S. Senate election in Michigan. *Id.*; *see also* Tyler Yeargain, *Fake Polls, Real Consequences: The Rise of Fake Polls and the Case for Criminal Liability*, 85 MO. L. REV. 129, 133 (2020). The day the poll issued, Senator Stabenow's "stock" price on PredictIt dropped from 78 cents to 63 cents, and ended at 70 cents. Yeargain, *supra*, at 133–134. This, the Commission claims, shows that "market manipulation" is "not mere speculation[.]" Commission Reply at 10.

But that example does not hold up to scrutiny. For starters, "falsified polling is nothing new." Yeargain, *supra*, at 140. In 2009 and 2010, companies released what experts considered to be fraudulent polls, but neither the article nor the Commission suggests those companies did so to manipulate election-betting markets. *Id.* Furthermore, "the long-term effect of the Michigan poll was virtually undetectable" because Kid Rock opted not to run and Senator Stabenow won reelection. *Id.* at 134. Perhaps the Commission will amass more evidence substantiating its fears about election outcomes, but, on the evidence provided to this court, those fears—as yet—"fail to rise beyond the speculative level." *Citizens for Resp. & Ethics in Washington*, 904 F.3d at 1019; *see also Committee in*

11

*Solidarity With People of El Salvador v. Sessions*, 929 F.2d 742, 745–46 (D.C. Cir. 1991) ("Injunctions * * * will not issue to prevent injuries neither extant nor presently threatened, but only merely feared.") (formatting modified).

In that regard, if the Commission felt the risks of election contracts were as concrete and pressing as it argues here, it has long had—and still has—the power to forbid them on the exchanges it regulates. Specifically, the Special Rule empowers the Commission to find through a formal rule or notice-and-comment rulemaking that certain types of event contracts—such as election contracts—are "contrary to the public interest" and to forbid them. 7 U.S.C. § 7a-2(c)(5)(C)(i)(VI).[2] Yet in the seven years since the fake Kid Rock poll was used, the Commission has not invoked the very tool Congress gave it to head off such harms.

*Third*, and relatedly, the Commission claims that the absence of reliable benchmarks for election-contract markets "may increase the risk of manipulative [market] activity." J.A. 21. According to the Commission, the "vast majority of commodities underlying Commission-regulated derivatives contracts" have reliable informational sources—for example, "government issued crop forecasts, weather forecasts, federal government economic data * * * [and] market-based interest rate curves[.]" J.A. 21. By contrast, the Commission argues, "unregulated" and "opaque" information sources like polls and voter surveys will supply the relevant information sources for Congressional Control Contracts. J.A. 21. The lack of reliable forecasts, the Commission claims, may make election-contract markets more susceptible to bad actors' manipulation with fake

---

[2]  "[T]he Commission may determine * * * by rule or regulation" that activities "similar" to the other listed categories are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i)(VI).

12

polls or misinformation, while simultaneously decreasing the Commission's ability to detect such manipulation.  J.A. 21.

The Commission does not spell out this conclusion, but its theory seems to be that, while profit may be the primary goal of these election-contract purchasers, a byproduct will be misinformation about the upcoming elections.  The Commission might be right.  But Kalshi insists just the opposite.  According to Kalshi, election-contract markets provide "real-time and accurate data that traditional polls often cannot replicate."  *Kalshi Opp.* at 4; *see also* J.A. 233 ("[I]nformational models that require contributors to have 'skin in the game' when opining or contributing to public discussion [are] a great way to disincentivize the propagation of misinformation.").  Whatever the case, "simply showing some 'possibility of irreparable injury'"—that it "may" occur, J.A. 21—is not enough.  *Nken*, 556 U.S at 434 (citation omitted).

More to the point, the Commission has not explained why traditional tools for regulating market manipulation will not work in the election-contract context.  For example, the Commission can serve subpoenas, call witnesses, and hold hearings to investigate whether someone is manipulating an event contract.  7 U.S.C. § 9.  And manipulating or attempting to manipulate the price of a commodity is a felony under federal law.  7 U.S.C. § 13(a).  In addition, the Commission does not point to any pattern of unregulated market manipulation in the existing markets for election contracts.  Plus Kalshi has introduced evidence that other political topics—such as the prospect of particular legislation passing or the federal government shutting down—have been the subject of event contracts on licensed exchanges.  J.A. 245.  Those events also lack established benchmarks for predictions, and yet the Commission has not shown they have proven more susceptible to market abuse.

13

*Fourth*, on the Commission's telling, individuals might trade in Congressional Control Contracts or engage in activity that influences the election-contract market to "create the impression of likely electoral success or failure" for certain candidates. J.A. 22. The Commission hypothesizes several such examples. One, paid employees of political campaigns or polling organizations, though prohibited from trading in Congressional Control Contracts, may engage in outside "activity" intended to "artificially move" those markets. J.A. 22. Two, foreign investors may bypass Kalshi's restrictions on foreign investment and use Congressional Control Contracts to influence elections. Commission Mot. at 21. Three, individuals or entities not excluded from trading—such as congressional campaign volunteers, consultants, or donors— might buy and sell contracts to change the perception of candidates' likelihood of success. J.A. 22. In addition, the Commission points to comment letters it received during its review of Kalshi's contract, including letters submitted by a number of U.S. Senators, that oppose the trading of election-contracts on regulated exchanges. *See* J.A. 681–683.

Ensuring the integrity of elections and avoiding improper interference and misinformation are undoubtedly paramount public interests, and a substantiated risk of distorting the electoral process would amount to irreparable harm. The problem is that the Commission has given this court no concrete basis to conclude that event contracts would likely be a vehicle for such harms. The Commission cites to only one example where a trader on an unregulated (and now-suspended) exchange placed large bids on Mitt Romney to win the 2012 presidential election. Commission Reply at 10. It is "conceivable" the trader did so to "manipulate beliefs about the odds of victory in an attempt to influence fundraising, campaign morale, voter preferences, and turnout." David M.

14

Rothschild *et al.*, *Trading Strategies and Market Microstructure: Evidence from a Prediction Market*, THE JOURNAL OF PREDICTION MARKETS, Nov. 22, 2015, at 22. But the trader fell short because the attempted manipulation was easily detected by market investors. *Id.* at 23. And the Commission's speculation about that trader's "conceivable" motivations is, at bottom, an "unsubstantiated and speculative" theory. *Wisconsin Gas Co.*, 758 F.2d at 674. Notably, the Commission offers no other evidence that such market machinations have happened over the last 36 years in which *unregulated* markets have offered election contracts.

*Finally*, the Commission claims that, as the "regulator of the markets in [Congressional Control] [C]ontracts, [it] would be required to investigate suspected manipulation in those markets"—a job it is ill-suited to perform and that "misalign[s]" with its "historic mission and mandate[.]" J.A. 22–23. Though the Commission would be *authorized* to investigate suspected manipulation, it could also draw on the expertise of other federal agencies or refer suspected violations to those agencies. *See, e.g.*, Federal Election Commission, *Enforcing Federal Campaign Finance Law* ("[O]ther government agencies [may] refer possible violations to the FEC."), https://perma.cc/K8NJ-TNPF. In any event, the Commission's generalized worries about investigative challenges, without more, do not amount to irreparable harm.

\* \* \* \* \*

In short, the concerns voiced by the Commission are understandable given the uncertain effects that Congressional Control Contracts will have on our elections, which are the very linchpin of our democracy. But whether the statutory text allows the Commission to bar such event contracts is debatable, and the Commission has not substantiated that risks to election

15

integrity are likely to materialize if Kalshi is allowed to operate
its exchange during the pendency of this appeal.  At this point,
in other words, the Commission has failed to make the essential
showing of irreparable harm.

But such a showing is not out of reach.  For example,
political campaigns or their proxies encouraging supporters to
purchase Congressional Control Contracts could constitute
evidence that the contracts harm election integrity or that
manipulation is underway.  Foreign investors bypassing
Kalshi's restrictions on foreign traders, just as Kalshi claims
U.S. investors are doing on Polymarket, could substantiate the
Commission's concerns about harmful interference.  *See*
Kalshi Opp. at 20.  Or evidence emerging that election-contract
markets confuse American voters about the strength or viability
of certain candidates might also satisfy the Commission's
burden.  Other evidence of harms could also emerge.  Because
the Commission may (or may not) identify cognizable harms
going forward, this ruling is without prejudice to the
Commission's renewal of its stay request during the pendency
of this appeal.

## IV

The Commission has failed to demonstrate that it or the
public will suffer irreparable injury absent a stay pending
appeal, and therefore its motion for a stay is denied without
prejudice to renewal should substantiating evidence arise.  The
administrative stay is hereby dissolved.

*So ordered*.