ORAL ARGUMENT REQUESTED
No. 24-5205

## United States Court of Appeals
### For the District of Columbia Circuit

_____

KALSHIEX LLC,

Appellee,

v.

U.S. COMMODITY FUTURES TRADING COMMISSION,

Appellant.

On Appeal from the U.S. District Court
for the District of Columbia
Case No. 1:23-cv-03257-JMC (Hon. Jia M. Cobb)

## APPELLANT'S BRIEF

Robert A. Schwartz
*General Counsel*
Anne W. Stukes
*Deputy General Counsel*
Raagnee Beri
Margaret P. Aisenbrey
*Senior Assistant General Counsels*
Conor B. Daly
*Counsel*
**U.S. COMMODITY FUTURES
TRADING COMMISSION**
1155 21st Street, N.W.
Washington, D.C. 20581-0001
Phone: (202) 418-5986
Email: maisenbrey@cftc.gov

October 16, 2024

## CERTIFICATION AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellant U.S. Commodity Futures Trading Commission states as follows:

**(A) Parties and Amici**

The parties in this case are KalshiEx LLC and the U.S. Commodity Futures Trading Commission.

No entities have yet indicated an intention to submit a brief as amicus curiae in this Court.

Before the district court, the following submitted briefs as amicus curiae: Aristotle International, Inc., Better Markets, Inc., Jeremy D. Weinstein, Joseph A. Grundfest, and Paradigm Operations LP.

**(B) Rulings under Review**

The U.S. Commodity Futures Trading Commission seeks review of the district court's order issued September 6, 2024, and memorandum opinion issued September 12, 2024, in *KalshiEx LLC v. CFTC*, No. 23-cv-03257 (D.D.C.). The September 6, 2024 order can be found in the Joint Appendix at APP. 92 and the memorandum opinion at APP. 93.

**(C) Related Cases**

There are no cases related to this appeal.

# TABLE OF CONTENTS

CERTIFICATION AS TO PARTIES, RULINGS, AND RELATED CASES ............i

GLOSSARY ............................................................................... xii

INTRODUCTION .......................................................................1

STATEMENT OF JURISDICTION ...........................................3

STATEMENT OF THE ISSUES ................................................4

STATUTORY AND REGULATORY BACKGROUND ............................4

    A. Brief Introduction to the CFTC, the Commodity Exchange Act, and
       Derivatives ....................................................................4

    B. The Public Interest in Regulated Derivatives Markets: Hedging and Price
       Basing ........................................................................7

    C. The CEA's "Special Rule" for Certain Event Contracts..................9

    D. Prior Application of the "Special Rule" to Political Event Contracts ...........11

PROCEDURAL BACKGROUND .........................................................12

    A. Proceedings before the Commission ............................................12

    B. Proceedings in the District Court................................................20

STANDARD OF REVIEW ................................................................23

SUMMARY OF THE ARGUMENT .....................................................24

ARGUMENT .............................................................................28

    A. "Involve" has broad meaning and interacts with more than
       the instrument's underlying event ...............................................28

    1. The plain meaning of the statutory text is that the Special Rule applies when any aspect of the agreement, contract, transaction, or swap involves an enumerated activity ..............................................28

    2. The district court erroneously rejected the statutory text based on the "consistent usage" canon ....................................................31

    3. "Transactions" should be construed to mean transactions. ......................34

        a. The plain meaning of transactions supports the Commission's reading ..........................................................................34

        b. The reading of the word "listed" in Section 5c(c)(5)(C) and "transactions involving" elsewhere in the CEA does not support reading "transaction" as the contract....................................37

B. Gaming includes wagering on contests ........................................38

    1. The ordinary meaning of gaming does not require a game......................39

    2. The legislative history supports the Commission's interpretation ..........42

    3. The Commission did not adopt a wide-ranging definition of gaming, nor was it required to for purposes of this informal adjudication .................43

    4. The structure of the statute and the legislative history support that gaming is broader than "games" ...........................................46

    5. The gaming definition does not turn on economic consequences or state law exceptions for bona fide transactions .................................48

C. The Contracts are properly understood to be "unlawful under…State law."...............................................................51

    1. The Commission did not read "unlawful under any state law" to include state laws that would operate to outlaw all event contracts ........51

    2. The text of the "unlawful" category is broad and reaches laws that are not preempted by the CEA ...............................................52

    3. The Commission focused on state interests that were separate from trading in derivatives markets ...............................................54

    4. The statutory context and structure support the Commission's reading of the "unlawful" category ........................................55

CONCLUSION .......................................................................57

# TABLE OF AUTHORITIES

Cases

*Ali v. Federal Bureau of Prisons*,
  552 U.S. 214 (2008).......................................................................53

*All Party Parliamentary Group on Extraordinary Rendition v. DOD*
  754 F.3d 1047 (D.C. Cir. 2014) ...................................................40

*Building Owners & Managers Association International v. FCC*,
  254 F.3d 89 (D.C. Cir. 2001)........................................................46

*Bostock v. Clayton County*,
  590 U.S. 644 (2000).......................................................................48

*Clark v. Martinez*,
  543 U.S. 371 (2005)............................................................32, 33, 34

*CFTC v. McAfee,* No. 21-cv-1919 (JGK),
  2022 WL 3969757 (S.D.N.Y. July 14, 2022)................................6

*CFTC v. Xie*, No. 23-cv-01947,
  2023 WL 8532325 (N.D. Ill. Sept. 26, 2023) ...............................6

*Confederated Tribes of Grand Ronde Community of Oregon v. Jewell*,
  830 F.3d 552 (D.C. Cir. 2016).......................................................23

*Connecticut National Bank v. Germain*,
  503 U.S. 249 (1992).......................................................................28

*Consumer Electricians Association v. FCC*,
  347 F.3d 291 (D.C. Cir. 2003)......................................................47

*Dubin v. United States*,
  599 U.S. 110 (2023).......................................................................45

*Fink v. Time Warner Cable*,
  810 F. Supp. 2d 633 (S.D.N.Y. 2011) ..........................................44

*Fox v. Clinton*,
　684 F.3d 67 (D.C. Cir. 2012)..............................................................23

*Holland v. National Mining Association*,
　309 F.3d 808 (D.C. Cir. 2002)..........................................................24

*Kawashima v. Holder*,
　565 U.S. 478 (2012)............................................................................33

*Leist v. Simplot*,
　638 F.2d 283 (2d Cir. 1980) .............................................................52

*Loper Bright Enterprises v. Raimondo*,
　144 S. Ct. 2244 (2024)...........................................................24, 28, 49

*Loving v. IRS*,
　742 F.3d 1013 (D.C. Cir. 2014) .......................................................56

*Michigan v. Bay Mills Indian Community*,
　572 U.S. 782 (2014)............................................................................41

*National Association of Manufacturers v. DOD*,
　583 U.S. 109 (2018)............................................................................28

*National Cable & Telecommunications Association v. FCC*,
　567 F.3d 659 (D.C. Cir. 2009)..........................................................45

*New York v. FERC*,
　535 U.S. 1 (2002)................................................................................47

*Oncale v. Sundowner Offshore Services, Inc.*,
　523 U.S. 75 (1998)..............................................................................47

*Pinson v. DOJ*,
　964 F.3d 65 (D.C. Cir. 2020).............................................................35

*Pulsifer v. United States*,
　601 U.S. 124 (2024)............................................................................32

*Pfizer, Inc. v. Government of India*,
　434 U.S. 308 (1978)............................................................................40

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ........................................................45

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ........................................................44

\* *Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ....................................................24, 49

*Southwest Airlines Co. v. Saxon*,
   596 U.S. 450 (2022) ........................................................29

*Stoiber v. SEC*,
   161 F.3d 745 (D.C. Cir. 1998) ......................................24

*Strothers v. City of Laurel*,
   895 F.3d 317 (4th Cir. 2018) ........................................44

\* *Taniguchi v. Kan Pacific Saipan, Ltd.*,
   566 U.S. 560 (2012) ..................................................29, 35

*United States v. Alexander*,
   331 F.3d 116 (D.C. Cir. 2003) ......................................29

*United States v. King*,
   325 F.3d 110 (2d Cir. 2003) ......................................29, 33

*United States v. McKenney*,
   450 F.3d 39 (1st Cir. 2006) ..........................................29

*United States v. Simpkins*,
   826 F.2d 94 (D.C. Cir. 1987) ........................................45

*United States v. Williams*,
   931 F.3d 570 (7th Cir. 2019) ........................................29

*United States v. Woods*,
   571 U.S. 31 (2013) ..........................................................35

*United States ex rel. Polansky v. Executive Health Resources, Inc.*,
   599 U.S. 419 (2023) ........................................................34

U.S. Code

Title 5
    Section 706(2)(A) ...................................................................................23

Title 7
    Section 1a(15), CEA Section 1a(15)..............................................................5
    Section 1a(19), CEA Section 1a(19)............................................................10
    Section 1a(47), CEA Section 1a(47 ............................................................12
    Section 2(a)(1), CEA Section 2(a)(1) ..........................................................52
    Section 2(a)(1)(A), CEA Section 2(a)(1)(A) ...............................................37
    Section 2(a)(1)(C)(i)(I), CEA Section 2(a)(1)(C)(i)(I) ................................30
    Section 2(a)(1)(C)(i)(II), CEA Section 2(a)(1)(C)(i)(II) .............................38
    Section 2(a)(1)(C)(ii), CEA Section 2(a)(1)(C)(ii) .....................................38
    Section 2(a)(1)(C)(iv), CEA Section 2(a)(1)(C)(iv) ...................................30
    Section 2(a)(1)(D)(i), CEA Section 2(a)(1)(D)(i)........................................37
    Section 2(c)(2)(B)(iii), CEA Section 2(c)(2)(B)(iii) ...................................35
    Section 2(e), CEA Section 2(e).....................................................................6
    Section 2(h)(8), CEA Section 2(h)(8)..........................................................38
    Section 4c(b), CEA Section 4c(b).................................................................56
    Section 5, CEA Section 3 ...............................................................................7
    Section 5(a), CEA Section 3(a).....................................................................36
    Section 6, CEA Section 4 ...............................................................................6
    Section 6a, CEA Section 4a ..........................................................................36
    Section 6a(a)(4)(A), CEA Section 4a(a)(4)(A)............................................30
    Section 6b, CEA Section 4b ..........................................................................36
    Section 6c(b), CEA Section 4c(b)............................................................6, 37
    Section 6c(c), CEA Section 4c(c).................................................................38
    Section 6c(d)(2)(A)(i), CEA Section 4c(d)(2)(A)(i).....................................30
    Section 6g, CEA Section 4g..........................................................................36
    Section 7a-2(c), CEA Section 5c(c).........................................................8, 56
    Section 7a-2(c)(1), CEA Section 5c(c)(1)......................................................9
    Section 7a-2(c)(4), CEA Section 5c(c)(4)....................................................10
    Section 7a-2(c)(5), CEA Section 5c(c)(5).................................................9, 56
    * Section7a-2(c)(5)(C), CEA Section 5c(c)(5)(C) ...................1, 9, 11, 30
    Section 7a-2(c)(5)(C)(i), CEA Section 5c(c)(5)(C)(i) .................10, 28, 29, 33, 54

Section 7a-2(c)(5)(C)(i)(V), CEA Section 5c(c)(5)(C)(i)(V) ..............................30

Section 7a-2(c)(5)(C)(ii), CEA Section 5c(c)(5)(C)(ii) ..................................11, 54

Section 7(d), CEA Section 5d .................................................................................7

Section 7(d)(3), CEA Section 5(d)(3) ....................................................................7

Section 7(d)(4), CEA Section 5(d)(4) ....................................................................7

Section 7(7) (repealed).........................................................................................55

Section 9, CEA Section 6(c) .................................................................................6

Section 20(e), CEA Section 16(e).........................................................................30

Section 23(b)(1), CEA Section 19(b)(1) ...............................................................37

Section 24a(e)(2)(E), CEA Section 21(e)(2)(E) ...................................................36

Section 25(a)(1)(D)(ii), CEA Section 22(a)(1)(D)(ii) ..........................................30

Title 28

Section 1291...........................................................................................................4

Section 1331...........................................................................................................3

Other Authorities

17 C.F.R. § 33.3 ....................................................................................................6

17 C.F.R. § 40.2 ................................................................................................9, 12

17 C.F.R. § 40.3 ..................................................................................................10

17 C.F.R. § 40.11, Regulation 40.11 ...............................................................11, 14

17 C.F.R. § 40.11(a), Regulation 40.11(a) ..........................................................14

17 C.F.R. § 40.11(a)(1), Regulation 40.11(a)(1)..................................................20

17 C.F.R. § 40.11(c)(1), Regulation 40.11(c)(1)..................................................14

Contract Market Designation, 40 Fed. Reg. 25849 (June 19, 1975) .....................8

Event Contracts, 89 Fed. Reg. 48,975 (proposed May 10, 2024),
    https://www.cftc.gov/media/10706/votingcopy051024_
    EventContracts/download ...............................................................................45

S. REP. NO. 93-1194 (1974),
    *as reprinted in* 1974 U.S.C.C.A.N. 3996, 3997...............................................8, 55

156 CONG. REC. S5906-07, 2010 WL 2788026, at *S5906-07
(daily ed. July 15, 2010) ..................................................11, 40, 42, 47, 48

Commodity Futures Modernization Act of 2000,
Pub. L. No. 106–554, 114 Stat. 2763 (2000)....................................9, 56

Dodd-Frank Wall Street Reform and Consumer Protection Act,
Pub. L. No. 111-203, 124 Stat. 1376 (2010)...........................................9

2A C. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION
§ 47.17 (7th ed. 2023) .......................................................................56

IOWA CODE § 725.7 (2024)...............................................................46

NEV. ADMIN. CODE, GAMING REG. § 22.1205 .......................................41

NEV. REV. STAT. § 293.830 (2023)........................................................54

Wis. Stat. Ann. § 945.01 (West 2024)..................................................49

UK Gambling Commission, *License Conditions and Code of Practice*
(effective Aug. 30, 2024), https://www.gamblingcommission.gov.uk/
licensees-andbusinesses/lccp/print...........................................................12

CFTC, *Glossary: A Guide to the Language of the Futures Industry*,
https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/
CFTCGlossary/index.htm (last visited October 14, 2024)................................5, 8

CFTC, *Order Prohibiting the Listing or Trading of Political Event Contracts*
(Apr. 2, 2012), https://www.cftc.gov/sites/default/files/stellent/groups/public/
@rulesandproducts/documents/ifdocs/nadexorder040212.pdf ...............11, 12, 50

Kalshi, *Elections*, https://kalshi.com/events/elections
(last visited Oct. 14, 2024)......................................................................3

Kalshi, *Press*, https://kalshi.com/blog/press (last visited Oct. 14, 2024)...............13

*2024 US Presidential Election*, MGM, https://sports.on.betmgm.ca/en/
sports/events/2024-us-presidential-election-9867644
(last visited Oct. 14, 2024)....................................................................42

Anna Lamche, *Election betting scandal: Met Police ends its investigation*,
BBC NEWS (Aug. 23, 2024),
https://www.bbc.com/news/articles/c4gd7qxwvjzo..................................49

Dan Mangan, *Kalshi expands Trump, Harris election bet options, adds Senate races; CFTC objects*, CNBC (Oct. 9, 2024), https://www.cnbc.com/2024/10/09/kalshi-expands-election-betting-options-cftc-complains.html......................................................................................3

Katherine Sayre, *West Virginia Approves, Then Disapproves, Betting on Elections*, WALL ST. J. (Apr. 8, 2020), https://www.wsj.com/articles/west-virginia-approves-then-disapproves-betting-on-elections-11586384497......................................................................................12

Sean Tomlinson, *Donald Trump 2024 Odds to Win the Next U.S. Presidential Election: Trump Inching Away as Favorite*, SPORTSBOOK REVIEW (Oct. 10, 2024), https://www.sportsbookreview.com/picks/more-sports/donald-trump-presidential-election-odds-politics/ ...........................42

Tarek Mansour, *It's official: You can now trade on the U.S. Presidential Election*, KALSHI, https://kalshi.com/blog/article/official-kalshi-makes-history-with-100-legal-election-trading (last visited Oct. 15, 2024) ...................................................3

Tyler Cheese, *Ontario's online gaming market launches, but some insiders and experts have concerns*, CBC NEWS (Apr. 4, 2022), https://www.cbc.ca/news/canada/toronto/ontario-igaming-online-gambling-launch-1.6404314......................................................................................49

Letter from Andrea Corcoran, Dir., Div. of Trading and Mkts, to Prof. George Neumann, Professor of Econ., Univ. of Iowa (June 18, 1993) https://www.cftc.gov/sites/default/files/files/foia/repfoia/foirf0503b004.pdf......................................................................................6

Letter from Vincent McGonagle, Dir., Div. of Mkt. Oversight, to Neil Quigley, Deputy Vice-Chancellor, Rsch.,Victoria Univ. of Wellington (Oct. 29, 2014), https://www.cftc.gov/csl/14-130/download...............6

*Contract*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...........................................35

*Contest*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/contest_2?tab=meaning_and_use#8440744......................................................................................17

*Derivative*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...........................................5

*Gaming*, BLACK'S LAW DICTIONARY, (12th ed. 2024) ...........................................39

*Gaming*, DICTIONARY.COM,
   https://www.dictionary.com/browse/ (last visited Oct. 14, 2024)........................39

*Gaming*, MERRIAM-WEBSTER.COM,
   http://www.merriamwebster.com/dictionary/gaming
   (last visited Oct. 14, 2024)...................................................................................39

*Gaming*, OXFORD ENGLISH DICTIONARY,
   https://www.oed.com/dictionary/gaming_n?tab=meaning_and
   _use&tl=true............................................................................................................39

*Involve*, MERRIAM-WEBSTER.COM,
   https://www.merriam-webster.com/dictionary/involve .................................29, 53

*Involve*, RANDOM HOUSE COLLEGE DICTIONARY 703 (Revised ed. 1979) ........29, 53

*Involve*, RIVERSIDE UNIVERSITY DICTIONARY 645 (1983)..................................29, 53

*Involve*, ROGET'S INTERNATIONAL THESAURUS 1040 (7th ed. 2010)......................29

*Transaction*, BLACK'S LAW DICTIONARY (12th ed. 2024) ........................................35

*Underlying*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...........................................5

*Authorities chiefly relied on are marked with an asterisk.

## GLOSSARY

**APA** – Administrative Procedure Act, 5 U.S.C. § 551, *et seq*.

**CEA**– Commodity Exchange Act, 7 U.S.C. § 1, *et seq*.

**CFMA** – Commodity Futures Modernization Act of 2000, Pub. Law No. 106-554,
114 Stat. 2763 (Dec. 21, 2000)

**CFTC or Commission** – U.S. Commodity Futures Trading Commission

**DCM** – Designated Contract Market

**IGRA** – Indian Gaming Regulatory Act, 25 U.S.C. § 2701, *et seq*.

**Kalshi** – KalshiEx LLC

**UIGEA** – Unlawful Internet Gambling Enforcement Act, 31 U.S.C. § 5361, *et seq*.

**INTRODUCTION**

This appeal concerns an order of the U.S. Commodity Futures Trading Commission ("CFTC" or "Commission") that prohibited Appellee KalshiEx LLC ("Kalshi") from offering election gambling contracts for trading on its federally registered derivatives exchange. The Commission exercised its authority under the Commodity Exchange Act ("CEA") to prohibit, if against the public interest, certain contracts that "involve" one of five enumerated activities, including "gaming" or "activity unlawful under any … State law." 7 U.S.C. § 7a-2(c)(5)(C). Kalshi has never denied that trading its election-gambling contracts "involve[s]," as that term is ordinarily understood, gambling or betting on elections, or that gambling or betting on elections is unlawful under numerous states' laws. Nonetheless, the district court erroneously held that the CEA did not authorize the Commission to prohibit a futures exchange from offering bets on the outcomes of elections.

The district court erred at every turn, rejecting the plain meaning of, or simply confusing, four separate terms or phrases in the statute. First, although the statute applies where certain "agreements, contracts, or transactions involve" an enumerated activity, 7 U.S.C. § 7a-2(c)(5)(C), the court held that the statute applies much more narrowly than the words say: only where the contract's *underlying event*—here, elections themselves—involves the enumerated activity. Second, the

1

court erroneously held that "gaming" refers only to betting on games, and not any other form of gambling, despite the total lack of authority for that proposition or any dictionary definition to support its cramped reading.  On the other hand, the Commission's broader view that gaming includes betting on elections and other contests is supported by dictionaries, state and federal statutes, and Supreme Court caselaw, all of which the court rejected.

Third, the court held without basis that the Commission may not examine "transactions" that involve gaming (*i.e.*, trading the contracts), although the statute plainly says that it may—mistakenly determining that "transaction" was another word for the "contract" or instrument, rather than its plain meaning, the act of contract formation and discharge.  Finally, the holding that "unlawful activity" cannot capture election-betting contracts even though state law prohibits gambling on elections because the CEA preempts application of state law was utterly circular—once transactions are allowed on a federally regulated exchange, they are no longer illegal.  But the question presented is whether election betting should be allowed on a federal exchange because it undermines important state interests.

Kalshi has taken the decision as *carte blanche* to list dozens of election betting contracts, including bets on the outcome of the presidential election, the winner of the popular vote, margins of victory, which state will have the narrowest

margin of victory, and bets on numerous other state and federal elections.[1]

Kalshi's website previews other contracts, including what it refers to as "parlays"

(a term used in sports betting) on various election outcomes, as "coming soon."[2]

One Kalshi representative stated, "this was always the plan."[3]  Bets range in size

from $1 for anyone up to $100 million for institutions and wealthy individuals.

This would not have happened had the district court not misconstrued the statute.

The judgment should be reversed, and the Commission's order reinstated.

## STATEMENT OF JURISDICTION

Kalshi filed this lawsuit under the Administrative Procedure Act ("APA"),

challenging a final Commission order that prohibited Kalshi from offering election

betting contracts, known as the Congressional Control Contracts ("Contracts"), on

its derivatives exchange.  The district court had jurisdiction under 28 U.S.C. §

1331.

On September 6, 2024, the district court granted judgment to Kalshi,

followed by a memorandum opinion on September 12, 2024.  The order disposed

---

[1] Kalshi, *Elections*, https://kalshi.com/events/elections (last visited Oct. 14, 2024).

[2] Tarek Mansour, *It's official: You can now trade on the U.S. Presidential Election*, KALSHI, https://kalshi.com/blog/article/official-kalshi-makes-history-with-100-legal-election-trading (last visited Oct. 15, 2024).

[3] Dan Mangan, *Kalshi Expands Trump, Harris election bet options, adds Senate races; CFTC objects*, CNBC (Oct. 9, 2024) https://www.cnbc.com/2024/10/09/kalshi-expands-election-betting-options-cftc-complains.html.

of all parties' claims.

The Commission appealed on September 12, 2024. This Court has
jurisdiction under 28 U.S.C. § 1291 because the judgment was a final, appealable
order.

## STATEMENT OF THE ISSUES

1. Whether, as the Commission interpreted an event contract "involves" an
   enumerated activity under the Special Rule where the transactions in the
   contract involve that activity because the statute asks whether "the
   agreements, contracts, or transactions involve" an enumerated activity and
   not whether the underlying event involves that activity?

2. Whether the Commission correctly decided that "gaming" under the Special
   Rule is synonymous with gambling, following the term's ordinary dictionary
   definition and legislative intent, thus including wagering on the outcome of a
   contest of others?

3. Whether the Commission may consider a "transaction" in a contract, where
   the statute says it may examine "agreements, contracts, or transactions."

4. Whether Congress authorized the Commission to invoke the Special Rule to
   ask whether transacting in a particular event contract would be unlawful
   under state laws when those laws are separate and apart from necessarily-
   preempted state laws?

## STATUTORY AND REGULATORY BACKGROUND

### A. Brief Introduction to the CFTC, the Commodity Exchange Act, and Derivatives.

The CFTC is an independent federal agency that regulates derivatives

markets and administers the CEA. A "derivative" is a financial instrument whose

value depends on (*i.e.*, is derived from) the performance of a secondary source, such as a physical or financial commodity. *Derivative*, BLACK'S LAW DICTIONARY (12th ed. 2024). The asset or other factor that gives rise to the rights and obligations in a derivative contract is called its "underlying." *Underlying*, BLACK'S LAW DICTIONARY (12th ed. 2024). Many derivatives are traded on a "Designated Contract Market" ("DCM"), the statutory name for a registered futures exchange. All derivatives contracts on a DCM are required to be "cleared," which generally means that, following a transaction in the contract, a central counterparty assumes the obligations of both parties to the contract, thereby assuming associated credit risk. *Cf.* 7 U.S.C. § 1a(15).

Relevant here, an "event market" is a derivatives exchange that offers "event contracts," a financial instrument whose payoff is "based on a specified event or occurrence such as the release of a macroeconomic indicator, a corporate earnings announcement, or the dollar value of damages caused by a hurricane."[4] Unlike traditional contracts whose underlying is a specified quality and quantity of a cash market asset such as corn or treasury bills, in an event contract, the underlying is typically the event, such as a hurricane.

The stated purposes of the CEA include to ensure "fair and financially

---

[4] CFTC, *Glossary: A Guide to the Language of the Futures Industry*, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm (last visited October 14, 2024).

secure trading facilities" and to protect "all market participants from fraudulent or other abusive sales practices." 7 U.S.C. § 5(a)-(b). The statute prohibits fraud and manipulation in connection with commodity derivatives, or contracts of sale of any commodity in interstate commerce. 7 U.S.C. § 9. The Commission enforces these prohibitions by investigating and bringing actions against persons who commit manipulative or fraudulent acts in connection with derivatives markets,[5] whether the misconduct occurs on derivatives exchanges or in connection with a contract's underlying.[6]

Under the CEA, retail customers' only legal avenue to trade futures contracts, or derivatives such as event contracts, is on an exchange registered with the CFTC. *See* 7 U.S.C. §§ 2(e), 6, 6c(b); 17 C.F.R. § 33.3.[7] Kalshi's exchange is

---

[5] *See, e.g., CFTC v. Xie*, No. 23-cv-01947, 2023 WL 8532325 (N.D. Ill. Sept. 26, 2023) (consent order) (fraudulent trades in futures market based on misappropriated information).

[6] *See, e.g., CFTC v. McAfee,* No. 21-cv-1919 (JGK), 2022 WL 3969757 (S.D.N.Y. July 14, 2022) (consent order) (illegal pump-and-dump of digital assets via misinformation scheme on social media).

[7] Currently, two unregistered markets offer contracts on elections, both operate in connection with "No-Action" letters issued by CFTC staff, rather than a Commission-approved registration order, and both operate for academic purposes, on a not-for-profit basis, with a limited number of traders. Letter from Andrea Corcoran, Dir., Div. of Trading and Mkts., to Prof. George Neumann, Professor of Econ., Univ. of Iowa, (June 18, 1993) https://www.cftc.gov/sites/default/files/files/foia/repfoia/foirf0503b004.pdf; Letter from Vincent McGonagle, Dir., Div. of Mkt. Oversight, to Neil Quigley, Deputy Vice-Chancellor, Rsch., Victoria Univ. of Wellington, (Oct. 29, 2014), https://www.cftc.gov/csl/14-130/download.

registered as a DCM. As a DCM, it must comply with core principles laid out in 7

U.S.C. § 7(d), including, among other things, requirements to list contracts not

readily susceptible to manipulation and to have the capacity to prevent

manipulation and price distortion through surveillance and enforcement. *See, e.g.*,

7 U.S.C. § 7(d)(3), (d)(4).

## B. The Public Interest in Regulated Derivatives Markets: Hedging and Price Basing.

The CEA includes a congressional finding that transactions subject to it "are

affected with a national public interest by providing a means for managing and

assuming price risks, discovering prices, or disseminating pricing information

through trading in liquid, fair and financially secure trading facilities." 7 U.S.C.

§ 5. In other words, there is a codified public interest in regulation of derivatives

markets because such markets provide a means to "hedge" economic risks and to

help the economy generate pricing information for real-world commodities. As it

relates to regulated markets, "hedging" is generally understood as the use of

derivatives to manage the various price risks incidental to commercial activity.

Price discovery is the process of determining the price level for a commodity

through interaction of buyers and sellers on the derivatives market, based on

supply and demand conditions.[8]

From 1974 to 2000, the CEA required exchanges to demonstrate to the Commission that any new contract was in the public interest before it could be listed for trading on an exchange. *See* S. Rep. No. 93-1194 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 3996, 3997. Each contract to be traded on a DCM had to meet an "economic purpose test" and not otherwise be contrary to the public interest. *See* Contract Market Designation, 40 Fed. Reg. 25849 (June 19, 1975). To meet the test, the DCM was "expected to establish that something more than occasional use of the contract for hedging or price basing[9] exists, or can reasonably be expected to exist." *Id.* at 25,850. The exchange was required to provide evidence that 1) the prices in the futures transaction can reasonably be expected to be generally quoted and disseminated as a basis for determining prices to producers, merchants, or consumers of the commodity or its byproducts and 2) such transaction can be expected to be utilized by merchants or consumers engaged in handling the commodity or its byproducts as a means of hedging themselves against possible loss through fluctuations in price. *Id.*

---

[8] CFTC, *Glossary: A Guide to the Language of the Futures Industry*, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm (last visited Oct. 14, 2024).

[9] "Price basing" occurs when producers, processors, merchants, or consumers of a commodity establish commercial transaction prices based on the futures price for that or a related commodity. APP. 144.

The Commodity Futures Modernization Act of 2000, Pub. L. No. 106–554, 114 Stat. 2763 ("CFMA"), scaled back the regulatory regime applicable to derivatives trading. The CFMA added CEA Section 5c(c), which limited the Commission's role in allowing or disallowing the trading of particular contracts and empowered DCMs to "self-certify" that new contracts or instruments comply with the CEA and CFTC regulations. *See* Pub. L. No. 106-554, 114 Stat. 2763 (2000); 7 U.S.C. § 7a-2(c)(5); 17 C.F.R. §§ 40.2, 40.3. Broadly, the CFMA eliminated the public interest test for new contracts and left the economic utility of those contracts to be decided by the marketplace. *Id*. In 2010, however, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111-203, 124 Stat. 1376 (2010), which gave the CFTC regulatory authority over derivatives known as "swaps" and reinstated the Commission's public interest review for a subset of event contracts, in certain circumstances. Specifically, Dodd-Frank enacted a "Special Rule" for certain event contracts, which is the subject of this case. 7 U.S.C. § 7a-2(c)(5)(C).

## C. The CEA's "Special Rule" for Certain Event Contracts.

A DCM wishing to offer a new product will usually self-certify it and trade it one business day after submission to the CFTC, without waiting for the Commission to take any action. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2. There is an option for pre-approval, where the Commission will review the submission and

approve the product unless it violates a specific provision of the CEA or the Commission's regulations.  7 U.S.C. § 7a-2(c)(4)-(5); 17 C.F.R. § 40.3.  For most derivatives contracts, self-certification is the end of the matter.  If the DCM follows a set of core principles and the contract complies with the CEA and CFTC regulations, in most cases the Commission has no statutory vehicle to object to or prevent the trading of the derivative.

Under the Special Rule, however, the Commission may determine whether a given event contract should be disallowed as contrary to the public interest.  7 U.S.C. § 7a-2(c)(5)(C).  The Special Rule provides that the Commission "may determine" that "agreements, contracts, transactions, or swaps in excluded commodities [7 U.S.C. § 1a(19)] that are *based upon* the occurrence, extent of an occurrence, or contingency," *i.e.* event contracts, "are contrary to the public interest" "if the agreements, contracts, or transactions *involve*—

(I)     activity that is unlawful under any Federal or State law;
(II)    terrorism
(III)   assassination;
(IV)    war;
(V)     gaming; or
(VI)    other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest."

7 U.S.C. § 7a-2(c)(5)(C)(i) (emphases added).  If the "agreement[], contract[], or transaction[]" does "involve" a statutorily enumerated activity and the Commission finds it contrary to the public interest, it may not be "listed or made available for

10

clearing or trading on or through a registered entity."  7 U.S.C. § 7a-2(c)(5)(C)(ii).

Legislative history suggests that when the Commission evaluates the public interest, it should "prevent gambling through futures markets" and consider whether the "proposed derivatives contract would be used predominantly by speculators or participants not having a commercial or hedging interest," and if so, the Commission is authorized to determine "that a contract is a gaming contract" rather than one that has a "hedging or economic use."  *See* 156 Cong. Rec. S5906-07, 2010 WL 2788026, at S5906-07 (daily ed. July 15, 2010) (statements of Sen. Blanche Lincoln and Sen. Dianne Feinstein).

### D.    Prior Application of the "Special Rule" to Political Event Contracts.

Before this case, the Commission had completed one review under 7 U.S.C. § 7a-2(c)(5)(C) and its implementing regulation, Regulation 40.11, 17 C.F.R. § 40.11.  In December 2011, North American Derivatives Exchange self-certified a variety of political event contracts, including contracts involving control of both congressional chambers and the Presidency.  The Commission exercised its authority under the Special Rule to review the contracts and issued an order prohibiting their trading.  CFTC, *Order Prohibiting the Listing or Trading of Political Event Contracts* (Apr. 2, 2012), https://www.cftc.gov/sites/default /files/stellent/groups/public/@rulesandproducts/documents/ifdocs/nadexorder0402 12.pdf.  The Commission found that these contracts involved "gaming" and were

contrary to the public interest. *Id.* The Commission noted the unpredictability of specific economic consequences of an election meant the contracts could not reasonably be expected to be used for hedging and there was no situation where the contracts' prices could form the basis for pricing a commercial transaction involving a commodity. *Id.* Accordingly, until the judgment in this case, event contracts based on the results of elections have never been legally offered for trading on a DCM in the United States.[10]

## PROCEDURAL BACKGROUND

### A. Proceedings before the Commission.

Kalshi operates as a DCM and lists event contracts for trading. Kalshi's event contracts are a form of options, typically known as binary options.[11] On June 12, 2023, Kalshi filed a product self-certification of the Contracts, pursuant to

---

[10] Nor has any form of gambling on the results of elections been prominently offered in the United States. *See* Katherine Sayre, *West Virginia Approves, Then Disapproves, Betting on Elections*, WALL ST. J. (Apr. 8, 2020), https://www.wsj.com/articles/west-virginia-approves-then-disapproves-betting-on-elections-11586384497. Kalshi frequently notes that other countries permit betting on elections. But such betting is in gambling markets and not on derivatives exchanges. Thus, in countries like the United Kingdon, the UK Gambling Commission regulates those markets and does not require its licensees serve any purpose that is characteristic of regulated derivatives. *See, e.g.* UK Gambling Commission, *License Conditions and Code of Practice* (Aug. 30, 2024), https://www.gamblingcommission.gov.uk/licensees-and-businesses/lccp/print.

[11] These particular binary options fall within the definition of a swap. 7 U.S.C. § 1a(47).

CEA Section 5c(c)(1) and Regulation 40.2.  Joint Appendix ("APP.") 150, 152.

Kalshi has never denied that the Contracts are election gambling or betting

contracts, and its website touts press coverage that describes the Contracts as

"Election Gambling," "Political Betting," and "election betting."[12]

The Contracts are binary (yes/no) event contracts based on the question:

"Will <chamber of Congress> be controlled by <party> for <term>?"  APP. 153.

The settlement values of the Contracts are determined by the party affiliation of the

leader of the identified chamber of Congress on the expiration date.  APP. 158.

While trading on the Contract is open, traders can adjust their positions and trade

freely.  APP. 154.  Thus like most other markets, a trader can make money by

buying at one price and selling if the price moves higher before the event contract

reaches settlement.  Upon settlement, the holder of one side of the contract is paid

a dollar per contract, and holders of the opposite position receive nothing.  APP.

154.

Kalshi planned to list the Contracts every two years, corresponding to each

congressional term, with the contracts expiring at 10:00 A.M. Eastern Time on

February 1 of the year the relevant congressional term begins.  APP. 152, 159.  The

Contracts would have a notional value of one dollar with a minimum price

fluctuation of $0.01 and would be purchased in multiples of 5,000 contracts per

---

[12] Kalshi, *Press*, https://kalshi.com/blog/press (last visited Oct. 14, 2024).

order.  APP. 158-59.[13]  The Contracts would have tiered position limits depending on the category of market participant—individual, entity, or eligible contract participant—and whether the participant has a "demonstrated established economic hedging need," which Kalshi does not define.  APP. 158-59. An institutional trader or high net worth individual can bet up to $100,000,000.  APP. 158.

Shortly after Kalshi submitted the Contracts, the CFTC commenced a 90-day review of the contracts based on its determination that the Contracts may involve an activity enumerated in CEA Section 5c(c)(5)(C) and Regulation 40.11(a).  APP. 274.  In accordance with Regulation 40.11(c)(1), the CFTC requested that Kalshi suspend any listing and trading of the Contracts during the pendency of the review period.  APP. 274.  Though not required by the CEA or Regulation 40.11, the CFTC sought public comment during a 30-day period on specific questions related to Kalshi's self-certification and the public interest. APP. 275.

On September 22, 2023, at the conclusion of the review period, the Commission issued an Order prohibiting Kalshi from listing the Contracts for trading.  The Commission determined that the Contracts "involve" two enumerated activities – "gaming" and "activity that is unlawful under any . . . State law."  The

---

[13] On October 14, 2024, Kalshi submitted a modification for this contract, reducing the minimum order size from 5,000 contracts to a single contract.

Commission then determined that the Contracts were contrary to public interest and, as such, prohibited them from listing and trading. APP. 127-49.

Noting that "involve" is not defined by statute for purposes of Section 5c(c)(5)(C)(i), the Commission looked to its ordinary meaning in analyzing whether the Contracts "involve" enumerated activities. APP. 131. The Commission drew from multiple dictionaries and determined that the definitions of "involve" include "to relate to or affect," "to relate closely," to "entail," or to "have an essential feature or consequence." APP. 131. The Commission rejected Kalshi's proposed narrower reading that a contract involves an enumerated activity only if the contract's underlying involves the activity. APP. 132. The Commission noted that Kalshi's reading is inconsistent with the statutory language because Section 5c(c)(5)(C)(i) uses "based on" to refer to the underlying, stating that it applies to agreements, contracts, or transactions "based on an occurrence, extent of an occurrence, or contingency." APP. 132. Thus, the only thing Section 5c(c)(5)(C)(i) says about the underlying is that it must be an event, not that it must be one of the enumerated activities. APP. 132-33. The Commission reasoned that Congress's choice of the broader term "involve" means that CEA Section 5c(c)(5)(C)(i) broadly captures both contracts whose underlying is one of the enumerated activities and contracts with a different connection to one of the enumerated activities. APP. 133.

In finding that the Contracts "involve" the enumerated activity of "gaming," the Commission applied the ordinary meaning of "gaming" to include betting or wagering on elections. APP. 134-36. The Commission reasoned that: (1) dictionaries define "gaming" to mean "gambling;" (2) under most state laws "gambling" involves staking something of value upon the outcome of a game, contest, or contingent event; (3) the Unlawful Internet Gambling Enforcement Act ("UIGEA") defines the term "bet or wager" as "the staking or risking by any person of something of value upon the outcome of a contest of others …, upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome," thus demonstrating the interconnectedness of these terms; and (4) state statutes link the terms "gaming" or "gambling" specifically to betting or wagering on elections. APP. 134-35. Accordingly, because taking a position in the Contracts would be staking something of value (*i.e.* betting or wagering) upon the outcome of a contest of others (*i.e.* the outcome of congressional elections), the Contracts, and trading the contracts (*i.e.*, transactions), involve "gaming." APP. 136.

As to unlawful activity, the Commission found that the Contracts involve an activity that is unlawful under state law because betting or wagering on elections is prohibited by numerous state statutes and because several state court decisions hold that betting or wagering on elections is unlawful. APP. 137-38. The

Commission reasoned that taking a position in the Contracts would be wagering upon the outcome of contests between electoral candidates, and therefore would ordinarily fall within state prohibitions.  APP.  138-39.[14]  The Commission also explained that to permit nationwide election gambling would directly undermine important state interests in controlling election gambling.   APP. 139 n.28. Notably, the Commission expressly did not base its determination on so-called "bucket shop" laws that might be interpreted to capture broadly all trading on a DCM.  Instead, consistent with the legislative purpose, the Commission looked to laws that expressed state interests outside of trading futures contracts and found permitting nationwide election gambling would directly undermine important state interests in controlling election gambling.   139 n.28.

Next, the Commission found that the Contracts are contrary to public interest because: 1) they have negligible hedging and price-basing utility, APP. 141-45; 2) the potential negative impact on election integrity or the perception of election integrity, APP. 145-48; 3) conduct designed to artificially affect the electoral process could manipulate the market and incentivize the spread of misinformation, or, conversely, on-exchange manipulation could be used to

_____

[14] Kalshi disputes that an election is a "contest" because it is not a "game," even though the plain meaning of "contest" has no such limitation.  *See Contest*, OXFORD ENGLISH DICTIONARY (defining "contest" to include "conflict," "contention," and "struggle for victory," and not mentioning entertainment until the third alternate definition).  APP. 136 n.25.

influence real-world events, APP. 146; and 4) permitting trading in the Contracts could require the Commission to assume a role in overseeing the electoral process, APP. 148-59.

In assessing hedging and price-basing utility, the Commission applied an "economic purpose test" supported by the legislative history of CEA Section 5c(c)(5)(C)(i), as well as the congressional finding in CEA Section 3 of a national public interest in well-regulated markets for hedging and price basing.  APP. 141.

The Commission acknowledged that control of a chamber of Congress may contribute to eventual economic effects related to policy changes, but that those eventual effects are diffuse, unpredictable, and difficult to quantify, considering the many intervening events and variables that exist between control of a chamber of Congress and the actual implementation of policy.  APP. 143.  For this reason, the Commission found, the Contracts could not be useful for specific, identifiable hedging purposes.  APP. 143.  The Commission noted the specifications for the contract, including the binary nature of the payout and the frequency of settlement, further limited the hedging capabilities of the contract.  APP. 143-44.  For similar reasons, the Commission explained, the Contracts could not predictably be used for price basing.  APP. 144-45.

As to election integrity, the Commission found that the Contracts could adversely affect election integrity or the perception of election integrity by creating

monetary incentives to vote (including as an organized collective) for candidates or by incentivizing the spread of misinformation to influence the markets and that the markets could be used to influence perceptions about elections. The Commission cited, among other things, comment letters from seven U.S. Senators expressing serious concerns along those lines and observed that it received over 600 comments from members of the public who expressed grave concerns about the impact on the integrity of elections. APP. 145-46.

The Commission noted the difficulty of guarding against misinformation and manipulative activity because the Contracts have no underlying cash market, unlike other commodity markets, and instead the price forming information is driven largely by opaque and unregulated sources such as polling and voter surveys. APP. 146-47. This differs from the reliable informational sources, such as government crop forecasts, that are used to price most commodities underlying Commission regulated derivatives contracts. APP. 147.

The Commission found that the Contracts' proposed trading prohibitions provide insufficient protections against manipulative activities because they do not exclude all persons who could have a motivation to manipulate the markets, nor do they prevent the prohibited individuals and entities from engaging in activity other than trading that could artificially move the market in the Contracts. APP. 148.

Finally, the Commission found that as a regulator of the Contracts' markets,

the CFTC could find itself in the position of investigating suspected manipulation of the markets, which could by extension involve investigating election-related activities.  APP. 148-49.  The Commission observed that several commenters, including members of Congress, noted that the Commission is not equipped or well suited for this role, which falls well outside its statutory mandate.  APP. 148-49.

Accordingly, the Commission determined that the Contracts involve gaming and activity that is unlawful under State law and are contrary to the public interest. The Commission ordered that pursuant to CEA Section 5c(c)(5)(C)(ii) and Regulation 40.11(a)(1), the Contracts are prohibited and shall not be listed for clearing or trading on or through Kalshi.  APP. 149.

## B. Proceedings in the District Court.

On November 1, 2023, Kalshi filed the present lawsuit alleging that by prohibiting the listing of the Contracts for trading, the Commission's order exceeded the Commission's authority under the CEA and was arbitrary, capricious, and otherwise contrary to law.  Kalshi raised statutory construction challenges to the Commission's interpretation of the terms "involve," "gaming," and "unlawful under … State law," asserting that the Commission's order "fundamentally misconstrue[d]" these terms and then "distort[ed]" both "gaming" and "unlawful activity."  Dkt. 1 at ¶¶ 88-90.  Kalshi also challenged the Commission's public interest analysis as "faulty and overreaching."  *Id*. at ¶ 91.

On September 6, 2024, the district court granted summary judgment for Kalshi on all claims, and 6 days later issued a memorandum opinion. The court found for Kalshi on all statutory interpretation questions and held that the Contracts are not subject to public interest analysis under the Special Rule. The district court did not, accordingly, discuss the Commission's public interest determination. The district court rejected the plain meaning of several of the statute's terms and phrases and ignored or misapplied important canons of statutory construction. The district court eschewed any deference to the CFTC in the wake of *Loper Bright*. APP. 105.

As to "involve," the district court disregarded the statute's plain language which asks whether the "*agreements, contracts, or transactions* involve" an enumerated activity and held that "involve" is "event-focused" meaning that the underlying event (here elections) must be or closely relate to the enumerated activity. APP. 111.

As to "gaming," the district court reasoned that "gaming requires a game" and rejected the Commission's citation to dictionary definitions which cross-referenced gambling, on the grounds that the cross-referenced definitions were too broad in the context of the Special Rule. APP. 106-07. Nevertheless, the district court also cited definitions that cross-referenced gambling but disregarded those cross-references without explanation. APP. 108. The district court determined the

CFTC's reliance on state statutory definitions was not "particularly relevant" but referenced other state statutes that tied gaming to games. APP. 109. And, without support, the district court held gaming covers only sporting events or games of chance, or other events held for entertainment, and agreed with Kalshi that elections are not contests within the meaning of gaming. APP. 111. The court also dismissed as a "colloquial[ism]" the routine use in American English of the word "contest" to describe elections. APP. 110 n.12.

The district court incorrectly determined that the Commission cannot look at whether a "transaction" in a contract (*i.e.*, trading and taking positions) "involves" an enumerated activity in the sense that transacting in the contract "relates to," "entails," or "has as an essential feature or consequence," of gaming or unlawful activity. The court acknowledged that the plain meaning of "transaction" includes the formation or discharge of a contract but disregarded that plain meaning, stating without support that "transaction" refers only to the "instrument" because the statute lists it beside other terms (*i.e.* agreements, contracts, and swaps) that refer to financial instruments. APP. 114. The court noted that the "statute identifies a transaction as something that can be list[ed]" but did not include the remainder of the clause stating "or made available for clearing." APP. 114 (citing 7 U.S.C. § 7a-2(5)(c)(ii)). The court concluded, therefore, that the CFTC could not consider whether transacting in a contract itself entails or has as an essential feature or

consequence of an enumerated activity.  APP. 114.

Finally, under a mistaken understanding of the statutory scheme, the district court erroneously reasoned that if the ordinary meaning of "involve" were to apply, the category of "unlawful activity" would "swallow" the rule, and expressed confusion about the relevance of state interests in election integrity.  APP. 116, 116 n.15.

The district court concluded that the Contracts do not "involve" either "gaming" or "unlawful activity" because their underlying (elections) do not involve games or unlawful activity.  Thus, the court held that the Contracts are not subject to the Special Rule.

## STANDARD OF REVIEW

In an action challenging a final agency decision under the APA, the reviewing court determines, as a matter of law, whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*, 830 F.3d 552, 558 (D.C. Cir. 2016) (quoting 5 U.S.C. § 706(2)(A)).  Under this standard, an agency's final decision must be "within the scope of its lawful authority" and "the product of reasoned decisionmaking."  *Fox v. Clinton*, 684 F.3d 67, 74-75 (D.C. Cir. 2012).  In APA appeals, this Court reviews the district court's rulings and

statutory interpretations *de novo*.  *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002).

Under *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944), an agency's interpretation of a statute "made in pursuance of official duty" and "based upon . . . specialized experience," while not controlling, "constitute[s] a body of experience and informed judgment to which courts and litigants [could] properly resort for guidance."  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2259 (2024) (quoting *Skidmore*, 323 U.S. at 139-40).  Though the Supreme Court overruled *Chevron* in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. at 2273, it held that courts may still apply *Skidmore* deference.  *Id.* at 2268.  The district court incorrectly suggested that the CFTC forfeited *Skidmore* deference.  APP. 105 n.9.  However, the CFTC argued that insofar as there is any ambiguity, *Chevron* deference, which was still in effect, applied, and then noted that *Skidmore* applied to agency statutory interpretations not entitled to *Chevron* deference.  CFTC Cross-Summary Judgment Motion, Dkt. 30 at 19 n.17.  Even if the Commission had not raised *Skidmore* deference, this would have been "excusable [as] due to an intervening change in the law."  *Stoiber v. SEC*, 161 F.3d 745 (D.C. Cir. 1998).

## SUMMARY OF THE ARGUMENT

The district court's interpretations of various parts of Section 5c(c)(5)(C) were based on unreasonable and incorrect readings of the Special Rule that are

contrary to the CEA's plain language, canons of statutory construction, and statutory context. The district court erroneously interpreted "involve," "gaming," "transaction," and "activity that is unlawful under any … State law," in determining that the Commission unlawfully prohibited the Contracts. This Court should reverse for the following reasons:

*First*, notwithstanding the fact that the statute applies to an "agreement, contract, transaction, or swap" that "involve[s]" an enumerated activity, the district court held that "involve" only "[i]nteracts with the [i]nstrument's [u]nderlying [e]vent." This holding is based on a misapplication of the "consistent usage" canon. Despite the breadth of the word "involve," the district court held that a contract can only involve an enumerated activity in the single narrowest way that can be applied to the entire list of activities. Because, under the district court's reasoning, a contract can only practically relate to assassination if the underlying relates to assassination, the same must be true of gaming and unlawful activity. That holding is neither logical nor a correct application of the canon of consistent usage. The district court also ignored the meaningful variation canon, which applies here because the Special Rule uses the term "based upon" when it refers to the underlying, and "involve" when separately it refers to the agreement, contract, or transaction as a whole. *See, infra*, pp. 27-33.

Moreover, the district court erred by failing to effectuate the plain meaning

of "transaction," which permits the Commission to consider whether trading a given instrument involves an enumerated activity and by concluding instead that the transaction must mean the financial instrument. In erring, the court mistakenly relied on one phrase of Section 5c(c)(5)(c), which refers to an agreement, contract, or transaction being "listed" (which, a transaction ordinarily is not) while ignoring the very next words: "or made available for clearing" (transactions frequently *are* cleared). The district court also pointed to other portions of the CEA purportedly to show the statute "can only be referring to the underlying commodity or subject of the transaction," but ignored the multitude of other places in the CEA where similar language clearly refers to the nature of the transaction. *See infra*, 33-38.

*Second*, the district court erred in interpreting "gaming" by arbitrarily narrowing it to refer to "games" or "playing games for stakes," and then deciding that because elections and congressional control are not "games" or "games for stakes," election contracts do not involve gaming. But in ordinary usage, "gaming" is interchangeable with "gambling," especially when the bet involves staking something of value on the outcome of contests of others (like elections). There is no basis to limit gaming to "games." At the same time, it was incorrect to conclude that defining "gaming" by reference to "gambling" renders the statute overly broad, so as to capture all event contracts. Not all event contracts involve wagering on a contest of others, so the Commission's order does not broadly

implicate those other contracts or transactions. And as the CFTC noted, there is no reason to believe the Commission would ever interpret "gaming" so broadly as to swallow every event contract, but Kalshi's Contracts did not present any such issue—they are squarely within the meaning of gaming because they involve wagering on a contest of others. *See, infra*, pp. 38-50.

*Finally*, the district court erred in rejecting the Commission's application of the "unlawful activity" category by again imputing an overbroad interpretation that the Commission never used. The court mistakenly stated that the Commission concluded that these contracts involve unlawful activity because event contracts as a whole are unlawful under some states' laws. But due to federal preemption, event contracts never violate state law when they are traded on a DCM. The question is whether these contracts *should* trade on a DCM. These contracts specifically undermine non-preempted state laws, including laws focused on election integrity. The contracts relate to prohibited election betting because they give bettors an escape hatch from states' efforts to protect elections. The Commission did not and would not rely on laws that could be construed as outlawing trading in event contracts more generally, where the application of such laws is preempted by the CEA. *See, infra*, pp. 50-56.

# ARGUMENT

**A.  "Involve" has broad meaning and interacts with more than the instrument's underlying event.**

**1.  The plain meaning of the statutory text is that the Special Rule applies when any aspect of the agreement, contract, transaction, or swap involves an enumerated activity.**

"Courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  Where a statute is unambiguous, the Court's analysis "begins with the statutory text, and ends there as well." *Nat'l Ass'n of Mfrs. v. DOD*, 583 U.S. 109, 127 (2018).  Nobody contends that the text of Section 5c(c)(5)(C) is ambiguous, so the district court should have followed it.

As discussed, the Special Rule provides that the Commission may determine that certain "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency," *i.e.* event contracts, "are contrary to the public interest" "*if the agreements, contracts, or transactions involve*—(I) activity that is unlawful under any Federal or State law; [or] (IV) gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added).

This statutory text "means what it says." *Loper Bright*, 144 S. Ct. at 2262. It applies when the "agreements, contracts, or transactions involve" an enumerated activity.  Because the CEA does not define "involve," its ordinary meaning applies.

*See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The plain

meaning of "involve" is broad. This meaning includes, as the Commission

observed, "to relate to or affect," "to relate closely," to "entail," or to "have as an

essential feature or consequence." APP 130 (citing *Involve*, MERRIAM-

WEBSTER.COM, https://www.merriam-webster.com/dictionary/involve; *Involve*,

RANDOM HOUSE COLLEGE DICTIONARY 703 (Revised ed. 1979); *Involve*,

RIVERSIDE UNIVERSITY DICTIONARY 645 (1983); *Involve*, ROGET'S INTERNATIONAL

THESAURUS 1040 (7th ed. 2010)). The word has "expansive connotations." *See*

*United States v. Alexander*, 331 F.3d 116, 131 (D.C. Cir. 2003); *United States v.*

*Williams*, 931 F.3d 570, 575 (7th Cir. 2019); *United States v. McKenney*, 450 F.3d

39, 42-43 (1st Cir. 2006); *United States v. King*, 325 F.3d 110, 113 (2d Cir. 2003).

Even Kalshi had to concede that the Commission's reading was "grammatically

appropriate." APP.10. That should have been the end of the matter.

The Commission's application of the plain meaning of "involve" is also

supported by the "meaningful-variation canon." *See Sw. Airlines Co. v. Saxon*, 596

U.S. 450, 457-58 (2022). Where Congress uses "one term in one place, and a

materially different term in another, the presumption is that the different term

denotes a different idea." *Id.* at 458. Section 5c(c)(5)(C)(i) deals separately with

what must be the underlying and what activity the contract or transaction as a

whole must involve.

As to the contract's underlying, the provision states that the Special Rule applies to "agreements, contracts, transactions, or swaps in excluded commodities that are *based upon* the occurrence, extent of an occurrence, or contingency." 7 U.S.C. § 7a-2(c)(5)(C) (emphasis added). In other words, the contract's underlying must be an event—and that is all it says about the underlying.

As to the activity, Section 5c(c)(5)(C)(i) states separately that the Special Rule applies where "such *agreements, contracts, or transactions* involve" an enumerated activity. In context, "based upon" and "involve" must have different meanings, with "based upon" referring to the underlying and requiring only that it be an event, and "involve" retaining its broader ordinary meaning and referring to "agreements, contracts, or transactions" as a whole. APP. 132-33. By contrast, where the CEA means to specify a contract's underlying, it generally uses the word "underlying," *e.g.*, 7 U.S.C. §§ 6c(d)(2)(A)(i), 20(e), 25(a)(1)(D)(ii), or, where syntax requires, refers to what the contract is "based on" or "based upon," 7 U.S.C. §§ 2(a)(1)(C)(i)(I), 2(a)(1)(C)(ii), 2(a)(1)(C)(iv), 6a(a)(4)(A). [15]

---

[15] Kalshi argued below that because certain CEA provisions using "involve" refer to an "underlying," the Commission incorrectly observed that when Congress uses "underlying," "based on," or "based upon," it refers narrowly to a contract's underlying. Kalshi Summary Judgment Motion, Dkt 17 at 21. Kalshi mischaracterizes the Commission's Order, which acknowledged that the ordinary meaning of "involve" *can* include, for purposes of Section 5c(c)(5)(C)(i)(V), contracts where an enumerated activity is the contract's underlying. But the fact that certain CEA provisions use "involve" in a context referring to a contract's underlying does not prove that is the *only* thing to which "involve" can refer.

The district court agreed that "involve" should be broadly construed, APP. 118, and Kalshi conceded that the Commission correctly determined the ordinary meaning of the word. APP. 13-14 ("We don't actually disagree on what involve means."). But, finding no flaw in the Commission's definition of "involve," the court stated that the only issue was "how it interacts with the enumerated activities." APP. 112. Facially, the statute dispenses with that issue in six words: "the *agreements, contracts, or transactions* involve" an enumerated activity, with no limitation to any aspect of the agreement, contract, or transaction such as the underlying. That should have resolved the issue.

The Contracts involve gaming because that is what they are for—gaming is an "essential feature or consequence" of them, and notwithstanding Kalshi's assertion that "Election Gambling" (per Kalshi's own website) is a "hedging" tool—gaming is what these transactions "entail." APP. 136, 139 n.28. And the Contracts likewise "relate closely" to and would "affect"—by utterly undermining—state laws that prohibit gambling on elections. APP. 137-39. Accordingly, the Contracts "involve" gaming and activity that is illegal under state law, and Section 5c(c)(5)(C)(i) is satisfied.

## 2. The district court erroneously rejected the statutory text based on the "consistent usage" canon.

The district court erroneously rejected the statute's unambiguous text based on the "consistent usage canon," *i.e.*, that "[i]n a given statute, the same term

usually has the same meaning." *Pulsifer v. United States*, 601 U.S. 124, 149 (2024). But the Commission's use of the plain meaning of the statutory text does not run afoul of that canon.

The district court reasoned that a contract can "involve" an activity in no more than one way. APP. 113. Specifically, because a contract can involve war, terrorism, or assassination only when the underlying involves war, terrorism, or assassination, then a contract can only involve gaming or unlawful activity if the underlying involves those things. APP. 113. But that conclusion misapplies the canon of consistent usage—the Commission did not apply inconsistent meanings of "involve" to different activities; it applied the same broad meaning to *all* enumerated activities.

The court's reliance on *Clark v. Martinez*, 543 U.S. 371, 378 (2005), for the proposition that the Commission may not "give the same words a different meaning for different categories" was mistaken. APP. 113. In *Clark*, the Supreme Court simply held that a single term in an immigration statute could not be used *inconsistently* as to three categories of immigrant to which it applied. 543 U.S. at 378. A previous decision held that the words "may be detained" authorized the Secretary of Homeland Security to detain one category of immigrant only for a limited time. *Id.* In *Clark*, the Court held that the very same phrase cannot also authorize the Secretary to detain a second category of immigrant for an *unlimited*

time—in other words, unremarkably, "may be detained" cannot "both at the same time" authorize indefinite detention of one group but restrict the detention period as to the other. *Id.* The Court would not give "the same words a different"—and *contradictory*—"meaning for each category." *Id.*

That has nothing to do with the Commission's application of the plain meaning of "involve." The word is broad, and its plain meaning reflects congressional intent that the Special Rule encompass a range of connections between the agreement, contract, or transaction and the enumerated activity. Courts have recognized that "involve" can modify terms in more than one way. *See King*, 325 F.3d at 112-3 (finding sentencing enhancement for "serious drug offense" "involving manufacturing, distributing, or possessing . . . a controlled substance" applied to attempted drug offenses because "involvement" extends the inquiry beyond precise crimes); *Kawashima v. Holder*, 565 U.S. 478, 483-84 (2012) (rejecting petitioners' challenge to deportation for commission of crimes that "involved fraud or deceit" on grounds that respective crimes did not include formal elements of fraud or deceit, because "involve" broadly captured "offenses with elements that necessarily entail fraudulent or deceitful conduct"). Nothing in *Clark* suggests that a broad word must be construed narrowly to create only a limited, uniform nexus between that word and the terms it modifies. If Congress intended to apply Section 5c(c)(5)(C)(i) only where "the underlying event

involves" an activity, rather than more broadly when the "agreements, contracts, or transactions involve" the activity, it would have said so. To narrow the word as the district court did is "to invent a statute rather than interpret one." *Clark*, 505 U.S. at 378.

### 3. "Transactions" should be construed to mean transactions.

The Commission correctly determined that, separately, transactions in the Contracts involve gaming and activity that is unlawful under state law. As it explained, "[t]aking a position in the contracts would be staking something of value on the outcome of contests between electoral candidates, such that wagering on elections is 'an essential feature or consequence' of the contracts." APP. 139 n.28.

The district court erroneously rejected the plain meaning of "transactions" in "agreements, contracts, or transactions" and held that "transaction" refers to the contract itself. Based on that flawed premise, the court held "transactions" in election-betting contracts may not be considered, although the statute plainly states that they can. There was no basis for that departure.

a.  The plain meaning of transactions supports the Commission's reading.

"[E]very clause and word of a statute should have meaning." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023). None of the words "contracts," "transactions," or "or" are defined in the CEA, so they retain

their ordinary meaning. *Taniguchi*, 566 U.S. at 566. Thus, in Section 5c(c)(5)(C), as in ordinary legal usage, a "contract" is "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law," *Contract*, BLACK'S LAW DICTIONARY (12th ed. 2024), and a "transaction" is "the formation, performance, or discharge of a contract," *Transaction*, BLACK'S LAW DICTIONARY (12th ed. 2024). Congress used the word "or" to connect these terms, the use of which "is almost always disjunctive, that is, the phrases it connects are to 'be given separate meanings.'" *Pinson v. DOJ*, 964 F.3d 65, 69 (D.C. Cir. 2020) (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)) (cleaned up). Nothing in the statute suggests that the Court should apply anything but the plain meaning of these terms. Thus, it was proper for the Commission to consider whether trading in the Contracts involve gaming or unlawful activity.

The district court did not explain why "transaction" should lack independent significance. Nor could it: Congress uses the term throughout the CEA to grant broad jurisdictional authority to the CFTC, in contexts where it would be nonsensical to interpret it as referring to "the instrument" to the exclusion of *trading* in the instrument. For example, the CEA empowers the Commission to issue regulations "reasonably necessary to effectuate any of the provisions of, or to accomplish any of the purposes of, this Act in connection with agreements, contracts, or transactions" in certain foreign currency instruments. 7 U.S.C.

§ 2(c)(2)(B)(iii).  It would be absurd to suggest that the Commission nevertheless lacks the power to regulate "transactions" in those instruments.

Another example:  CEA Section 21 requires the chief compliance officer of a swap data repository to "ensure compliance with this Act relating to agreements, contracts, or transactions." *Id*. § 24a(e)(2)(E).  No chief compliance officer doubts that they are responsible for ensuring proper treatment of information about *trades*. If anything, regulating "transactions" is the *most* significant part of the CFTC's mission.  *See* 7 U.S.C. § 5(a) (finding that "[t]he *transactions* subject to this chapter are … affected with a national public interest." (emphasis added)).

The individual significance of each term in "agreements, contracts, or transactions" is bolstered by Congress' use of them separately elsewhere in the Act.  *See* 7 U.S.C. § 6a (prohibiting "excessive speculation in any commodity under *contracts* of sale of such commodity for future delivery . . . or swaps"); 7 U.S.C. § 6b (prohibiting fraud "in or in connection with …any *contract* of sale"); *Id*. § 6g (requiring registrants to provide to the Commission any reports regarding "*transactions* and positions" of those registrants and their customers).  Nothing in the CEA indicates that where Section 5c(c)(5)(C) uses the words "transactions," "contracts," or "or," those words mean anything other than what they say.

## b. The reading of the word "listed" in Section 5c(c)(5)(C) and "transactions involving" elsewhere in the CEA does not support reading "transaction" as the contract.

The district court noted that "the statute identifies a transaction as something that can be 'listed,' further suggesting that it is referring to an actual financial instrument or product being exchanged." APP. 114. This overlooks the next few words of the provision. Section 5c(c)(5)(C)(ii) states that a covered agreement, contract, or transaction that involves an enumerated activity, and that the Commission determines is contrary to the public interest, may not "be listed *or made available for clearing*." Transactions are not listed, they are cleared. So, the use of the word "listed" is no basis to refuse the ordinary meaning of "transaction."

The district court pointed to other CEA provisions that use "transactions involving" in concluding it is "clear that the statute can only be referring to the underlying commodity or the subject of the transaction." APP. 115. But these provisions, unlike the Special Rule, expressly refer to "transactions involving" "the purchase or sale of any commodity," "different commodities," or "a security futures product." *See* APP. 115 (citing 7 U.S.C. §§ 6c(b), 23(b)(1), 2(a)(1)(D)(i)). In those provisions, it is natural that "involve" creates a nexus with the commodity or subject of the transaction. But other CEA provisions that use "transactions involving" cannot refer to the subject of the transaction (*i.e.* the underlying), but instead refer to the nature of the transaction. *See* 7 U.S.C.

37

§ 2(a)(1)(A) (referring to "transactions involving swaps or contracts of sale of a commodity for future delivery"); 7 U.S.C. 2(a)(1)(C)(i)(II) (referring to "transactions involving, ..., a put, call, or other option on 1 or more securities..."); 7 U.S.C. 2(a)(1)(C)(ii) (referring to "transactions involving, . . . contracts of sale (or options on such contracts) for future delivery"); 7 U.S.C. § 2(h)(8) (referring to "transactions involving swaps"); 7 U.S.C. § 6c(c) (referring to "transactions involving the trading of options on contract markets"). The Special Rule's language which asks whether "transactions involve—(I) activity that is unlawful under any Federal or State law; [or] (IV) gaming" is consistent with CEA provisions that also refer to the nature of the transaction.

Thus, the Commission correctly invoked Section 5c(c)(5)(C)(i) here—and the district court erred by holding otherwise—because "taking a position in the Contracts," *i.e.*, trading or transacting in them, has gaming and activity that is unlawful under state law as an essential feature or consequence. APP. 136.

## B. Gaming includes wagering on contests.

Building on its erroneous interpretation of "involve," the district court artificially narrowed "gaming" to "[r]equire[] a [g]ame," and then explained that because elections and congressional control are not "games" or "games for stakes," the Commission erred in determining the Contracts involve gaming. APP. 102. The analysis is grounded in two significant flaws: first, it arbitrarily limited the

38

ordinary meaning of "gaming," which is synonymous with "gambling," to decide "gaming" must be "[]tethered to the act of playing a game;" and second, it misconstrued the Commission's interpretation as "expansive[ly]" capturing all event contracts.  APP. 108.

## 1. The ordinary meaning of gaming does not require a game.

In narrowing "gaming," the district court recognized that the term retains its ordinary meaning, APP. 107, but then arbitrarily rejected the Commission's ascertainment of that meaning.  The Commission's interpretation was based on its observation that "gaming" and "gambling" are synonymous and used interchangeably in dictionary definitions and federal and state statutes,[16] and that the ordinary meaning of gambling or betting, as supported by federal and state laws, includes staking something of value upon the outcome of, among other things, a contest of others.  APP.  136.

The district court stated that the CFTC "bypassed the dictionary definitions of [gaming] cited [in the opinion] which equate 'gaming with 'games' in favor of more expansive definitions of gambling, which is not a term used in the statute."

---

[16] *Gaming*, MERRIAM-WEBSTER.COM, http://www.merriamwebster. com/dictionary/gaming (defining the noun "gaming" as "the practice or activity of playing games for stakes: gambling") (last visited Oct. 14, 2024); *Gaming*, BLACK'S LAW DICTIONARY, (12th ed. 2024) (cross-referencing gambling without further definition); *Gaming*, DICTIONARY.COM, https://www.dictionary.com/browse/gaming (defining "gaming" as "gambling") (last visited Oct. 14, 2024).

APP. 109.  But the very same dictionary definitions the court cited in concluding

that "gaming" is limited to "playing games for stakes" expressly reference

"gambling."[17]  Further, that "gambling" "is not a term used [by Congress] in the

statute" is of no moment because the words share common meaning.  *All Party*

*Parliamentary Grp. on Extraordinary Rendition v. DOD.*, 754 F.3d 1047, 1051

(D.C. Cir. 2014) ("Where, as here, two words share at least one common meaning,

we read nothing into Congress's use of one rather than the other.").  This is

particularly true here, where the legislative history indicates that Congress intended

to capture "gambling" through the Special Rule.  156 Cong. Rec. S5906-07, 2010

WL 2788026 (daily ed. July 15, 2010) (confirming in colloquy between Senators

Feinstein and Lincoln that the "gaming" provision is intended "to prevent . . .

*gambling* through futures markets" and to prevent "derivatives contracts" that

"exist predominately to enable *gambling*") (emphases added); *see also Pfizer, Inc.*

*v. Gov't of India*, 434 U.S. 308, 312-13 (1978) (legislative history of Sherman Act

did not support restrictive definition of "person" where used interchangeably with

terms with broader connotation in floor debates).  The Supreme Court too has

---

[17] *Gaming*, OXFORD ENGLISH DICTIONARY,
https://www.oed.com/dictionary/gaming_n?tab=meaning_and_use&tl=true ("The
action or practice of playing games, as cards, dice, etc., for stakes. Cf. gambling.");
*Gaming*, MERRIAM-WEBSTER.COM, http://www.merriamwebster.
com/dictionary/gaming ("[T]he practice or activity of playing games for stakes:
gambling").

treated "gaming" and "gambling" interchangeably in addressing tribal sovereign immunity in the context of the Indian Gaming Regulatory Act—the very statute the district court cited in incorrectly concluding that "gaming" refers only to betting on a "game." *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 792 (2014) ("The 'gaming activit[y]' is (once again) the gambling.").[18]

That "gaming" need not be based on a game accords with real life. Many state agencies that regulate gambling are known as "gaming" commissions, such as the Nevada Gaming Commission, New York State Gaming Commission, and Illinois Gaming Board. Indeed, state "gaming" commissions are sometimes the ones who prohibit gambling on elections: The Nevada Gaming Commission prohibits wagers on "any election for public office." Nev. Gaming Reg. 22.1205. Relatedly, international gambling websites, including one operated by the casino giant MGM, offer election betting right alongside their offerings on football and

---

[18] The district court found the CFTC's citation to *Bay Mills* unhelpful because "the 'gaming activities' at issue involved the operation of casinos, and the quote … describes 'gaming activity to include gambling in the poker hall.'" APP. 108 n.10. The court then asserted that "[p]laying poker is both 'gaming' and 'gambling'" but that "does not mean all forms of gambling are gaming." APP. 108. This misunderstands *Bay Mills*, which construed whether "gaming activity" under the IGRA included the proceedings of a casino's off-site administrative authority. *Bay Mills Indian Cmty.*, 572 U.S. at 792. Whether the operation of the casino involved gaming was not at issue. However, the Court made clear that gaming was synonymous with gambling, stating that the "gaming activit[y]" subject to the statute was the actual gambling activities, not the casino's administrative operations. *Id.*

racing. *See 2024 US Presidential Election*, MGM,

https://sports.on.betmgm.ca/en/sports/events/2024-us-presidential-election-

9867644 (last visited Oct. 14, 2024); *see also* Sean Tomlinson, *Donald Trump*

*2024 Odds to Win the Next U.S. Presidential Election: Trump Inching Away as*

*Favorite*, SPORTSBOOK REVIEW (Oct. 10, 2024)

https://www.sportsbookreview.com/picks/more-sports/donald-trump-presidential-

election-odds-politics/.

Thus, it was appropriate for the Commission to construe "gaming" by

reference to its ordinary meaning, as interchangeable with gambling.

**2. The legislative history supports the Commission's interpretation.**

The district court misunderstood the legislative history of the Special Rule in

interpreting "involve" and "gaming."  Though limited, it indicates that Congress

meant to include contracts like Kalshi's that, as a whole, relate to or entail an

enumerated activity like gaming.  Senator Blanche Lincoln, then-Chair of the

Senate Agriculture Committee, stated in colloquy that Section 5c(c)(5)(C) is

intended to "prevent gambling through futures markets" and to restrict exchanges

from, for example, "construct[ing] an 'event contract' around sporting events such

as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament."  *See* 156

Cong. Rec. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010).  The district

court sided with Kalshi and concluded that the Senator's colloquy did not indicate

an intent that gaming includes elections, presumably because the examples might be characterized as sporting events. This misunderstands the point. If the reasoning was right and a contract "involves" gaming only if the underlying *is* or *closely relates* to gaming, either none of those events would be covered—football and golf are "games," not "gaming"—or all of them including elections would be covered, because each of these contests only "involves" gaming if you bet on it.[19] To "prevent gambling through futures markets," it would be proper for the Commission to review all such contracts.

### 3. The Commission did not adopt a wide-ranging definition of gaming, nor was it required to for purposes of this informal adjudication.

The district court acknowledged that the ordinary definitions of gaming are "consistent with the [Commission's] articulation that 'gambling' under many state statutes means to 'stake something of value upon the outcome of a game, contest, or contingent event.'" APP. 107-08. Even so, the district court rejected the Commission's application of "gaming" as "unworkable."

In finding "unworkability," the district court misconstrued the Commission's order. The district court observed that in addition to defining gaming as betting on contests of others, many state statutes also define gaming more broadly to include

---

[19] To that end, Kalshi suggested, and the district court endorsed, a contract whose underlying is the winner of the World Series of Poker. APP. 117 n.16. Nothing in the text of the CEA or its legislative history (or common sense) indicates that Congress's concerns were so narrow.

betting on any contingent events. The court questioned how the Commission "settled on such an expansive definition of gaming (or gambling)," so that "all event contracts would be subject to review . . . because they all involve purchasing (and thus risking money on) some contingent event with the hope of receiving a pay off." APP. 108.

But the Commission never "settled on such an expansive definition" that it would include all risking something of value on any contingent event *other than* a contest of others. It did not have to: Kalshi's Contracts involve wagering on contests of others, and the Commission found that this constitutes gaming. The Commission did refer to provisions of state statutes and dictionaries that define "gaming" to include other things besides wagering on a contest of others, but it did not by implication adopt every jot and tittle of every source it cited—no more so than a court citing a dictionary necessarily embraces every alternate definition that may not fit the circumstances.

An agency has the authority to proceed on a case-by-case adjudicative basis and consider individual sets of facts rather than rigidifying a rule that embraces a whole category of products. *See SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947). Courts applying a statutory term to a set of facts need not set forth the outer limits of a statute's meaning. *See Strothers v. City of Laurel*, 895 F.3d 317, 331 (4th Cir. 2018) ("[W]e need not test the definition's outer limits."); *Fink v. Time Warner*

*Cable*, 810 F. Supp. 2d 633, 643 (S.D.N.Y. 2011) (finding no "need[] to define the outer limits of the concept, [because] the term 'access' should be interpreted broadly enough to include Defendant's alleged conduct"); *see also United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987) (noting "no issue arises concerning the outer limits of the meaning of 'danger to the community'" where the future misconduct that is anticipated concerns violent criminal activity). Nothing in the CEA or APA required the Commission to do so here or to settle on a rule to govern *future* applications of the Special Rule presenting different facts, and accordingly it did not.

The extrapolation of state provisions the Commission did not rely on to factual circumstances not before it was also unrealistic. Given the statutory context, the Commission is not likely to ever adopt a definition of "gaming" so broad that it would include all contracts on contingent events and render the other categories superfluous. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012); *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 664 (D.C. Cir. 2009). "[A] statute's meaning does not always turn solely on the broadest imaginable definitions of its component words." *Dubin v. United States*, 599 U.S. 110, 120 (2023). Rather, the meaning is interpreted in statutory context. *Id*. Section 5c(c)(5)(C) was intended to subject only a subset of event contracts to the Commission's public interest review, and the Commission has recently

acknowledged as much in a proposed rulemaking on event contracts. *See* Event Contracts, 89 Fed. Reg. 48,975 (proposed May 10, 2024) (declining to define "gaming" as staking or risking something of value on any contingent event because that "could encompass event contracts that were not intended by Congress to be subject to the Commission's heightened authority pursuant to CEA section 5c(c)(5)(C)"). If a future case arises involving a bet on a contingent event that is not a contest, it may well be correct to construe "gaming" in such a way that it excludes such an interpretation to effectuate congressional intent in the context of the Special Rule. But that is no excuse to exclude types of gaming, like betting on contests of others, that fall within the plain meaning of the word and pose no such inconsistency. For these reasons, the district court erred in finding the Commission's interpretation of "gaming" is "unworkable."

**4. The structure of the statute and the legislative history support that gaming is broader than "games."**

Narrowing "gaming" to require "games" also does not make sense here. First, and importantly, nothing in the statute supports such a reading. Had Congress intended to cover only betting on sports or games of chance, it would have said so. *See Bldg. Owners & Managers Ass'n Int'l v. FCC*, 254 F.3d 89, 95 (D.C. Cir. 2001). Second, the reliance on state statutes in deciding gaming means games does not actually support that conclusion. For example, the district court cited Iowa Code § 725.7 which provides that "gaming and betting" includes

"[p]articipat[ing] in a game for any sum of money or other property of any value" or, broadly, *"[m]ak[ing] any bet,"* which by its plain language is not limited to games.  APP. 109.

Third, though Kalshi pointed to Senator Lincoln's statement with examples of "gaming" contracts to include "sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament," this does not demonstrate contracts *must* involve a "game" to fall within the category.  The Kentucky Derby is not known as a "game."  It is a contest of others, bets on which are reasonably comparable to bets on congressional elections because the "predominant use" of wagers on their results would be a "speculative as opposed to a hedging or economic use" or "real commercial purpose."  156 Cong. Rec. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010); *see also* APP 267-71 (Commission order finding the contracts "could not be reasonably expected to be used for hedging and/or price basing on more than an occasional basis or that the [contracts] could reasonably be expected to be used predominantly by market participants having a commercial or hedging interest").  Nor do these examples "define the outer limits of the statute's coverage."  *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003) (quoting *New York v. FERC*, 535 U.S. 1, 21 (2002)).  Broadly worded statutes such as the Special Rule "often go beyond the principal evil to cover reasonably comparable evils."  *Oncale v. Sundowner Offshore Servs., Inc.*,

523 U.S. 75, 79 (1998); *see also Bostock v. Clayton County*, 590 U.S. 644 (2000) (same).

### 5. The gaming definition does not turn on economic consequences or state law exceptions for bona fide transactions.

Kalshi has asserted that Congress was concerned with "games" (despite not legislating "games") because "a game doesn't have economic consequences outside of the game itself." Stay OA Tr. at 63:14-15; APP. at 15:6-18. That is obviously not true, as hotels and other businesses around the World Series could attest. But even setting that aside, there is no support for Kalshi's contention. Notably, war and terrorism indisputably have economic effects outside of the events themselves, but Congress still empowered the Commission to consider whether the trading of contracts involving these events is contrary to the public interest. 156 Cong. Rec. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010) ("Firms facing financial risk posed by threats to our national security may take out insurance, but they should not buy a derivative."). If war is an enumerated category despite having economic consequences, gaming would be as well under Kalshi's logic. In reality, there is no such limitation on any of these terms.

Thus, the question is not whether there could be economic consequences, but only whether the contracts "involve" "gaming." If they do, the Commission may engage in a public interest review, which considers the contracts' economic purpose at *that* time. Moreover, Kalshi's recently-listed contracts on the popular

vote and margins of victory, etc., are noteworthy because they cannot even theoretically be tied to economic consequences.  There is no good reason to treat one kind of election betting as gaming, but not the other.  The existence of international election betting markets underscores the point: those markets are regulated under gambling laws, not financial regulations, because those markets are not properly understood to be financial markets.[20]

Some state gambling laws have "carve outs" for bona fide business transactions such as commodity contracts, securities, and insurance.  *See, e.g.,* Wis. Stat. Ann. § 945.01.  First, the Commission's finding that the Contracts were against the public interest because, among other reasons, they could not be reasonably expected to be used for hedging or price basing on more than an occasional basis further demonstrates that the contracts are gaming (or gambling) contracts, not bona fide business transactions.  This determination was based on the Commission's specialized experience and expertise in how derivatives markets operate.  *Loper Bright*, 144 S. Ct. at 2262 (quoting *Skidmore*, 323 U.S. at 139)

---

[20] The UK was discussed *supra* n.10.  In Australia, which is in the midst of a scandal regarding insider trading on election gambling, the relevant Commission and law are the Gambling Commission and the Gambling Act.  *See* Anna Lamche, *Election betting scandal: Met Police ends its investigation*, BBC NEWS (Aug. 23, 2024), https://www.bbc.com/news/articles/c4gd7qxwvjzo.  Similarly, Canada regulates election betting under its gambling laws.  Tyler Cheese, *Ontario's online gaming market launches, but some insiders and experts have concerns*, CBC NEWS (Apr. 4, 2022), https://www.cbc.ca/news/canada/toronto/ontario-igaming-online-gambling-launch-1.6404314.

(agency statutory interpretations "may be especially informative 'to the extent it rests on factual premises within the agency's expertise'"); *see also* CFTC, *Order Prohibiting the Listing or Trading of Political Event Contracts* (Apr. 2, 2012), https://www.cftc.gov/sites/default/files/stellent/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040212.pdf. Second, while state laws might except transactions on a regulated exchange from a state statute's definitions of bet or wager, that does not answer the question of whether the transactions are subject to prohibition under Section 5c(c)(5)(c)(ii). Even if many states' gaming laws have such exceptions, Congress still enumerated the category "gaming," indicating it nonetheless intended to subject certain "gaming" event contracts to public interest review.

Finally, while the Commission looked to state laws as one of several sources to define the term "gaming" for purposes of the Order, it did not determine whether the event contracts would be unlawful gaming under general gambling statutes. Instead, it considered the definition of gaming, applying its own expertise in the derivatives markets and considering gaming in the context of its traditional regulators, *i.e.* the states. On the other hand, the Commission's "unlawful" determination was made by reference to election gambling laws, discussed below. APP. 134-36.

## C. The Contracts are properly understood to be "unlawful under … State law."

Persisting in the flawed interpretation of "involve," the district court rejected the Commission's determination that the Contracts involve "unlawful activity," observing: congressional control "involves (relates to, entails, has as an essential feature, or any other iteration of the word) elections, politics, Congress, and party control," but "nothing …. illegal or unlawful." APP. 118. This again misses the point.

As noted, the Commission determined that Kalshi's contracts involve unlawful activity because they entail staking something of value (or betting) on the outcome of electoral contests, which is unlawful under numerous states' laws specifically prohibiting betting on elections. *See* APP. 138-39. The district court's reference to state laws that define gambling writ large in a way that could capture all event contracts ignored what the Commission's order actually concluded, and instead extrapolated that by "the CFTC's logic" "*any* event contract" could be subject to Commission review. APP. 115-16. But that is not the Commission's logic, and its order rejects this extrapolation. APP. 139 n.28.

### 1. The Commission did not read "unlawful under any state law" to include state laws that would operate to outlaw all event contracts.

The Commission acknowledged that there are state laws, sometimes called "bucket shop" laws, that could appear to capture, as unlawful, trading futures on

registered exchanges. But as the Commission explained, application of these laws is preempted by CEA section 2(a)(1), which grants the Commission "exclusive jurisdiction" over contracts traded on a DCM. 7 U.S.C. § 2(a)(1); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). Accordingly, transacting in event contracts on a DCM cannot, in and of itself, be an "activity that is unlawful under any … State law." For this reason, the Commission did not—and would not—look to bucket shop laws in evaluating an event contract under the "unlawful activity" category.

The district court dismissed that explanation, stating that "the CFTC does not provide a coherent justification as to why it argues that state laws that categorically ban all event contracts are preempted, but those that ban specific types of event contracts are not." APP. 116 n.15. This misconstrues what the Commission did. The Commission did not look to state laws that "ban specific types of event contracts." As the Commission explained, the unlawful activity category is concerned with "important state interests expressed in statutes separate and apart from those applicable to trading on a DCM." *See* APP. 139 n.28. And the CEA's preemption does not preclude the Commission from reviewing event contracts that involve activity that violates state laws separate and apart from those that would be preempted.

### 2. The text of the "unlawful" category is broad and reaches laws that are not preempted by the CEA.

When passing the Special Rule, Congress knew that the CEA preempts state

laws concerning trading in CFTC-regulated markets, but still provided for a discretionary public interest review of an agreement, contract, transaction, or swap that involved activity that is unlawful under *any* state law. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("[R]ead naturally, the word 'any' has an expansive meaning."). Thus, products may still involve activity that is unlawful under a state law, in the sense that transactions in the products may "relate closely" to, "entail," or "have as an essential feature or consequence" of an activity, outside of trading on a DCM, that violates state law. *See Involve*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/involve (last visited Oct. 14, 2024); *Involve*, RANDOM HOUSE COLLEGE DICTIONARY 703 (Revised ed. 1979); *Involve*, RIVERSIDE UNIVERSITY DICTIONARY 645 (1983).

Here, many state laws prohibit wagering on elections: some states prohibit it via their gambling laws, others via election laws, and others via common law. Stating that an election integrity law is preempted because the trades take place on a DCM puts the cart before the horse—the statute asks the Commission to determine *whether* the contracts may trade on a DCM. Kalshi's election contracts are subject to public interest review because they relate closely to illegal election betting—they are their mirror image, and the CEA should not be an escape hatch from state law interests. So, while transactions in the Contracts on a DCM do not violate, for example, state bucket-shop laws, they nevertheless involve an activity

otherwise unlawful in several states—wagering on elections.

The Commission did not determine that any state law operates to "ban specific types of event contracts." The district court echoed Kalshi's flawed argument that the Commission's reasoning threatens to "upend the CEA's regulatory scheme by empowering state legislatures to dictate the regulation of event contracts." Kalshi Summary Judgment Motion, Dkt 17 at 32. But event contracts are subject to prohibition only if the Commission initiates a discretionary review and determines they are contrary to public interest. 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii). And the presumption that no event contract can involve unlawful activity under (non-bucket shop) state laws just because DCMs may legally offer event contracts turns the Commission's task of evaluating contracts and transactions on its head. Such faulty logic presumes lawfulness before the Commission has made the required determination.

### 3. The Commission focused on state interests that were separate from trading in derivatives markets.

Ultimately the Commission determined that the Contracts involve unlawful activity by reviewing laws concerning "important state interests expressed in statutes separate and apart from those applicable from trading on a DCM." APP. 139 n.28. In this regard, the Commission cited several state laws that expressly prohibit gambling on elections. *See, e.g.*, Nev. Rev. Stat. § 293.830. Exclusive federal jurisdiction over exchange-traded derivatives does not mean such state

interests must give way to a DCM's desire to run an election gambling operation on a regulated exchange, thereby circumventing well-founded state laws designed to protect the democratic process. The district court gave no explanation, beyond its erroneous application of "involve" and illogical extension of the Commission's order to ordinary event contracts, as to why the Commission's focus on state interests was improper.

### 4. The statutory context and structure support the Commission's reading of the "unlawful" category.

The application of "involve" to "unlawful activity" further conveys its misunderstanding of statutory context. The court erroneously concluded that to read the Special Rule and the "unlawful activity" category as the Commission did would "effectively undo the congressional amendment to the CEA that eliminated the CFTC's across the board review." APP. 116. Apart from the unfounded concern that the CFTC's reasoning would subject all event contracts to review, this also misunderstands the statutory history and the Special Rule's significance. The 2000 amendment eliminated public interest review of *all products* that a DCM proposed to list, including futures. By contrast, the Special Rule, enacted *after* the 2000 amendment, reestablished public interest review for certain event contracts only, underscoring that Congress determined event contracts are categorically different from a typical derivative contract and may require public interest review. *Compare* S. Rep. No. 93-1194 (1974), 7 U.S.C. § 7(7) (1994) (repealed and

replaced) (directing Commission "to designate any board of trade as a 'contract market' when, and only when, such board of trade . . . demonstrates that transactions for future delivery in the commodity for which designation as a contract market is sought and will not be contrary to the public interest") *and* (codifying and 7 U.S.C. § 4c(b) giving Commission plenary power to regulate options), *with* Pub. L. No. 106-554, 114 Stat. 2763 (2000) (codifying 7 U.S.C. § 7a-2(c)(5)) (providing a DCM may elect to list "*any new contract or other instrument* . . . by providing to the Commission. . . a written certification"). The suggestion that the Commission's reasoning "effectively undo[es]" the change to the Commission's authority is wrong.

Ignoring this context, the district court asserted that it is the "underlying" that must "involve" "activity that is unlawful under any state law" in order not to "swallow" the Special Rule. This restrictive reading is at odds with the statutory text: "Activity that is unlawful under any Federal or State law" is a broadly worded category and overlaps with at least two other categories: "(II) terrorism;" and "(III) assassination." 7 U.S.C. 7a-2(c). But even if the words overlap, the broader reading fits the natural construction and accords with the doctrine of *ejusdem generis*. *See* 2A C. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 47.17 (7th ed. 2023) (*ejusdem generis*); *see also Loving v. IRS*, 742 F.3d 1013, 1019 (D.C. Cir. 2014) ("[L]awmakers . . . sometimes employ overlap or redundancy so

as to remove any doubt and make doubly sure.").

## CONCLUSION

For the foregoing reasons, and such others as appear just and reasonable, this Court should reverse the judgment below.

Dated: October 16, 2024                                    Respectfully submitted,

*/s/ Margaret P. Aisenbrey*
   *Senior Assistant General Counsel*

  Robert A. Schwartz
   *General Counsel*
  Anne W. Stukes
   *Deputy General Counsel*
  Raagnee Beri
   *Senior Assistant General Counsel*
  Conor B. Daly
   *Counsel*
  Commodity Futures Trading
  Commission 1155 21st Street, NW
  Washington, D.C. 20581-0001
  Phone: (202) 418-5986
  maisenbrey@cftc.gov

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(A) and Fed. R. App. P. 32(a)(7)(B), I hereby certify that the Brief of Appellant Commodity Futures Trading Commission complies with the type-volume limitation as set forth in Fed. R. App. P. 32(a)(7)(B) because the Brief contains 12,984 words excluding the parts of the Brief exempted by Fed. R. App. P. 32(f).

I further certify that the Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the Brief has been typed in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

*/s/ Margaret P. Aisenbrey*

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2024, the foregoing Brief for Appellant CFTC was electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia using the CM/ECF system. I also certify that I caused 8 paper copies to be delivered to the Clerk's Office.

Service was accomplished on counsel of record by the CM/ECF system, with two paper copies also dispatched by overnight service to lead counsel.

*/s/ Margaret P. Aisenbrey*

# STATUTORY ADDENDUM

## 7 U.S.C. § 7a-2, CEA Section 5c

(a)Acceptable business practices under core principles
(1)In general
>Consistent with the purposes of this chapter, the Commission may issue interpretations, or approve interpretations submitted to the Commission, of sections 7(d) and 7a–1(c)(2) of this title, to describe what would constitute an acceptable business practice under such sections.

(2)Effect of interpretation
>An interpretation issued under paragraph (1) may provide the exclusive means for complying with each section described in paragraph (1).

(b)Delegation of functions under core principles
(1)In general
>A contract market, derivatives transaction execution facility, or electronic trading facility with respect to a significant price discovery contract may comply with any applicable core principle through delegation of any relevant function to a registered futures association or a registered entity that is not an electronic trading facility.

(2)Responsibility
>A contract market, derivatives transaction execution facility, or electronic trading facility that delegates a function under paragraph (1) shall remain responsible for carrying out the function.

(3)Noncompliance
>If a contract market, derivatives transaction execution facility, or electronic trading facility that delegates a function under paragraph (1) becomes aware that a delegated function is not being performed as required under this chapter, the contract market, derivatives transaction execution facility, or electronic trading facility shall promptly take steps to address the noncompliance.

(c)New contracts, new rules, and rule amendments
(1)In general
>A registered entity may elect to list for trading or accept for clearing any new contract, or other instrument, or may elect to approve and implement any new rule or rule amendment, by providing to the Commission (and the Secretary of the Treasury, in the case of a contract of sale of a government security for future delivery (or option on such a contract) or a rule or rule amendment specifically related to such a contract) a written

certification that the new contract or instrument or clearing of the new contract or instrument, new rule, or rule amendment complies with this chapter (including regulations under this chapter).

(2)Rule review

The new rule or rule amendment described in paragraph (1) shall become effective, pursuant to the certification of the registered entity and notice of such certification to its members (in a manner to be determined by the Commission), on the date that is 10 business days after the date on which the Commission receives the certification (or such shorter period as determined by the Commission by rule or regulation) unless the Commission notifies the registered entity within such time that it is staying the certification because there exist novel or complex issues that require additional time to analyze, an inadequate explanation by the submitting registered entity, or a potential inconsistency with this chapter (including regulations under this chapter).

(3)Stay of certification for rules

(A) A notification by the Commission pursuant to paragraph (2) shall stay the certification of the new rule or rule amendment for up to an additional 90 days from the date of the notification.

(B)A rule or rule amendment subject to a stay pursuant to subparagraph (A) shall become effective, pursuant to the certification of the registered entity, at the expiration of the period described in subparagraph (A) unless the Commission—

(i) withdraws the stay prior to that time; or

(ii) notifies the registered entity during such period that it objects to the proposed certification on the grounds that it is inconsistent with this chapter (including regulations under this chapter).

(C) The Commission shall provide a not less than 30-day public comment period, within the 90-day period in which the stay is in effect as described in subparagraph (A), whenever the Commission reviews a rule or rule amendment pursuant to a notification by the Commission under this paragraph.

(4)Prior approval

(A)In general

A registered entity may request that the Commission grant prior approval to any new contract or other instrument, new rule, or rule amendment.

(B)Prior approval required

Notwithstanding any other provision of this section, a designated contract market shall submit to the Commission for prior approval each rule amendment that materially changes the terms and conditions, as determined by the Commission, in any contract of sale for future delivery of a commodity specifically enumerated in section 1a(10) of this title (or

any option thereon) traded through its facilities if the rule amendment applies to contracts and delivery months which have already been listed for trading and have open interest.

(C)Deadline

If prior approval is requested under subparagraph (A),

the Commission shall take final action on the request not later than 90 days after submission of the request, unless the person submitting the request agrees to an extension of the time limitation established under this subparagraph.

(5) Approval

(C) Special rule for review and approval of event contracts and swaps contracts

(i) Event contracts

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i) [2] of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve-

(I) activity that is unlawful under any Federal or State law;

(II) terrorism;

(III) assassination;

(IV) war;

(V) gaming; or

(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

(ii) Prohibition

No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

(iii) Swaps contracts

(I) In general

In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules that the Commission, in its discretion,

determines.
  (II) Requirements
    Any such criteria, conditions, or rules shall consider-
    (aa) the financial integrity of the derivatives clearing organization; and
    (bb) any other factors which the Commission determines may be
    appropriate.
  (iv) Deadline
  The Commission shall take final action under clauses (i) and (ii) in not later
  than 90 days from the commencement of its review unless the party seeking
  to offer the contract or swap agrees to an extension of this time limitation.

(d)Repealed. Pub. L. 111–203, title VII, § 745(c), July 21, 2010, 124 Stat. 1737
(e)Reservation of emergency authority
    Nothing in this section shall limit or in any way affect the emergency powers
    of the Commission provided in section 12a(9) of this title.
(f)Rules to avoid duplicative regulation of dual registrants
    Consistent with this chapter, each designated contract market and registered
    derivatives transaction execution facility shall issue such rules as are
    necessary to avoid duplicative or conflicting rules applicable to any futures
    commission merchant registered with the Commission pursuant to section
    6f(a) of this title (except paragraph (2) thereof), that is also registered with
    the Securities and Exchange Commission pursuant to section 78*o*(b) of title
    15 (except paragraph (11) thereof) with respect to the application of—
        (1)
        rules of such designated contract market or registered derivatives
        transaction execution facility of the type specified in section 6d(e) of
        this title involving security futures products; and
        (2)
        similar rules of national securities associations registered pursuant to
        section 78o–3(a) of title 15 and national securities exchanges
        registered pursuant to section 78f(g) of title 15 involving security
        futures products.


**7 U.S.C. §§1a(15), (19), CEA Sections 1a(15), (19)**

§1a. Definitions
As used in this chapter:
(15) Derivatives clearing organization
  (A) In general

The term "derivatives clearing organization" means a clearinghouse, clearing association, clearing corporation, or similar entity, facility, system, or organization that, with respect to an agreement, contract, or transaction-
(i) enables each party to the agreement, contract, or transaction to substitute, through novation or otherwise, the credit of the derivatives clearing organization for the credit of the parties;
(ii) arranges or provides, on a multilateral basis, for the settlement or netting of obligations resulting from such agreements, contracts, or transactions executed by participants in the derivatives clearing organization; or
(iii) otherwise provides clearing services or arrangements that mutualize or transfer among participants in the derivatives clearing organization the credit risk arising from such agreements, contracts, or transactions executed by the participants.
(B) Exclusions
The term "derivatives clearing organization" does not include an entity, facility, system, or organization solely because it arranges or provides for-
(i) settlement, netting, or novation of obligations resulting from agreements, contracts, or transactions, on a bilateral basis and without a central counterparty;
(ii) settlement or netting of cash payments through an interbank payment system; or
(iii) settlement, netting, or novation of obligations resulting from a sale of a commodity in a transaction in the spot market for the commodity.

(19) Excluded commodity
The term "excluded commodity" means-
(i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;
(ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is-
(I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or
(II) based solely on one or more commodities that have no cash market;
(iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or
(iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is-
(I) beyond the control of the parties to the relevant contract, agreement, or

transaction; and

(II) associated with a financial, commercial, or economic consequence.