**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 24-5205**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

KALSHIEX LLC,
*Plaintiff-Appellee,*

*v.*

COMMODITY FUTURES TRADING COMMISSION,
*Defendant-Appellant,*

On Appeal from the U.S. District Court for the District of Columbia
No. 23-cv-03257-JMC

**BRIEF OF APPELLEE KALSHIEX LLC**

Joshua B. Sterling
MILBANK LLP
1850 K St. N.W.
Washington, DC 20006
(202) 835-7500

Samuel V. Lioi
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
(216) 586-3939

Yaakov M. Roth
John Henry Thompson
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
(202) 879-3939
yroth@jonesday.com

Amanda K. Rice
JONES DAY
150 W. Jefferson Avenue,
Suite 2100
Detroit, MI 48226
(313) 733-3939

*Counsel for Plaintiff-Appellee KalshiEx LLC*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for appellee KalshiEx LLC certifies as follows:

**A.    Parties and Amici**

All parties, intervenors, and amici appearing before the District Court and in this Court are listed in Defendant-Appellant's opening brief.

**B.    Rulings Under Review**

References to the rulings at issue appear in Defendant-Appellant's opening brief.

**C.    Related Cases**

Related cases are listed in Defendant-Appellant's opening brief. This case has not previously been before this Court, except for a motions panel's resolution of the Defendant-Appellant's motion for a stay pending appeal in this case, No. 24-5205.

November 15, 2024                    /s/ *Yaakov M. Roth*
                                     Yaakov M. Roth

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, KalshiEx LLC makes the following disclosures:

KalshiEx LLC is a limited liability corporation organized under the laws of Delaware with its principal place of business in New York. KalshiEx LLC's parent organization (and the only company that owns ten percent or more of its stock) is Kalshi Inc.

November 15, 2024

/s/ *Yaakov M. Roth*

Yaakov M. Roth

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...................................................................................... i

CORPORATE DISCLOSURE STATEMENT .......................................... ii

TABLE OF AUTHORITIES ................................................................. v

GLOSSARY ..................................................................................... xiii

INTRODUCTION ............................................................................... 1

STATUTES AND REGULATIONS ....................................................... 5

STATEMENT OF THE ISSUES .......................................................... 5

STATEMENT OF THE CASE ............................................................. 5

      A.    Event Contracts Are Tools for Hedging Economic Risks and Aggregating Information. ............................ 5

      B.    Congress Allows Regulated Exchanges To List Event Contracts, Subject to a Narrow List of Exceptions. ................................................................. 7

      C.    Kalshi Proposes Congressional Control Contracts. ... 10

      D.    The CFTC Prohibits the Contracts. ............................ 13

      E.    The District Court Vacates the CFTC's Order, and This Court Denies a Stay Pending Appeal. ................. 14

SUMMARY OF THE ARGUMENT ....................................................... 16

STANDARD OF REVIEW ................................................................... 18

ARGUMENT ..................................................................................... 19

    I.    THE DISTRICT COURT CORRECTLY HELD THAT THESE CONTRACTS DO NOT INVOLVE UNLAWFUL ACTIVITY. ............. 19

A.    An Event Contract Involves Unlawful Activity if Its Underlying Event Relates to Unlawful Activity. ..................................................................... 20

B.    The CFTC's Contrary Reading Fails. .......................... 24

    *1.    The CFTC's trading-focused interpretation would force the same word to perform different functions.* ............................................. 25

    *2.    The CFTC's trading-focused interpretation would cover either nothing or everything.* ........... 30

    *3.    The word "transactions" does not solve anything.* ............................................. 38

II.    THE DISTRICT COURT CORRECTLY HELD THAT KALSHI'S CONTRACTS DO NOT INVOLVE GAMING. ................................ 41

    A.    Statutory Text, History, and Purpose All Confirm That "Gaming" Requires an Underlying Game.......... 42

    B.    The CFTC's Contrary Reading Fails. .......................... 46

        *1.    Defining "gaming" to mean all "gambling" would swallow the rule.* ..................................... 47

        *2.    Limiting "gaming" to gambling on "contests" is an arbitrary and ineffective gerrymander......* 52

        *3.    The Commission properly disclaims any attempt to define "gaming" based on hedging use.* ................................................................... 56

CONCLUSION ......................................................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Ali v. BOP,*
    552 U.S. 214 (2008)..................................................................35

*Am. Agric. Movement, Inc. v. Bd. of Trade,*
    977 F.2d 1147 (7th Cir. 1992).........................................31, 37

*Bankamerica Corp. v. United States,*
    462 U.S. 122 (1983)..................................................................26

*Bd. of Trade v. Christie Grain & Stock Co.,*
    198 U.S. 236 (1905)..................................................................50

*Boim v. Quranic Literacy Inst.,*
    291 F.3d 1000 (7th Cir. 2002).................................................21

*Brown v. Gardner,*
    513 U.S. 115 (1994)..................................................................25

*Brown v. NHTSA,*
    673 F.2d 544 (D.C. Cir. 1982).................................................25

*\*Clark v. Martinez,*
    543 U.S. 371 (2005)....................................................25, 26, 28

*Clarke v. CFTC,*
    74 F.4th 627 (5th Cir. 2023) ...............................................7, 13

*Consumer Elecs. Ass'n v. FCC,*
    347 F.3d 291 (D.C. Cir. 2003).................................................44

*Davis v. Mich. Dep't of Treasury,*
    489 U.S. 803 (1989)..................................................................30

*Dole v. United Steelworkers of Am.*,
　494 U.S. 26 (1990)..............................................................54

*Greenlaw v. United States*,
　554 U.S. 237 (2008)............................................................51

*Gustafson v. Alloyd Co.*,
　513 U.S. 561 (1995)............................................................28

*HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*,
　594 U.S. 382 (2021)............................................................18

*Ind. Mich. Power Co. v. Dep't of Energy*,
　88 F.3d 1272 (D.C. Cir. 1996) ...........................................42

*James Madison Ltd. ex rel. Hecht v. Ludwig*,
　82 F.3d 1085 (D.C. Cir. 1996) ...........................................30

*Jones v. Hendrix*,
　599 U.S. 465 (2023)......................................................30, 51

*KalshiEX LLC v. CFTC*,
　119 F.4th 58 (D.C. Cir. 2024)...........................5, 6, 7, 9, 15

*Kawashima v. Holder*,
　565 U.S. 478 (2012)............................................................27

*Leist v. Simplot*,
　638 F.2d 283 (2d Cir. 1980) ..............................................31

**Loper Bright Enters. v. Raimondo*,
　144 S. Ct. 2244 (2024)...................................................18, 52

*Mohamad v. Palestinian Auth.*,
　566 U.S. 449 (2012)............................................................25

*Mohasco Corp. v. Silver*,
447 U.S. 807 (1980)................................................................24

*Moreau v. Klevenhagen*,
508 U.S. 22 (1993)................................................................52

*Murphy v. NCAA*,
584 U.S. 453 (2018)..............................................................42

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018)..............................................................19

*NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*,
80 F.4th 413 (2d Cir. 2023).................................................20

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
551 U.S. 224 (2007)..............................................................23

*\*Ratzlaf v. United States*,
510 U.S. 135 (1994).........................................................24, 25

*Reno v. Bossier Par. Sch. Bd.*,
528 U.S. 320 (2000)..............................................................24

*Riegel v. Medtronic, Inc.*,
552 U.S. 312 (2008)..............................................................17

*Roberts v. United States*,
741 F.3d 152 (D.C. Cir. 2014).............................................17

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)................................................................53

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944).........................................................17, 18

*Sullivan v. Stroop*,
    496 U.S. 478 (1990) ................................................................. 25

*\*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
    599 U.S. 419 (2023) ........................................................... 33, 49

*United States v. King*,
    325 F.3d 110 (2d Cir. 2003) .................................................. 27

*United States v. Santos*,
    553 U.S. 507 (2008) ................................................................. 28

*United States v. Slatten*,
    865 F.3d 767 (D.C. Cir. 2017) .......................................... 20, 30

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ................................................................. 49

*Yates v. United States*,
    574 U.S. 528 (2015) ................................................................. 54

*Ysleta Del Sur Pueblo v. Texas*,
    596 U.S. 685 (2022) ................................................................. 31

**STATUTES**

7 U.S.C.

    § 1a ............................................................... 7, 38, 39, 41

    § 2 ........................................................................ 8, 38

    § 6 .......................................................................... 38

    § 6c ........................................................................ 22

    § 7 ........................................................................ 7, 8

§ 7a-1 ................................................................................................ 38

*§ 7a-2 ............ 1, 3, 4, 7, 9, 10, 12, 13, 16, 17, 19, 20, 21, 22, 24, 34, 39

§ 15b ................................................................................................ 22

§ 23 .................................................................................................. 22

§ 25 .................................................................................................. 38

25 U.S.C. § 2703 .............................................................................. 43

31 U.S.C. § 5362 ........................................................................ 43, 52

Pub. L. No. 93-463, 88 Stat. 1389 (1974) .................................... 8

Pub. L. No. 106-554, 114 Stat. 2763 (2000) ............................... 8

Ala. Code § 13A-12-20 ................................................................. 53

Alaska Stat. Ann. § 11.66.280 ..................................................... 53

Ariz. Rev. Stat. Ann. § 16-1015 .................................................. 54

Colo. Rev. Stat. Ann.

§ 18-10-102 ................................................................................ 43

§ 44-30-103 ................................................................................ 43

Del. Code tit. 11, § 1403 .............................................................. 53

Fla. Stat. § 849.14 ........................................................................ 53

Ga. Code Ann. § 16-12-21 ............................................................ 54

Haw. Rev. Stat. § 712-1220 ......................................................... 53

720 Ill. Comp. Stat. 5/28-1 .......................................................... 54

Ky. Rev. Stat. § 528.010 .......................................................................... 53

La. Stat.

    § 14:90 ................................................................................................. 53

    § 27:205 ............................................................................................... 43

Mass. Gen. Laws ch. 23K, § 2 .................................................................. 43

Me. Rev. Stat. tit. 17-A, § 952 ................................................................. 53

Mich. Comp. Laws § 168.931.................................................................... 54

Miss. Code Ann.

    § 75-76-5 ............................................................................................. 43

    § 97-33-1 ............................................................................................. 43

Mo. Rev. Stat. § 572.010........................................................................... 53

Mont. Code Ann. § 23-5-112 ..................................................................... 32

N.J. Stat.

    § 2C:37-1 ............................................................................................. 32

    § 19:34-24 ........................................................................................... 51

N.M. Stat. Ann.

    § 30-19-2 ............................................................................................. 43

    § 60-2E-3 ............................................................................................. 43

N.Y. Penal Law § 225.00 ..................................................................... 43, 53

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1301 ..................................... 43

Neb. Rev. Stat. § 28-1101 .................................................................. 54

Or. Rev. Stat. § 260.635 ................................................................... 54

Tex. Penal Code Ann. § 47.02 .......................................................... 54

Utah Code § 76-10-1101 ................................................................... 53

Wash. Rev. Code § 9.46.0237 ........................................................... 53

**OTHER AUTHORITIES**

17 C.F.R.

    § 38.4 ................................................................................................ 8

    § 38.100 ........................................................................................... 8

    § 40.2 ................................................................................................ 8

    § 40.3 ................................................................................................ 8

    § 40.4 ................................................................................................ 8

    § 40.5 ................................................................................................ 8

    § 40.6 ................................................................................................ 8

    § 40.11 ............................................................................................ 10

25 C.F.R. § 502.4 ............................................................................... 43

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) ......... 22, 44, 45, 56, 57

40 Fed. Reg. 25,849 (June 19, 1975) ............................................... 57

89 Fed. Reg. 48,968 (June 10, 2024) ......................................... 10, 51

*Gamble, Concise Oxford English Dictionary* ...................... 47, 48

*Gamble*, *Merriam-Webster's Collegiate Dictionary* ............................ 47, 48

*Game*, *Concise Oxford English Dictionary* (11th ed., rev. 2008) ................................................................................ 41

*Game*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2020) ................................................................................ 44

*Game*, *New Oxford American Dictionary* (3d ed. 2010) .......................... 42

*Gaming*, *American Heritage Dictionary* (4th ed. 2009) ........................ 42

*Gaming*, *Bouvier Law Dictionary* (2011 ed.) ......................................... 42

*Gaming*, *Cambridge Dictionary of American English* (2d ed. 2008) ................................................................................ 42

*Gaming contract*, *Chambers Dictionary* (13th ed. 2014) ....................... 42

*Gaming*, Merriam-Webster.com ............................................................. 42

*Involve*, *American Heritage Dictionary* 921 (4th ed. 2009) ................... 20

*Involve*, Merriam-Webster.com .............................................................. 20

Katherine Blunt, *Wall Street Giants to Make $50 Billion Bet on AI and Power Projects*, WALL ST. J. (Oct. 30, 2024) ..................... 49

Michael J. de la Merced, *Political Betting Markets See Vindication in Trump Victory*, N.Y. TIMES (Nov. 6, 2024) ................ 15

Michael Mackenzie, *Bond Market's Bet on a Half-Point Fed Cut This Month Is Over*, BLOOMBERG (Sept. 11, 2024) ..................... 49

Philip Bond, et al., *The Real Effects of Capital Markets*, 4 ANN. REV. FIN. ECON. 339 (2012) ....................................................... 56

S. 5100, 118th Cong. (Sept. 18, 2024) ..................................................... 59

# GLOSSARY

**APA** – Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*

**App.** – Joint Appendix

**CEA** – Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*

**CFTC or Commission** – U.S. Commodity Futures Trading Commission

**DCM** – Designated Contract Market

**Kalshi** – Appellee KalshiEx LLC

## INTRODUCTION

The issue in this case is whether the Commodity Futures Trading Commission (CFTC) exceeded its statutory authority when it tried to ban election prediction markets. The District Court correctly held that it did. The CFTC's reading of the Commodity Exchange Act (CEA) violated basic canons of construction, and lacked a limiting principle. The District Court therefore vacated the agency order, permitting prediction markets to go live for the 2024 election cycle—a result this Court declined to stay pending appeal. This Court should now affirm on the merits.

Stepping back, Appellee KalshiEx LLC (Kalshi) operates a federally regulated exchange for trading event contracts. Event contracts entitle traders to payment based on whether future events occur. Like other derivatives, these instruments are tools to hedge risks; they also harness the "wisdom of crowds" to generate valuable predictive data. Under the CEA, event contracts may lawfully be traded on regulated exchanges. The Commission may prohibit an event contract only if it (1) "involve[s]" unlawful activity, terrorism, assassination, war, gaming, or a "similar activity" specified by regulation, *and* (2) is determined by the CFTC to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

1

In June 2023, Kalshi sought to list event contracts contingent on whether a particular party will control the House of Representatives or the Senate on a particular date. Those Congressional Control Contracts do not "involve" unlawful activity, terrorism, assassination, war, gaming, or any similar activity that the Commission has specified by regulation. Nor are they contrary to the public interest. Quite the opposite: Election prediction markets are a unique mechanism for hedging economic risks associated with politics, and have also become a ubiquitous market-based check on unreliable polling and misinformation.

Nevertheless, the CFTC asserted that Kalshi's contracts "involve" unlawful activity and gaming—and then determined that the contracts undermined the public interest, and banned them. Kalshi challenged the Commission's Order under the Administrative Procedure Act (APA), arguing that the CFTC had exceeded its statutory authority in reviewing the contracts and engaged in arbitrary and capricious decision-making in prohibiting them. After thorough briefing from the parties and *amici*, as well as an in-depth oral argument, the District Court (Cobb, J.) agreed with Kalshi that the CFTC lacked the statutory authority to subject the Congressional Control Contracts to public-interest scrutiny.

The District Court got this right, and this Court should affirm. The Commission's Order contorted the CEA's text, ignored its structure, and untenably allowed two narrow exceptions to swallow the Act's general rule. On appeal, the Commission fails to grapple with the fundamental deficiencies of its interpretation, and instead tries to distract from them with confused arguments that do not move the needle.

*First*, Kalshi's Congressional Control Contracts do not "involve … activity that is unlawful under any Federal or State law," 7 U.S.C. § 7a-2(c)(5)(C)(i)(I), because congressional elections have no relationship to unlawful activity. The Commission does not argue otherwise. Instead, it contends that it may review any contract whose *trading* would violate state law, and observes that some States ban betting on election results. But the Commission's reading flouts basic principles of interpretation by requiring the same word ("involve") to perform different tasks depending on the enumerated activity at issue. It also reads the "unlawful activity" exception so broadly that it swallows the general rule (and the other exceptions), because some States ban staking money on *any* contingency. As the District Court recognized, that "just cannot be right." App.109. The Commission offers this Court no way out of that muddle.

*Second*, Kalshi's contracts do not involve "gaming."  7 U.S.C. § 7a-2(c)(5)(C)(i)(V).  Dictionaries and statutes alike confirm that "gaming" typically means playing games or playing games for stakes.  Legislative history confirms that is what Congress had in mind.  And as the District Court explained, that commonsense reading is the *only* one that fits here.  Equating "gaming" with "gambling" more broadly, as the CFTC tries to do, would subject *every* event contract to agency review, since anyone who trades an event contract is "staking something of value upon the outcome of a … contingent event."  App.134.  The Commission protests that its Order did not go that far, but its logic plainly does.  Its only effort to draw a line—by concocting a Goldilocks definition of "gaming" that reaches bets on "contests" (including elections) but no other contingent events— is arbitrary, outcome-driven gerrymandering with no basis in the statute.  The District Court saw through it, and this Court should too.

In short, the Commission's decision to prohibit Kalshi's contracts exceeded its statutory authority.  Congress is free to add "elections" to the CEA's list of enumerated activities, and thereby authorize the CFTC to prohibit election prediction markets.  But Congress has not done so.  This Court should therefore affirm the District Court's judgment.

4

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the CFTC's opening brief.

## STATEMENT OF THE ISSUES

1.    Do event contracts contingent on election results "involve … activity that is unlawful under any Federal or State law" within the meaning of the CEA?

2.    Do event contracts contingent on election results "involve … gaming" within the meaning of the CEA?

## STATEMENT OF THE CASE

### A.    Event Contracts Are Tools for Hedging Economic Risks and Aggregating Information.

Derivatives are tools to mitigate risk.  *See* App.163, 227.  This case concerns "event contracts," a form of derivative whose payoff is based on the occurrence or extent of a specified event.  App.95; *see KalshiEX LLC v. CFTC*, 119 F.4th 58, 59 (D.C. Cir. 2024).  These financial instruments specify a future event with different potential outcomes, a payment structure for those outcomes, and a date when the contract expires.  App.153-54, 932.  They typically center on a yes-or-no question—*e.g.*, whether 30-year mortgage rates will exceed 8% at the end of the year,

whether average temperatures in California will hit an all-time high this summer, or whether a corporation's CEO will be replaced by a particular date. Businesses and individuals use event contracts to hedge the risk of a specified event. *See* App.94-95. For example, "a beachfront property owner might purchase an event contract predicting that a hurricane will reach landfall in her area to offset the risk of losing rental income from the storm." *KalshiEX*, 119 F.4th at 61. The price of event contracts can also help clarify the likelihood that an event will occur, because their dynamic prices reflect the market's aggregation of trader beliefs, and traders have a financial incentive to make the most accurate predictions based on the information they know. App.95.

Political events carry vast economic consequences, and thus present risks that can be hedged through these financial instruments, just like events related to finance, weather, or anything else. App.810-13; *see also* App.486 (former Chairman of President Obama's Council of Economic Advisors discussing the benefits of political event contracts). In addition, political event markets provide real-time data that traditional polls often cannot replicate, by providing financial incentives for traders to remain objective and sift through misinformation. App.420-21, 490.

Political event markets are widespread. PredictIt, for example, "is a futures market for politics" that allows trading on electoral outcomes. *Clarke v. CFTC*, 74 F.4th 627, 633 (5th Cir. 2023). CFTC staff have permitted it to operate under a no-action letter issued in 2014. *Id.* at 633-44. The University of Iowa's IEM platform is another election prediction market, one the CFTC has likewise permitted for decades. App.199, 455, 828. Similar markets exist (and have long existed) in other countries around the world. *See, e.g.*, App.387. And unregulated, offshore markets such as Polymarket—which lack the safeguards of regulated exchanges like Kalshi's—provide analogous services. *See* App.525, 563; *KalshiEX*, 119 F.4th at 62.

### B. Congress Allows Regulated Exchanges To List Event Contracts, Subject to a Narrow List of Exceptions.

Under the CEA, "[e]vent contracts" are regulated as "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i). While products like "wheat, cotton, rice, corn, [and] oats" may be more familiar, the CEA defines "excluded commodities" to include *events*—in the statutory parlance, any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties" and "associated with" economic consequences. *Id.* § 1a(9), (19).

7

To offer event contracts or other derivatives for public trading, an entity must receive CFTC designation as a regulated exchange (known as a "designated contract market" or DCM). *Id.* §§ 2(e), 7(a); 17 C.F.R. § 38.100. Registered exchanges are subject to comprehensive oversight and must comply with numerous regulatory requirements, including 23 "core principles." 7 U.S.C. § 7(d); 17 C.F.R. pt. 38. Among other things, those principles require exchanges to prevent manipulation and price distortion through surveillance and enforcement, to implement "[s]ystem safeguards" to minimize risks, and to refrain from listing contracts that are readily susceptible to manipulation. *See* 7 U.S.C. § 7(d)(3), (4), (20). Exchanges must follow CFTC procedures for approval, listing, and implementation of event contracts. *See* 17 C.F.R. §§ 38.4, 40.2-6.

Although the CFTC has robust authority to regulate exchanges, it has no authority under current law to prevent exchanges from listing most event contracts. Originally, the law was otherwise: An exchange had to persuade the Commission that any new product served "the public interest." *See* Pub. L. No. 93-463, § 207, 88 Stat. 1389, 1400 (1974). But Congress repealed that pre-approval requirement in 2000. *See* Pub. L. No. 106-554, §§ 110(2), 113, 114 Stat. 2763, 2763A-384, 399 (2000).

8

In 2010, Congress amended the CEA again to add the provision that governs here—what the CFTC calls the "Special Rule." Under it, an exchange is entitled to self-certify that a contract complies with the law, and list it for trading the next day. *See* 7 U.S.C. § 7a-2(c)(1), (c)(5)(B). But the agency may review and potentially prohibit a limited class of event contracts that fall within certain enumerated categories. *Id.* § 7a-2(c)(5)(C)(i)-(ii); *KalshiEX*, 119 F.4th at 62-63. Specifically, the CEA authorizes review of event contracts that "involve": "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined … by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). Unless the contract involves one of those activities, the CFTC has no authority to initiate a public-interest review. App.97-98.

The process for reviewing event contracts thus proceeds in two basic steps: *First*, the CFTC must determine whether the contract "involve[s]" one of the enumerated "activit[ies]." 7 U.S.C. § 7a-2(c)(5)(C)(i). If not, the contract can be listed without further scrutiny. *Second*, if the contract does "involve" a listed activity, the CFTC "may determine" it is "contrary to the public interest" and, if so, bar its listing. *Id.*

The Commission has promulgated a regulation that largely mirrors the statute. 17 C.F.R. § 40.11(a)(1)-(2). It has never exercised its power to determine, "by rule or regulation," that any activity "similar" to the five enumerated ones is "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i)(VI). Thus, public-interest scrutiny applies *only* if a contract "involves" unlawful activity, terrorism, assassination, war, or gaming.[1]

## C.  Kalshi Proposes Congressional Control Contracts.

Kalshi is a regulated exchange that allows the public to buy and sell event contracts. App.99. The Commission unanimously authorized Kalshi to operate its contract market in 2020. App.328. Contracts traded on Kalshi's exchange involve events that run the gamut from economics to climate, public health, and transportation—*e.g.*, the number of major hurricanes that will form over the Atlantic next year, or whether China's GDP growth will exceed a certain rate. App.328, 371, 382.

---

[1] Earlier this year, the Commission proposed a new rule to further implement its event-contract review authority. *See* 89 Fed. Reg. 48,968 (June 10, 2024). The CFTC's proposed rule would essentially codify the reasoning in the challenged Order (discussed in more detail below). It does *not* propose to add any new category of "similar" activity under the agency's authority pursuant to 7 U.S.C. § 7a-2(c)(5)(C)(i)(VI).

Kalshi also lists contracts involving political events—*e.g.*, whether the federal government will shut down, whether the debt ceiling will be lifted by a certain date, and whether the Senate will confirm particular nominees. *See Events*, Kalshi, https://kalshi.com/events.

This case involves Congressional Control Contracts, which enable traders to take positions on which political party will control the House or Senate on a future (post-election) date. *See* App.99-100. These are cash-settled, yes/no contracts based on the question: "Will <chamber of Congress> be controlled by <party> for <term>?" The contract defines control by reference to the party affiliation of the Speaker (for the House) or President Pro Tempore (for the Senate). App.153. To avoid conflicts of interest, the contracts' terms prohibit trading by certain individuals and institutions—including candidates; paid employees of Members of Congress, congressional campaigns, party organizations, PACs, Super PACs, or major polling organizations; existing Members of Congress; and household and immediate family members of the foregoing. App.161.

On June 12, 2023, Kalshi certified that these contracts comply with applicable law. App.152. That certification should have been sufficient to allow the contracts to be listed for trading. 7 U.S.C. § 7a-2(c)(1). But

11

on a split vote, the CFTC initiated review of the contracts. App.100-101. In announcing its review, the CFTC stated that the Congressional Control Contracts may involve an enumerated activity under the Special Rule. App.271. Two Commissioners dissented, one observing that the contracts did "not fall within the categories enumerated in the CEA."[2]

During the ensuing public comment period, academics, businesses, investors, former CFTC and SEC officials, human-rights activists, and nonprofits expressed support for the Congressional Control Contracts.[3] Many emphasized the economic and informational value of election prediction markets.[4] Others attested that they would buy these contracts to hedge risk.[5] Overall, the comments reinforced that the Congressional Control Contracts have significant societal value.

---

[2] Mersinger Dissenting Statement, CFTC.gov (June 23, 2023), https://www.cftc.gov/PressRoom/SpeechesTestimony/mersingerstatement062323; *see also* Pham Dissenting Statement, CFTC.gov (June 23, 2023), https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement062323.

[3] *See, e.g.*, App.326-37, 358-59, 360-62, 365-67, 369-80, 381-82, 413-15, 416-21, 422-23, 425-29, 470-72, 475-76, 479-83, 484-87, 489-91, 492-94, 497-502, 503-04, 509, 511-18, 519, 520-21.

[4] *See, e.g.*, App.384-412, 422-23, 425-29; 470-72, 616-84.

[5] *See, e.g.*, App.338, 356-57, 363-64, 368, 473, 474, 477-78, 505-06, 507, 510, 970.

### D.    The CFTC Prohibits the Contracts.

On September 22, 2023, the CFTC issued an order—once again, by a bare majority of three Commissioners—prohibiting Kalshi from listing its Congressional Control Contracts.   App.127-49.   Commissioner Mersinger published a dissent,[6] and Commissioner Pham abstained from the vote[7] citing the Commission's recent defeat in its litigation against PredictIt.  *See Clarke*, 74 F.4th 627.

In the Order, the CFTC correctly observed that it "may determine that contracts in certain excluded commodities … are contrary to the public interest if the contracts involve" any of the enumerated activities. App.129.  But it then went on incorrectly to find that the Congressional Control Contracts are subject to public-interest review because they ostensibly "involve" two enumerated activities: "gaming" and "unlawful" activity.  *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)(I), (V).

---

[6] Mersinger Dissenting Statement, CFTC.gov (Sept. 22, 2023), https://www.cftc.gov/PressRoom/SpeechesTestimony/mersingerstatement092223.

[7] Pham Abstention Statement, CFTC.gov (Sept. 22, 2023), https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement092223.

The Commission did not (and could not) determine that *elections* involve gaming or unlawful activity. Rather, it reasoned that an event contract "involve[s]" those activities if *trading the contract* would *amount to* gaming or unlawful activity. App.131-33. The CFTC then declared that trading these contracts would amount to both, relying primarily on state statutes that define illicit "gambling" to include staking money on the outcome of a "game, contest, or contingent event." App.134. It then determined that the contracts are "contrary to the public interest," supposedly because they lack sufficient economic purpose and pose vague threats to election integrity, and so prohibited them. App.139-49.

### E.    The District Court Vacates the CFTC's Order, and This Court Denies a Stay Pending Appeal.

Kalshi sued to vacate the Order under the APA. *See* App.104. After full merits briefing and oral argument, the District Court granted summary judgment to Kalshi. ECF 47, 51. In a careful opinion focused on the statute's text, context, and history, Judge Cobb concluded that the Commission acted unlawfully when it banned Kalshi's contracts. An event contract "involves" an enumerated activity, the District Court recognized, where the contract's underlying event (*i.e.*, the subject of the contract) relates to that activity. App.111-18. Kalshi's contracts relate

14

to "elections, politics, Congress, and party control" but not to "illegal or unlawful activity." App.118. Nor do the contracts "bear any relation to any game—played for stakes or otherwise." *Id.* The District Court rejected the Commission's competing interpretations as "much too broad" and "unworkable in the context of this statute." App.107-08, 113-14. Because it held that Kalshi's contracts fall outside the Commission's statutory review authority, the District Court had no occasion to address whether the Order's public-interest analysis violated the APA. App.118.

Judge Cobb declined to stay her order pending appeal, finding that the most important factors (success on the merits and irreparable harm) weighed "strongly" against a stay. ECF 54, Tr.27:25, 29:15-33:5. The Commission then asked this Court for a stay, but a motions panel found that the CFTC had adduced no cognizable evidence of any irreparable harm. *KalshiEX*, 119 F.4th at 67. While the panel invited the CFTC to renew its motion if such evidence developed, it never did, and Kalshi's election contracts traded successfully during the 2024 cycle. *See* Michael J. de la Merced, *Political Betting Markets See Vindication in Trump Victory*, N.Y. TIMES (Nov. 6, 2024) (noting that prediction market claims to better reflect reality "seem to have been borne out").

## SUMMARY OF THE ARGUMENT

**I.**     Kalshi's Congressional Control Contracts do not "involve …
activity that is unlawful under any Federal or State law."  7 U.S.C. § 7a-
2(c)(5)(C)(i)(I).  As the District Court held based on the statute's text and
structure, an event contract "'involves' an enumerated activity where the
underlying event constitutes or relates to that activity."  App.111.  And
it is undisputed that the underlying events here—elections to determine
partisan control of Congress—involve no unlawful activity.

The CFTC's contrary reading—under which the Commission may
review any contract whose *trading* would be unlawful under state law—
fails twice over.  First, it requires the same word ("involve") to perform
very different functions depending on the enumerated activity at issue,
shifting between an *event*-focused inquiry and a *trading*-focused inquiry.
That flouts basic principles of statutory interpretation.  Second, because
some States ban staking money on *any* contingency, the Commission's
reading permits the "unlawful activity" exception to swallow the statute's
general rule (and the other exceptions too).  That "just cannot be right."
App.109.  None of the Commission's arguments on appeal gets it past
these two critical flaws.

16

II.    These contracts also do not "involve … gaming."  7 U.S.C. § 7a-2(c)(5)(C)(i)(V).  The proper interpretation is again simple: "'gaming,' as used in the special rule, refers to playing games or playing games for stakes."  App.111.  An event contract therefore involves "gaming" if it is contingent on a game or a game-related event—like the Kentucky Derby, Super Bowl, or Masters golf tournament, all of which were mentioned in the provision's only legislative history.  And it is undisputed that elections do not relate to games in any sense.  App.107.

The Commission's contrary reading fails here too.  The CFTC tries to equate "gaming" with "gambling," but any interpretation "untethered to the act of playing a game [is] much too broad in [this] context."  *Id.*  After all, purchasing *any* event contract amounts to "staking something of value upon the outcome of a … contingent event," App.134, and the CEA plainly does not permit review of *every* contract.  The CFTC tries to escape this untenable result by contriving an intermediate definition of "gaming" that reaches wagers on "contests" but no other contingencies.  But there is no basis for that neither-here-nor-there definition; it is just a transparent way to block contracts the CFTC does not like.  This Court should reject that disingenuous approach, like the District Court did.

17

## STANDARD OF REVIEW

This Court reviews the District Court's judgment *de novo*. *Roberts v. United States*, 741 F.3d 152, 157 (D.C. Cir. 2014). It must determine the best reading of the statute, with no deference to the CFTC. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2259-62 (2024).

Although the Commission invokes *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), it forfeited that argument below. App.105 n.9. Indeed, the CFTC cited *Skidmore* below only to argue that "the more deferential *Chevron* standard" applied instead. ECF 30 at 19 n.17. And, contrary to *amicus*'s suggestion, *Skidmore* deference can be waived, just as *Chevron* deference could be. *Cf. HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 394 (2021). In all events, *Skidmore* can matter only if statutory text is ambiguous, *see Riegel v. Medtronic, Inc.*, 552 U.S. 312, 326 (2008), and the CFTC affirmatively *disclaims* any ambiguity. *See* CFTC Br. 28 ("Nobody contends that the text of Section 5c(c)(5)(C) is ambiguous."). Finally, *Skidmore* allows for deference only insofar as an agency interpretation has the "power to persuade." 323 U.S. at 140. For all of the reasons discussed below, the CFTC's interpretations of the key statutory terms are unpersuasive.

# ARGUMENT

The question in this case is whether the Commission acted lawfully when it banned the Congressional Control Contracts.  Given the Order's reasoning, that inquiry boils down to whether event contracts contingent on election results "involve" unlawful activity or gaming.  7 U.S.C. § 7a-2(c)(5)(C)(i)(I), (V).  The District Court correctly held that these contracts involve neither; elections have nothing to do with unlawful activity or gaming.  Thus, the CFTC had no power to block these contracts.

## I.    THE DISTRICT COURT CORRECTLY HELD THAT THESE CONTRACTS DO NOT INVOLVE UNLAWFUL ACTIVITY.

The Commission may review an event contract that "involve[s] … activity that is unlawful under any Federal or State law."  7 U.S.C. § 7a-2(c)(5)(C)(i)(I).  As the District Court held based on the statute's text and context, an event contract "'involves' an enumerated activity where the underlying event constitutes or relates to that activity."  App.111.  And the underlying events here—elections that determine partisan control of Congress—do not involve unlawful activity.  The CFTC's alternative reading of the unlawful-activity exception violates basic rules of statutory interpretation, and is neither "natural" nor "workable."  App.118.  Nothing in the CFTC's brief on appeal can salvage it.

## A.    An Event Contract Involves Unlawful Activity if Its Underlying Event Relates to Unlawful Activity.

Statutory interpretation "begins with the statutory text, and ends there" if the text is clear.  *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018).  Courts must also account for statutory context and structure.  *United States v. Slatten*, 865 F.3d 767, 807 (D.C. Cir. 2017). Here, text and context confirm that the unlawful-activity category reaches contracts contingent on illegal activities, or on events related to such activities.  For example, a contract on next year's murder rate in the District, or on whether activists will vandalize artwork in the National Gallery, would "involve" activity that is "unlawful" under D.C. law (*i.e.*, murder and vandalism).  In other words, the statutory inquiry is whether the contract's *underlying event* has a connection to unlawful conduct.

Begin with the single word that links "agreements, contracts, or transactions" to the six enumerated categories: "involve."  7 U.S.C. § 7a-2(c)(5)(C)(i).  There is no dispute about the abstract meaning of that word; it means "to relate closely," *Involve*, Merriam-Webster.com, or "[t]o have as a necessary feature or consequence," *Involve*, *American Heritage Dictionary* 921 (4th ed. 2009).  *See* CFTC Br. 29.  But to understand the role the word plays in a given statutory framework, it is necessary to

20

examine the statute's "structure" and "context." *See Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1010 (7th Cir. 2002); *NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 80 F.4th 413, 419 (2d Cir. 2023).

Here, structure and context confirm that a contract "involves" an enumerated activity when its *underlying event* constitutes or relates to that activity. *See* App.111-18. This natural, event-focused interpretation is the only reading of "involve" that works for every enumerated category. Indeed, as applied to "terrorism," "assassination," and "war"—the three categories that follow unlawful activity—there is no other viable reading. 7 U.S.C. § 7a-2(c)(5)(C)(i)(II)-(IV). As the District Court put it, "[a]n event contract can only involve war, terrorism, or assassination if the contract's *subject itself* relates in some way … to war, terrorism, or assassination." App.113 (emphasis added). "There is simply no other workable construction [as] applied to those categories." *Id.*

The unlawful-activity category works in exactly the same way, by capturing event contracts contingent on illegal acts. It thus functions as a check on instruments that could incentivize crime or allow traders to gain from socially destructive activity, just like the war, terrorism, and assassination categories. Indeed, the limited legislative history of the

21

relevant provision indicates that Congress was concerned about contracts that would allow traders "to profit from events that threaten our national security." 156 Cong. Rec. S5907 (daily ed. July 15, 2010). Consistent with that concern, the unlawful-activity category prevents traders from profiting from illegal behavior.

The CFTC's principal objection to this event-focused interpretation is that it conflates the word "involve" with the phrase "based upon," which the Act uses elsewhere (including in an earlier part of the Special Rule itself). *See* CFTC Br. 30 (quoting 7 U.S.C. § 7a-2(c)(5)(C)'s reference to a contract that is "based upon the occurrence, extent of an occurrence, or contingency"). So, the argument goes, Congress must have used the word "involve" to mean something *broader* than "based upon."

In reality, the CEA uses the terms "involve" and "based upon" in different ways across different contexts, and repeatedly uses "involve" to refer to the underlying commodity or subject of a contract or transaction.[8]

---

[8] *See, e.g.*, 7 U.S.C. §§ 2(c)(2)(D)(ii)(III)(aa) ("commercial practice in cash or spot markets for the commodity *involved*"); 6c(b) ("transaction *involving* any commodity regulated under this chapter"); 15b(d)-(h) ("cotton *involved*" in contracts); 23(b)(1) ("transactions *involving* different commodities"); 2(a)(1)(D)(i) ("contracts[] and transactions *involving* … a security futures product") (emphases added).

More importantly, though, Kalshi and the District Court *agree* that the word "involve" carries its typical meaning (to relate to, entail, etc.), which is broader than "based upon." *Accord* App.112 (noting that both parties agree that "involves" is "more expansive in scope than a phrase like 'based upon'"). To use the CFTC's example below, a contract contingent on "whether a certain amount of cocaine is seized" by customs agents at the Mexican border might not be "based upon" illegal activity, since the seizure itself would be legal. But that contract would still "involve" (*i.e.*, relate to) unlawful activity, since cocaine smuggling is unlawful. *Id.* Accordingly, the word "involve" allows even a loose relationship to unlawful activity to qualify. But it is still the *underlying event* that must bear that relationship to unlawful activity, since that is undeniably the only way to apply the neighboring terrorism, assassination, and war categories.

Applying that same approach here, it is clear that the CFTC cannot invoke the unlawful-activity category to block Kalshi's contracts. As the District Court explained, those contracts "involve elections (and politics, congressional control, and other related topics)"—but "not illegal activities." App.106, 111.

## B.    The CFTC's Contrary Reading Fails.

The Commission admits that the terrorism, assassination, and war categories require an event-focused reading of "involve," such that the relevant question is whether the contract's underlying event is related to those activities. *See* CFTC Br. 32 (conceding that "a contract can involve war, terrorism, or assassination only when the underlying involves war, terrorism, or assassination"). But it argues for a very different interpretation of the very same word as applied to unlawful activity. A contract "involves" unlawful activity, the Commission posits, if *the act of buying or selling the contract* involves unlawful conduct. *See* App.133-35. And because staking money on the outcome of elections is unlawful in some States, the CFTC concluded that these contracts involve "unlawful" activity under 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). App.134, 138-39.

As the District Court recognized, that reading fails for at least two reasons. *First*, it forces a single word ("involve") to perform two different functions depending on the category at issue—a plain violation of basic interpretive principles. *Second*, focusing on the act of trading either nullifies the unlawful-activity exception or expands it to swallow *all* event contracts—both of which are untenable.

24

### 1. The CFTC's trading-focused interpretation would force the same word to perform different functions.

To start, the CFTC's approach ignores the basic rule of statutory construction that "identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007); *Brown v. NHTSA*, 673 F.2d 544, 546 n.5 (D.C. Cir. 1982).

While that principle applies even where a term appears across different sections of a statute, *see Sullivan v. Stroop*, 496 U.S. 478, 484 (1990), it hardens as the gap between appearances shrinks. *See, e.g.*, *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980) (same section); *Brown v. Gardner*, 513 U.S. 115, 118 (1994) (presumption "at its most vigorous when a term is repeated within [one] sentence"); *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 455-56 (2012) (same). Unsurprisingly, this canon is *most* potent when applied to "a *single* formulation," which must be read "the same way each time it is called into play." *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994). Where one statutory term "applies without differentiation to" a set of "categories," construing it to perform different work as to "each category would … invent a statute," not "interpret one." *Clark v. Martinez*, 543 U.S. 371, 378 (2005).

Applying that principle, the Supreme Court "reject[ed] as unreasonable" an interpretation of "the phrase 'other than' to mean one thing when applied to 'banks' and another thing as applied to 'common carriers'" when the phrase "modifies both words in the same clause." *Bankamerica Corp. v. United States*, 462 U.S. 122, 129 (1983). Similarly, it rejected a construction of the "phrase 'abridging the right to vote on account of race or color'" to mean one thing "when it modifies 'effect,' but" something else "when it modifies 'purpose.'" *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 329 (2000).

The Commission's approach to the unlawful-activity category flouts this principle. Rather than apply "a *single* formulation … the same way each time it is called into play," *Ratzlaf*, 510 U.S. at 143, the Order assigned "involve" a "different meaning for each category" of enumerated activities, *Clark*, 543 U.S. at 378. Again, the CFTC admits that an event contract "involves" terrorism, assassination, or war only if the *underlying event* relates to those things. Yet it contends that a contract "involves" unlawful activity if *trading* it would *amount to* illegal conduct. The CFTC has never identified a single other statute in which one word performs such different work depending on the category it modifies.

26

As the District Court thus concluded, there is no "principled reason, consistent with applicable canons of [statutory] construction," to treat the "relationship between 'involve' and the unlawful activity" category "more broadly, and thus differently," than the war, assassination, or terrorism categories.    App.113-14.    That would only "invite ambiguity into a statutory framework that is otherwise clear."  *Id.*

The Commission offers no serious response.  It insists "involve" is capacious.  CFTC Br. 33.  That misses the point.  To be sure, the CFTC is right that "involve" can capture a range of relationships between two concepts.  That is all its cited cases say.  *See Kawashima v. Holder*, 565 U.S. 478, 482-83 (2012); *United States v. King*, 325 F.3d 110, 112-13 (2d Cir. 2003).  But the dispute here is not about the *scope* of the relationships captured by the word "involve," but rather the *subject and object* of those relationships.  Again, Kalshi agrees that "involve" can mean "related to," and that the word can capture a variety of relationships.  *See supra* at 20.  The question is what *function* the term performs in this scheme: Do the enumerated activities "relate to" the *underlying event*, or instead to the *act of trading* the contract?  As explained above, the only consistent and contextually workable answer is the event.  *See supra*, Part I.A.

The CFTC tries to launder the conceptual breadth of "involve" into a theory that the same term can and does perform totally different tasks on a category-by-category basis. It claims the consistent-meaning canon only rules out "*contradictory*" interpretations of the same term, and that it has introduced no such contradiction here. CFTC Br. 33. But, as its name suggests, the canon is a presumption that the meaning of a term remains "consistent" across usages, not merely that different usages do not contradict each other. *See, e.g.*, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995). Thus, a term's interaction with one of the categories that it modifies must remain constant as applied to the remaining categories: "The lowest common denominator, as it were, must govern." *Clark*, 543 U.S. at 380. And to say that "involve" connects the contract's *event* with war, but connects the contract's *trading* with unlawful activity, is to impute different meanings—indeed, fundamentally different functions—to a single word. *But see United States v. Santos*, 553 U.S. 507, 522 (2008) (plurality op.) ("giving the same word, *in the same statutory provision*, different meanings" is "interpretive contortion"). Put simply, the function of a single word cannot toggle back and forth over five subparagraphs.

28

The CFTC's related theory that "involve" consistently performs one of *two* possible tasks—either linking the contract's underlying event to one of the listed activities, *or* referencing some "different connection" between the contract and the activity (CFTC Br. 15)—would nullify the consistent-meaning canon. Defining a single term to mean "either X *or* Y" depending on the category it modifies assigns the term *two* meanings, not *one*. Again, the CFTC cannot identify a single case embracing that interpretive maneuver for *any* term, no matter how broad.

The CFTC's dual-purpose reading of "involve" also does not comport with normal usage. Imagine a movie theater posts a policy requiring parents to accompany children to "any screening that involves science fiction, horror, violence, or drug use." That policy plainly uses "involve" to link the film's *content* to the listed concepts. While it is semantically possible for the act of *attending* a film to "involve" violence (if a fight breaks out) or drug use (if someone uses drugs during the film), context forecloses that reading. It is not semantically possible for the act of attending to entail science fiction or horror—those are genres, not behaviors. Thus, the lowest common denominator directs that "involve" refers to the content of the movie across all four categories: No reasonable

person would read the policy to refer to the film's *content* with respect to science fiction and horror, but to the attendees' *behavior* with respect to violence and drug use.  Nor would anyone call that reading "consistent." The CFTC's split-screen reading of the CEA fails for the same reason.

### 2.    The CFTC's trading-focused interpretation would cover either nothing or everything.

Beyond its inconsistency, the CFTC's reading also contravenes the CEA's structure and context, because an inquiry into whether trading a contract violates state law would either capture *nothing* or the *universe* of event contracts.  Neither result is plausible.  And both confirm that the proper inquiry is into whether the contract's underlying event (not the act of trading it) entails or relates to a violation of state law.

Courts interpret provisions "with a view to their place in the overall statutory scheme."  *Davis v. Mich. Dep't of Treasury,* 489 U.S. 803, 809 (1989).  A statute's components should be construed to work "in harmony" rather than "at cross-purposes."  *Jones v. Hendrix*, 599 U.S. 465, 478 (2023); *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1093 (D.C. Cir. 1996).  Thus, courts do not interpret discrete exceptions in ways that "read out the rule."  *Slatten*, 865 F.3d at 807.

30

The Order's approach obliterates the statutory scheme. The CFTC reads the unlawful-activity provision to authorize review of any contract whose *trading* "involves … activity that is unlawful under any Federal or State law." *See* App.113; CFTC Br. 38. But that reading would capture *no* event contracts. If trading a contract violated a "federal" law, that instrument would be banned regardless of the Special Rule. Congress did not authorize public-interest review of *already-illegal* instruments.

As for "state law," the CFTC's "exclusive jurisdiction" over the derivatives markets preempts any state law that purports to prohibit the trading of a contract on a regulated exchange. 7 U.S.C. § 2(a)(1)(A); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.) (CEA "preempts the application of state law" to regulated markets); *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1156 (7th Cir. 1992) (*AAM*) (CEA preempts "application[s] of state law [that] would directly affect trading on or the operation of a futures market"). Taken at face value, the CFTC's trading-focused reading would thus leave the unlawful-activity exception "with no work to perform." *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022).

31

Recognizing as much, the Order tried yet another tack. It admitted that, thanks to preemption, "transacting these products … cannot, in and of itself, be an 'activity that is unlawful under any … State law.'" App.139 n.28. But it reasoned that the unlawful-activity category applies if trading a contract *would be* illegal *but for* federal preemption (or, put another way, whether trading the contract "outside … a DCM" would violate state law). CFTC Br. 52-53. And because some States ban wagering on elections, the Commission concluded that Kalshi's contracts "involve" that illicit activity. App.137 n.26 (collecting statutes).

This move does not work either, because it proves too much. As the District Court noted, a host of States prohibit staking money on *any* contingent future event—whether an election, a hurricane, or a wheat harvest. App.115.[9] Accordingly, under the CFTC's reading, trading *any* event contract "involve[s] … activity that is unlawful" in certain States,

---

[9] *See, e.g.*, Mont. Code Ann. § 23-5-112(14)(a) ("risking any money, credit, deposit, check, property, or other thing of value for a gain that is contingent in whole or in part upon lot, chance, or the operation of a gambling device or gambling enterprise"); N.J. Stat. § 2C:37-1(b) ("staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the actor's control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome").

in the sense that trading an event contract outside a regulated exchange would run afoul of these state laws (or, alternatively, that these state laws would prohibit all event contracts but for federal preemption). So, if the Commission's interpretation were correct, it would be empowered to subject *all* event contracts to public-interest scrutiny.

That "just cannot be right." App.109. Reading the unlawful-activity exception to permit review of every contract would "swallow the [CEA's] provisions authorizing the CFTC to review only event contracts that relate to specific, enumerated topics." App.116; *see also United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) (applying "principle that every clause and word of a statute should have meaning"). It "would also effectively undo the … amendment to the CEA that eliminated the CFTC's across-the-board review." App.116. As noted above, exchanges were originally required to prove to the CFTC that any new contract served the public interest, before Congress repealed that regime 25 years ago. *See supra* at 8. Rather than restore that across-the-board "public interest" review, Congress in the Special Rule chose to permit review of *only* contracts that "involve" enumerated activities. The CFTC's all-embracing reading would vitiate that choice.

On appeal, the Commission tries to sidestep this fatal problem by protesting that the challenged Order did not actually go so far as to say that *all* event contracts are subject to public-interest review. The agency insists it "never used" this "overbroad interpretation," and pledges that it "would not rely on state laws that could be construed as outlawing trading in event contracts more generally." CFTC Br. 27, 51-52, 54.

This line of argument is baffling. As the District Court explained, the Commission's interpretation of the unlawful-activity category would necessarily give rise to these absurd results. It does not matter that the CFTC, so far, has invoked only state election-betting statutes as grounds to block event contracts. If the CEA means what the agency says, *every* event contract would be shoehorned into a single exception. After all, as the Commission recognizes elsewhere, the exception is triggered by "activity that is unlawful under *any* state law." CFTC Br. 53; *see also* 7 U.S.C. § 7a-2(c)(5)(C)(i)(I) ("any Federal or State law"). And all agree that some States ban wagering on *any* contingent event. *See supra* at 32. So, whether the Commission wants to embrace or disclaim it, the Order's logic means that trading *any* event contract involves "activity that is unlawful under any ... state law." App.115-16.

Unwilling to accept the logical implications of its interpretation, the Commission tries to distinguish the election-betting statutes invoked in the Order from the broader set of gambling statutes that sweep in any wagers on contingent events.  It admits that the latter statutes could not (and thus would not) suffice to trigger the unlawful-activity exception. *See* CFTC Br. 51-52, 53-55.  But it never offers a coherent explanation for *why* they would not trigger the text of the Special Rule, if that provision really calls for inquiry into whether trading a contract violates state law. Again, the statute refers to "*any* state law," and as the Commission itself insists, "any" means exactly what it says.  CFTC Br. 53 (citing *Ali v. BOP*, 552 U.S. 214, 219 (2008)).  The text thus offers no basis for a distinction between different *types* of laws: *Any* prohibitive state statute will do.

Muddling things further, the CFTC appears to suggest that general gambling laws are preempted (and thus could not trigger review under the unlawful-activity exception) whereas other state laws are "separate and apart from those that would be preempted" (and therefore could). CFTC Br. 52.  That is badly confused.  Preemption under the CEA does not turn on the *scope* of the state statute at issue, but rather on whether that law is applied to "contracts traded on a DCM."  CFTC Br. 52; *see also*

35

*supra* at 31.  A state law that bans wagering on any contingent event and one that bans wagering on elections are both preempted *as applied to trading on a registered exchange*.  Conversely, neither statute would be preempted *as applied to event contracts outside an exchange*.  Whether a state law reaches wagers on *all* or *some* kinds of contingent events plays no role in the analysis.  The Commission cites no authority for its novel and bizarre theory of preemption.

To be clear, then, the preemption analysis works the same way for so-called "bucket shop laws" and other more targeted statutes.  If we ask whether trading a contract *on a DCM* violates state law, the answer will always be "no," because federal law would preempt any such application of state law (whether broad or narrow).  If we ask instead whether trading a contract *outside a DCM* violates any state law, the answer will always be "yes," because every event contract in those circumstances would run afoul of at least one state gambling law (a broad one if not a narrow one).  So the point remains that the CFTC's approach to the unlawful-activity category is a non-starter, sweeping in either nothing or everything.  This blind alley is powerful confirmation that looking at the act of trading was the wrong path from the start.

Finally, it does not help to invoke the supposedly distinct "state interests" that motivate laws aimed at wagering on election outcomes in particular (as opposed to laws aimed at gambling more generally). *See, e.g.*, CFTC Br. 17, 52-55. As the District Court recognized, this argument is not "coherent." App.116. How would the CFTC, an exchange, or a court discern the precise interests motivating a state law? Regardless, the Special Rule's reference to "*any*" state law leaves no room for any distinction based on legislative motives or objects. Perhaps the CFTC's point is that only laws motivated by a generalized anti-gambling policy are preempted? But again, preemption has nothing to do with a law's purpose—only whether its "application" could "directly affect trading on" a regulated exchange. *AAM*, 977 F.2d at 1156; *supra* at 31.

At bottom, the CFTC's theory that regulated exchanges cannot take "an escape hatch" from state public policy (CFTC Br. 27, 53) proves far too much: Multiple states have a policy against staking money on future contingencies; the entire federal scheme offers an "escape hatch" from those policy judgments; and Congress "knew that" when it enacted the Special Rule (CFTC Br. 52). Only the event-focused interpretation of the statute avoids this frolic and detour.

37

### 3.     The word "transactions" does not solve anything.

On appeal, the Commission emphasizes an argument that it did not advance until its final reply brief in the District Court: that the statute's reference to "agreements, contracts, or *transactions*" justifies the Order's act-of-trading gloss on the enumerated activities.  CFTC Br. 34.  Its point seems to be that the word "transactions" must refer to the act of trading the contract (even if the words "agreements" and "contracts" do not), such that an event contract triggers public-interest review if *transacting* in it "involves" a violation of state law.  As the District Court explained, this argument does not withstand scrutiny and makes no difference for the question at issue here.  App.114-15.  Indeed, it does not solve either of the fundamental problems with the CFTC's interpretation.

To begin, the Commission's premise is mistaken.  Congress used the phrase "agreement, contract, or transaction" throughout the CEA to refer to a financial instrument itself.[10]  There is no basis to infer that the word "transaction" in *this* provision was added to capture the act of trading the derivative.  Indeed, that reading makes no sense in context.

---

[10] *See, e.g.*, 7 U.S.C. § 1a(10)(A)(ii); *id.* § 2 (using phrase 25 times); *id.* § 6 (16 times); *id.* § 7a-1 (five times); *id.* § 25 (four times).

The Special Rule speaks to "the *listing* of agreements, contracts, transactions, or swaps" based on events, and provides that if one involves an enumerated activity and is contrary to the public interest, then that "agreement, contract, or transaction" cannot be "*listed*."  7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii) (emphases added).  Of course, the *act of trading* cannot be "listed"; only the *instrument itself* can be listed.[11]

All that aside, focusing on the "transaction" does not help anything.  As the District Court pointed out, a "transaction on an exchange has an underlying subject just like a contract."  App.114.  Such a "transaction," like such a "contract," can *only* "involve" terrorism, assassination, or war if its *underlying event* relates to one of those activities.  *Id.*  So swapping out "contract" for "transaction" does not ameliorate the inconsistency at the heart of the CFTC's interpretation.  The problem remains that the agency seeks a "construction of the statute that only works for some, but not all, of the enumerated categories."  App.115; *see supra*, Part I.B.1.

---

[11] The Commission responds that the Special Rule proceeds to say that such an "agreement, contract, or transaction" cannot be "made available for clearing" either.  CFTC Br. 37.  That just means the "transaction" must be something that is capable of *both* being "listed" *and* being "made available for clearing."  In all events, what exchanges make "available for clearing" is again *the instrument itself.*  *See* 7 U.S.C. § 1a(15)(A).

Finally, the CFTC's emphasis on "transactions" only highlights the structural problems plaguing its reading of the unlawful-activity prong. If every event-contract "transaction" that would run afoul of state law is subject to CFTC review, then either *none* or *all* of such "transactions" fall within this category.  That remains untenable.  *See supra*, Part I.B.2.

\*      \*      \*

In sum, as the District Court explained, "[t]he only formulation of the interaction between 'involve' and 'unlawful activity' that actually works … is if the contract or transaction's underlying event relates in some way to activity that is illegal—not if the act of staking money on the contract's underlying would be unlawful under any state law."  App.116. Unlike the CFTC's reading, that approach assigns the word "involve" a consistent role throughout the provision.  And unlike the CFTC's reading, it prevents the unlawful-activity prong from alternatively being rendered meaningless or swallowing all of the other enumerated activities.

Elections are the opposite of unlawful activity: They are a basic feature of constitutional government.  Accordingly, as the District Court concluded, the CFTC exceeded its powers by subjecting Kalshi's contracts to public-interest review under the unlawful-activity exception.

## II. THE DISTRICT COURT CORRECTLY HELD THAT KALSHI'S CONTRACTS DO NOT INVOLVE GAMING.

Kalshi's contracts do not "involve … gaming" either. As the District Court held, the proper interpretation is again simple: "'gaming,' as used in the Special Rule, refers to playing games or playing games for stakes." App.111. An event contract thus involves "gaming" if it is contingent on a game or a game-related event. App.107. The classic example is a contract on the outcome of a sporting event; as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets. Elections, by contrast, are not games or related to games. They are not staged for entertainment, diversion, or sport. The Congressional Control Contracts are thus not subject to public-interest review under the "gaming" exception.

Once again, the Commission's contrary reading—that "gaming" is synonymous with "gambling," "gambling" includes staking money on the "outcome of a game, contest, or contingent event," and trading election contracts is "staking something of value upon the outcome of a contest," App.134-36—is overbroad, proves too much, and cannot be squared with ordinary usage or statutory context. Here too, the CFTC cannot credibly argue that its tortured interpretation is the best reading of the Act.

### A.  Statutory Text, History, and Purpose All Confirm That "Gaming" Requires an Underlying Game.

This Court routinely looks to dictionaries to define statutory terms that have a "common meaning." *Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1275 (D.C. Cir. 1996). "Gaming" is such a term, as the CFTC admits. CFTC Br. 39. And, in ordinary English, "gaming" requires a *game*. The most common dictionary definitions of the term all refer to playing games—*e.g.*, "playing at games of chance for money," *Game*, *Concise Oxford English Dictionary* (11th ed., rev. 2008); "playing games for stakes," *Gaming*, Merriam-Webster.com; or "play games of chance for money," *Game*, *New Oxford American Dictionary* (3d ed. 2010). "Gaming" is often associated with playing games in the casino context. *Gaming*, *Cambridge Dictionary of American English* (2d ed. 2008) ("industry in which people gamble by playing cards and other games in casinos"); *see also Gaming*, *American Heritage Dictionary* (4th ed. 2009). But it can also describe "a wager upon any game," such as "a horse race or football match." *Gaming contract*, *Chambers Dictionary* (13th ed. 2014); *see also Gaming*, *Bouvier Law Dictionary* (2011 ed.) ("[a] contract to enter a game of skill or chance that one might win or lose"). The common denominator, as the word's root suggests, is the predicate of a game.

42

This commonsense reading is bolstered by federal and state laws, which most often use "gaming" to refer to games or betting on games. As for federal law, the Indian Gaming Regulatory Act delineates various "gaming" classes, each of which refers to a different set of games. *See* 25 U.S.C. § 2703(6)-(8); 25 C.F.R. § 502.4; *see also* App.110. Meanwhile, when Congress wanted to reach the broader acts of "staking … something of value upon the outcome of a contest of others," it used the terms "bet or wager"—*not* the word "gaming." 31 U.S.C. § 5362(1)(A).

At the state level, many statutes define "gaming operations" and "gaming activities" as "the offering or conducting of any game or gaming device," La. Stat. § 27:205(13); and similarly define "gaming" as "dealing, operating, carrying on, conducting, maintaining or exposing any game for pay," Mass. Gen. Laws ch. 23K, § 2. Indeed, many States expressly distinguish the narrower, game-focused concept of "gaming" from broader categories like "gambling" or "wagering."[12]

---

[12] *Compare* Colo. Rev. Stat. Ann. § 18-10-102(2) ("gambling"), *with id.* § 44-30-103(22) ("gaming"); *compare* Miss. Code Ann. § 97-33-1 ("wagering or betting"), *with id.* § 75-76-5(*l*) ("gaming"); *compare* N.M. Stat. Ann. § 30-19-2 ("gambling"), *with id.* § 60-2E-3(P) ("gaming"); *compare* N.Y. Penal Law § 225.00(2) (criminal "gambling"), *with* N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1301(19)-(20) ("gaming," "game").

The game-based interpretation of "gaming" also aligns closely with the available legislative history. In a colloquy over the Special Rule, two Senators discussed the types of event contracts covered by the "gaming" category. Three examples were given: contracts on the outcome of the Super Bowl, the Kentucky Derby, and the Masters golf tournament. *See* 156 Cong. Rec. S5907. All of those underlying events are games, and so those contracts would be covered by the District Court's commonsense, plain-meaning interpretation of "gaming." App.117-18.

The Commission responds that the Kentucky Derby is a contest, not a game (CFTC Br. 47), but the ordinary meaning of a "game" is an activity "engaged in for diversion or amusement." *Game*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2020). That plainly includes horse-racing that is staged for entertainment and to facilitate betting. The CFTC also protests that these examples do not "define the outer limits" of what the statute covers. CFTC Br. 47 (quoting *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003)). True enough, but the point is that the legislative history perfectly matches the ordinary meaning of "gaming" drawn from dictionary definitions and other statutes. That is a telling signal that Congress did not intend to depart from that usage.

Evidently, Congress sought to prevent exchanges from facilitating casino-style or sports gambling. App.117.[13]  On a policy level, that makes some sense: The basic purpose of Designated Contract Markets is to allow "hedging" of economic risk.   156 Cong. Rec. S5907.   Contracts that "serve[] no commercial purpose at all" may therefore not deserve to be traded on a regulated exchange.  *Id.* at S5906.  And, at least in general, contracts relating to *games*—again, activities conducted for diversion or amusement—are unlikely to serve any "commercial or hedging interest." *Id.*  So it would be sensible for Congress to empower the CFTC to at least *review* the category of game-based contracts.  Statutory purpose therefore further corroborates the ordinary meaning of "gaming."

Applying that ordinary meaning, the Congressional Control Contracts do not "involve … gaming."  The CFTC has never argued that elections are (or even relate to) games or gaming, and they obviously are not: Elections are not staged for diversion or amusement, but rather to select a representative government.  That dooms the Order.

---

[13] For context, when Congress enacted the Special Rule in 2010, sports betting was generally precluded by federal law; the landscape has since materially changed.  *See generally Murphy v. NCAA*, 584 U.S. 453 (2018) (invalidating federal statute on this topic).

### B.    The CFTC's Contrary Reading Fails.

Unable to argue that elections "involve" gaming, the Commission took the position in the Order that trading a contract contingent on an election amounts to "gaming."  As explained above, focusing on the act of trading a contract, rather than the event underlying it, misunderstands the structure of the Special Rule.  *See supra*, Part I.B.1.  That alone is dispositive.  *See* App.111, 118.  But even setting that point aside, trading election-related event contracts cannot plausibly be classified as gaming within the meaning of the statute.

As explained, "gaming" is properly defined to mean to wagering on games or related events, and elections are not games.  The Commission in its Order tried to equate "gaming" with "gambling," but that broader definition proves far too much—all event contracts (not to mention other derivatives and many more vanilla investments) could be characterized as "gambling" in a colloquial sense.  Trying to steer between a definition too *narrow* to reach Kalshi's contracts and one so *broad* it would swallow the rule, the Commission conjures an intermediate position.  But that awkward middle-road definition has no foundation in the text, history, or purpose of the statute.  It is clearly not the best reading of the CEA.

### 1.  Defining "gaming" to mean all "gambling" would swallow the rule.

The Order started by equating "gaming" with "gambling."  App.134. At the outset, that conflation is dubious as a matter of ordinary meaning. True, "gaming" (in the sense of betting on games) is a form of "gambling." *See* CFTC Br. 41.  But the converse is not true: Not all gambling is also gaming.  If two employees stake $5 on whether their boss will show up on Monday, they have made a bet and engaged in a form of "gambling," but no one would say that they are "gaming."  Likewise, if an agricultural business buys derivatives pegged to the future price of grain, that might be called "betting" or even "gambling" on the grain market, but it is not "gaming."  In ordinary parlance, "gaming" presupposes a "game."

The Commission argues that the dictionary definitions of "gaming" sometimes cross-reference "gambling."  CFTC Br. 40 & n.17.  That is true, but those dictionaries also offer definitions of "gamble" that roughly track the game-based definition of gaming.  Indeed, both dictionaries cited by the agency do so.  *See Gamble*, *Merriam-Webster's Collegiate Dictionary* ("to play a game for money"); *Gamble*, *Concise Oxford English Dictionary* (to "play games of chance for money").  Those definitions do not support the Order, because they still require an underlying game.

47

The Commission's strategy is thus to rely on the cross-references to "gambling" and then to incorporate the *broadest* definition of "gambling." For example, the same two dictionaries alternatively define "gamble" as "to stake something on a contingency," *Gamble*, *Merriam-Webster's Collegiate Dictionary*, or to "take risky action in the hope of a desired result," *Gamble*, *Concise Oxford English Dictionary*. Some state statutes also define gambling in similarly sweeping terms. App.134. According to the CFTC, gambling thus means to "stake something of value upon the outcome of a game, contest, or contingent event." App.108.

That broader interpretation reaches the trading of election-based contracts, since those traders are certainly staking money on the outcome of a "contingent event." But that jumps the Commission out of the frying pan and into the fire: Trading *any* event contract is, *by definition*, staking money on a future contingent event. 7 U.S.C. § 1a(19)(iv). That is what these instruments are. So if the Commission is right about what it means for a contract to "involve … gaming," it would be empowered to review (and prohibit) *every* event contract. Simply put, if staking money on an election is gambling, so too is staking money on wheat harvests, weather events, or interest-rate changes. No principled distinction exists.

Indeed, while the Commission cites news articles and out-of-context statements that refer to election-based event contracts as "betting" or "gambling" (CFTC Br. 3, 12 n.10), the media regularly refer to all sorts of financial instruments and investments in similar terms. *E.g.*, Michael Mackenzie, *Bond Market's Bet on a Half-Point Fed Cut This Month Is Over*, BLOOMBERG (Sept. 11, 2024); Katherine Blunt, *Wall Street Giants to Make $50 Billion Bet on AI and Power Projects*, WALL ST. J. (Oct. 30, 2024). So this common usage only proves that the CFTC's approach—defining "gaming" to mean colloquial "gambling" in the sense of staking money on a contingency—would sweep in the universe of event contracts.

As the District Court observed, that "cannot be right." App.109. No less than the Commission's overbroad approach to the unlawful-activity category, reading "gaming" to capture every event contract would render the other enumerated activities superfluous. *Polansky*, 599 U.S. at 432. It would also undo Congress's repeal of across-the-board public-interest review. *See supra*, Part I.B.2. There is no plausible reason to think that Congress hid sweeping authority to scrutinize all event contracts in the fifth entry on an enumerated list. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Especially when the word "gaming" on its face—

and in accord with its legislative history—is concerned with casino gambling and sports, not the premise of the entire derivatives market. As Justice Holmes put it, the "proposition that the dealings which give its character to the great market for future sales in this country are to be regarded as mere wagers" is "extraordinary and unlikely." *Bd. of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236, 249 (1905).

The Commission appears to accept that it would be untenable to "adopt a definition of 'gaming' so broad that it would include all contracts on contingent events and render the other categories superfluous." CFTC Br. 45. Yet, incredibly, the Commission insists that this Court can ignore that the Order's approach to "gaming," by its logic, does precisely that. The agency thinks it matters that it did not announce this interpretation of "gaming" in a regulation, merely "on a case-by-case adjudicative basis," without "rigidifying a rule." CFTC Br. 44; *see also* App.52-53, 59-60. According to the Commission, all it needed to do in this posture was decide that Kalshi's contracts involve "gaming"—without worrying about what its interpretation might mean for "*future* applications … presenting different facts." CFTC Br. 45. The agency thus seems to hold out the prospect of *inconsistency* as some sort of saving grace.

As the District Court recognized, that is nonsense. App.109 n.11. To decide whether Kalshi's contracts involve "gaming," a court must first understand what "gaming" entails. That poses a question of statutory interpretation. The Commission has offered a definition of "gaming"—staking money on "the outcome of a game, contest, or contingent event"—that would cover the waterfront of event contracts. App.108. But "[t]he illogical results of applying" an interpretation weigh "strongly against the conclusion that Congress intended these results." *Jones*, 599 U.S. at 480 (cleaned up); *see also, e.g.*, *Greenlaw v. United States*, 554 U.S. 237, 251 (2008) (courts "resist attributing to Congress an intention to render a statute … internally inconsistent"). That rule does not fall away merely because an agency announces its faulty interpretation in an adjudication. And neither an agency nor a court may construe a statute as a ticket good for one ride only. So if the Order's interpretation is contrary to law, it must be vacated. The structural incoherence wrought by the Order's reading confirms that the CFTC indeed exceeded its authority.[14]

---

[14] The Commission's insistence that this Court blind itself to ordinary interpretive principles because the Order is not a prospective regulation is also disingenuous: The CFTC has proposed a regulation to codify the Order's interpretive chicanery. *See* 89 Fed. Reg. at 48,974-75.

### 2. Limiting "gaming" to gambling on "contests" is an arbitrary and ineffective gerrymander.

Aware that its definition scrambles the statutory scheme—but still determined to wedge Kalshi's contracts into an enumerated category—the Order offers a workaround. "Gaming," it asserts, can be *expanded* beyond games to reach gambling more broadly—but then *limited* to bets or wagers on "contests of others," which purportedly includes elections, without reaching so far as to cover all event contracts. App.135-36 & n.25. This creative attempt to thread the needle fails.

Most fundamentally, the Commission's halfway definition cannot seriously be defended as the best reading of the statute. *See Loper Bright*, 144 S. Ct. at 2259-62. Neither the Order nor the Commission on appeal identifies a single dictionary or statutory definition of "gaming" that refers to betting on "contests" *but nothing more*. Instead, the Order relied on a statute that classifies betting on "contest[s] of others" not as *gaming*, but as a "bet or wager." 31 U.S.C. § 5362(1)(A). This statute sheds no light on the meaning of "gaming" in the CEA because it never defines that term. Indeed, that statute repeatedly uses "gaming" to refer to the Indian Gaming Regulatory Act which, as discussed, bolsters the game-centered definition of "gaming." *See id.* § 5362(10)(C); *supra* at 43.

The Order cited a few state laws that use the term "contest" in their gambling provisions. *See* App.134 n.22 & 135 n.24. But those sources, viewed in context, only underscore that the Commission engaged in outcome-driven cherry-picking, not serious statutory interpretation. Most of the cited statutes employ the phrase "contest *of chance*," which is a reference to traditional gambling activities, not elections.[15] The other statutes use the word "contest" in ways that likewise plainly exclude elections: Delaware and Florida, for example, ban "wagers upon the result of any trial or contest … of skill, speed or power of endurance of human or beast." Del. Code tit. 11, § 1403(1); *see also* Fla. Stat. § 849.14 (similar). Louisiana, as another example, defines "gambling" as a "game, contest, lottery, or contrivance whereby a person risks the loss of anything of value." La. Stat. § 14:90(A)(1)(a).[16]

---

[15] *See, e.g.*, Alaska Stat. Ann. § 11.66.280(2)-(3) (defining "contest of chance" as "a contest, game, gaming scheme, or gaming device"; defining "gambling" as staking "something of value upon the outcome of a contest of chance"); *see also* Ala. Code § 13A-12-20(4); Haw. Rev. Stat. § 712-1220; Me. Rev. Stat. tit. 17-A, § 952(3)-(4); Mo. Rev. Stat. § 572.010(4); N.Y. Penal Law § 225.00(2); Wash. Rev. Code § 9.46.0237.

[16] *See also* Ky. Rev. Stat. § 528.010(6)(a) ("outcome of a contest, game, gaming scheme, or gaming device"); Utah Code § 76-10-1101(8)(a) (same).

These laws are not referring to election "contests" any more than they are referring to jury "trials."  The word "contest" in these statutes must be understood "by the company it keeps."  *Yates v. United States*, 574 U.S. 528, 543 (2015).  In context, "contest" refers to events that are not ordinarily referred to as "games" but share key attributes with them—*e.g.*, horse-races or boxing matches.  Such "contests" are staged for entertainment; they have no independent significance; their outcomes carry no economic risks.  App.329.  Elections are nothing like the other terms on those statutory lists, and thus cannot be treated as "contests" under those provisions.  *See, e.g.*, *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990).  Indeed, States that define "gambling" to include betting on "contests" often *separately* prohibit wagering on elections—which would be unnecessary if "contests" already captured elections.[17] For this reason, too, the Order's logic fails.  *See* App.109.

---

[17] *See* Ariz. Rev. Stat. Ann. § 16-1015; Ga. Code Ann. § 16-12-21(a)(1)-(2) (separate prohibitions for betting on a "game or contest" and betting "upon the result of any … election"); 720 Ill. Comp. Stat. 5/28-1; Mich. Comp. Laws § 168.931(l); Neb. Rev. Stat. § 28-1101(4); N.J. Stat. § 19:34-24; Or. Rev. Stat. § 260.635; Tex. Penal Code Ann. § 47.02(a) (person commits "gambling" if he "(1) makes a bet on the partial or final result of a game or contest" *or* "(2) makes a bet on the result of any … election").

Taking a step back, it is utterly implausible that Congress, when it used the term "gaming," meant (1) to refer to the act of trading an event contract rather than its underlying event; (2) to invoke the conceptually broader activity of "gambling" rather than "gaming"; (3) to then *exclude* all gambling *except* wagering on the outcome of a "contest of others"; and (4) to capture elections in that category. To Kalshi's knowledge, "gaming" had never once been defined in that bizarre way in any English language source before the challenged Order. Nor did Congress have any plausible policy reason to draw *that* serpentine line. "Had Congress intended" to cover event contracts involving election outcomes, "it surely would have said so more simply." *Moreau v. Klevenhagen*, 508 U.S. 22, 33 (1993).

In the end, if "gaming" is really "interchangeable with gambling" (CFTC Br. 42), it is interchangeable with *all gambling*—not just betting on elections—and that cannot be right. So, as the District Court put it, the CFTC "cannot have it both ways: it cannot synonymize gaming with gambling, but simultaneously argue that only some gambling is gaming." App.109. Below, the Commission identified no justification to "displace the plain and ordinary meaning of gaming" in favor of the agency's made-for-litigation gerrymander (*id.*)—and it has done no better on appeal.

55

### 3. The Commission properly disclaims any attempt to define "gaming" based on hedging use.

At one point in its brief, the Commission appears to hint that the real distinction between a "gaming" contract and a legitimate one might be whether the contract is used for speculation, "as opposed to a hedging or economic use." CFTC Br. 47 (quoting 156 Cong. Rec. S5906). But on the very next page, the Commission expressly walks back that suggestion and maintains that the "gaming definition *does not* turn on economic consequences." CFTC Br. 48 (emphasis added). That properly aligns the Commission's brief with its Order, which defined "gaming" as staking money on a contest of others, whether done for a hedging purpose or not. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

The Commission's concession on this point is well-taken. Although the distinction between hedging and speculation may seem significant, it could not work as the test for whether a contract involves "gaming." That is because *every* market includes some speculators; indeed, speculators provide necessary liquidity that hedgers cannot. App.181, 400; *see also* Philip Bond, et al., *The Real Effects of Capital Markets*, 4 ANN. REV. FIN. ECON. 339, 340 (2012). Regardless of the particular instrument, some traders will be motivated by speculation and others by hedging. But the

56

CFTC cannot adopt an interpretation of "gaming" that turns on the subjective motivations of myriad individual traders. A subjective, trader-by-trader approach would be unworkable, not least because the Special Rule requires the Commission to evaluate *products*, not *people*.

To be sure, the Commission has taken the position (including in the Order here) that whether a contract would be used "predominantly" for speculation rather than hedging bears on whether it would advance the "public interest." App.267-71; CFTC Br. 49; *see also* 156 Cong. Rec. S5906-07 (suggesting that "public interest" test would let CFTC "consider the extent to which a proposed derivative contract would be used predominantly by speculators"). But even if that is appropriate, it relates only to the *second*, public-interest stage of the review process, which kicks in only if a contract "involve[s]" an enumerated activity. *See* CFTC Br. 48-49. When Congress adopted the Special Rule, it confined public-interest review to contracts that fall into those categories, replacing the across-the-board requirement to show an "economic purpose" for every product. *See supra* at 8; CFTC Br. 8-9; 40 Fed. Reg. 25,849, 25,850 (June 19, 1975). Hedging use is irrelevant to whether a contract falls into one of those enumerated categories at the *first* step.

The District Court here never reached the legitimacy of the Commission's public-interest analysis, because the court correctly held that the Congressional Control Contracts do not "involve" any of the CEA's enumerated activities.  For the record, however, Kalshi's contracts serve legitimate hedging needs (App.172-81), and numerous commenters (like the owners of green-energy businesses and cannabis ventures, for example) expressly attested that they would purchase the contracts to hedge against economic risks associated with partisan control of Congress (*see supra* n.5).  Of course, some traders will use the contracts to engage in speculation—as with any market—but that does not make the Congressional Control Contracts contrary to the public interest, let alone transform them into "gaming" contracts.

\*          \*          \*

As the District Court correctly held, "gaming" in the CEA "refers to playing games or playing games for stakes," and the CFTC's broader definition "is unworkable in the context of this statute."  App.108, 111.  Because Kalshi's contracts do not involve a game or betting on a game, they do not implicate this category either, and therefore should not have been subjected to agency review in the first place.

58

**CONCLUSION**

Congress could easily subject election-based event contracts to CFTC review simply by adding "elections" to the Special Rule's list of enumerated activities.  But it has not done so, despite apparent interest from some Members of Congress.  *See, e.g.*, S. 5100, 118th Cong., § 2 (Sept. 18, 2024) (proposed legislation amending CEA to add that "no agreement, contract, transaction, or swap involving any political election or contest … may be listed or made available for clearing").  Absent such an amendment, the CFTC's efforts to rewrite the statute are futile.  The Congressional Control Contracts do not involve "unlawful activity" or "gaming" any more than they involve "war," "assassination," or "terrorism."  This Court should therefore affirm the judgment below vacating the Commission's Order.[18]

---

[18] In the District Court, Kalshi argued that, even assuming the agency had the power to engage in a public-interest review, the Order's public-interest determination was arbitrary and capricious.  App.93, 104, 118.  The District Court did not reach that independent challenge.  This Court should therefore disregard arguments by the CFTC and its *amicus* that bear on that distinct legal question.  But if the Court ultimately reverses on the statutory-authority issue, it should remand for the District Court to address Kalshi's public-interest challenge in the first instance, particularly in light of the new evidence generated by the successful 2024 election cycle listings.

Dated: November 15, 2024         Respectfully submitted,

                                 /s/ *Yaakov M. Roth*
Joshua B. Sterling               Yaakov M. Roth
MILBANK LLP                      John Henry Thompson
1850 K St. N.W.                  JONES DAY
Washington, DC 20006             51 Louisiana Avenue N.W.
(202) 835-7500                   Washington, DC 20001
                                 (202) 879-3939
Samuel V. Lioi
JONES DAY                        Amanda K. Rice
901 Lakeside Avenue              JONES DAY
Cleveland, Ohio 44114            150 W. Jefferson Avenue,
(216) 586-3939                   Suite 2100
                                 Detroit, MI 48226
                                 (313) 733-3939

*Counsel for Appellee*
*KalshiEx LLC*

60

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,185 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted using the word-count function on Microsoft Word software.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook Std font.

November 15, 2024                                    */s/ Yaakov M. Roth*
                                                      Yaakov M. Roth

## CERTIFICATE OF SERVICE

I hereby certify that, on this 15th day of November, 2024, I electronically filed the original of the foregoing document with the clerk of this Court by using the CM/ECF system, which will serve the counsel for all parties at their designated electronic mail addresses. I also certify that I caused 8 paper copies to be delivered to the Clerk's Office.

November 15, 2024

*/s/ Yaakov M. Roth*
Yaakov M. Roth

62