ORAL ARGUMENT NOT YET SCHEDULED

**No. 24-5205**

# In the United States Court of Appeals for the District of Columbia Circuit

────────

KALSHIEX LLC,

*Plaintiff-Appellee,*

*v.*

U.S. COMMODITY FUTURES TRADING COMMISSION,

*Defendant-Appellant.*

────────

On Appeal from the U.S. District Court
for the District of Columbia
Case No. 1:23-cv-03257-JMC (Hon. Jia M. Cobb)

────────

**BRIEF FOR AMICUS CURIAE PARADIGM OPERATIONS LP
IN SUPPORT OF KALSHIEX LLC AND AFFIRMANCE**

────────

Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
408 W. 11th St., 5th Floor
Austin, TX 78701

Scott A. Keller
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

*Counsel for Amicus Curiae
Paradigm Operations LP*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(A)(1)

### A. Parties and Amici

All parties in this Court are listed in the Brief of Appellant the U.S. Commodity Futures Trading Commission. In addition to this amicus brief, Better Markets, Inc., Jeremy D. Weinstein, and Professor Joseph A. Grundfest have each filed (or indicated their intent to file) an amicus brief.

### B. Rulings under Review

The ruling under review is the district court's order issued September 6, 2024, and memorandum opinion issued September 12, 2024, in *KalshiEx LLC v. CFTC*, No. 23-cv-03257 (D.D.C.).

### C. Related Cases

There are no cases related to this appeal.

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, amicus curiae Paradigm Operations LP makes the following disclosure for the limited purpose of complying with the relevant rules: Paradigm Operations LP has no parent corporation. There is no publicly held corporation that owns 10% or more of Paradigm Operations LP. Paradigm Operations LP reserves the right to supplement this disclosure statement if needed.

# TABLE OF CONTENTS

Page

Certificate of Parties, Rulings, and Related Cases Pursuant to
   Circuit Rule 28(a)(1) .................................................................ii

Corporate Disclosure Statement ........................................................iii

Table of Authorities .......................................................................... v

Interest of Amicus Curiae...................................................................vii

Statement of Counsel.........................................................................vii

Statutes and Regulations ..................................................................viii

Introduction and Summary of Argument........................................ 1

Argument ............................................................................................ 2

   I.   Control Contracts serve the public interest by helping
      businesses and individuals hedge financial risk. ............................ 2

      A.  Congressional action or inaction poses inherent
          financial risk. .................................................................... 3

      B.  Control Contracts allow stakeholders to hedge against
          the aggregate and granular risks that flow from
          partisan control. .............................................................. 5

      C.  Control Contracts can also help hedge risks that are
          independent of official Congressional action...............7

  II.  Event markets for Control Contracts serve the public
      interest by offering an accurate and useful predictive tool...............8

      A.  Event markets give an up-to-the-minute prediction of
          political outcomes.......................................................... 9

      B.  Predictions of political outcomes are useful for many
          purposes.......................................................................... 11

Conclusion ........................................................................................ 13

Certificate of Service....................................................................... 14

Certificates of Compliance.............................................................. 14

iv

# TABLE OF AUTHORITIES

Page(s)

**Case**

*Harris v. U.S. Dep't of Veterans Affs.*,
    776 F.3d 907 (D.C. Cir. 2015) ........................................................ 12

**Legislation**

26 U.S.C. § 6045 ............................................................................... 5

26 U.S.C. § 6045-45A ....................................................................... 5

26 U.S.C. § 6050I .............................................................................. 5

Agriculture Improvement Act of 2018,
    Pub. L. No. 115-334, 132 Stat. 4490 (2018)................................... 3

Clarity for Payment Stablecoins Act,
    H.R. 4766, 118th Cong. (2023) ...................................................... 4

Financial Innovation and Technology for the 21st Century Act,
    H.R. 4763, 118th Cong. (2023) ...................................................... 4

Further Continuing Appropriations and Other Extensions Act,
    Pub. L. No. 118-22, H.R. 6363 (2024) ............................................ 3

Infrastructure Investment and Jobs Act.,
    Pub. L. No. 117-58, 135 Stat. 429 (2022)....................................... 5

Medicare Prescription Drug, Improvement, and Modernization Act,
    Pub. L. No. 108-173, 117 Stat. 2066 (2003)................................... 7

Proving Reserves of Others' Funds Act,
    S.3087, 118th Cong. (2023) ........................................................... 4

## Regulations

*Gross Proceeds and Basis Reporting by Brokers and Determination of Amount Realized and Basis for Digital Asset Transactions*, 88 Fed. Reg. 59,576 (proposed Aug. 29, 2023)................................................ 5

## Other Authorities

Allison Morrow, *How prediction markets saw something the polls and pundits didn't*, CNN Business (Nov. 8, 2024), https://perma.cc/L398-Y7LN ........................................................ 10

Kelly Cloonan, *Betting markets nailed Trump's decisive win — and it's a good reminder they can be more accurate than polls*, Business Insider (Nov. 9, 2024), https://perma.cc/4C85-97P6.................. 10

Jason Furman, *Comment Letter on KalshiEx Proposed Congressional Control Contracts Under CFTC Regulation 40.11*, (Sept. 18, 2022), https://perma.cc/TD76-9HMU ......................................... 12

Michael J. de la Merced, *Political Betting Markets See Vindication in Trump Victory*, N.Y. Times (Nov. 6, 2024), https://tinyurl.com/46hafuf7 .......................................................... 8

*Overview of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003* (Dec. 6, 2004), https://perma.cc/QWZ7-RVXN...................................................... 7

President's Radio Address (May 18, 2002), https://perma.cc/RCB2-QBSX...................................................... 7

@NateSilver538, X (Jan. 13, 2024), https://perma.cc/WD4X-YRGA.................................................. 10

## INTEREST OF AMICUS CURIAE

Paradigm Operations LP is a research driven crypto investment firm that backs entrepreneurs, companies, and protocols at the frontier of innovation. Paradigm has an interest in this case because prediction markets are an exciting application of crypto technology and are driving innovation in a field in which Paradigm invests. *See, e.g.*, Ciamac Moallemi & Dan Robinson, *pm-AMM: A Uniform AMM for Prediction Markets*, Paradigm (Nov. 5, 2024), https://perma.cc/V7JZ-LGL6 ("Prediction markets are an increasingly popular application in crypto."). Paradigm also has an interest in supporting the broad availability of regulated prediction markets, which are a valuable source of public information and allow market participants (including crypto investors and entrepreneurs) to hedge exposure to specific events.

## STATEMENT OF COUNSEL

No counsel for any party authored this brief in whole or in part, and no entity or person, aside from amicus curiae, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). Counsel for Appellant and Appellee consent to the filing of this amicus brief. *See* Fed. R. App. P. 29(a)(2); D.C. Cir. R. 29(b).

Paradigm is aware that other amici curiae may file amicus briefs. Pursuant to D.C. Circuit Rule 29(d), counsel for Paradigm certifies that a separate brief is necessary. Given the significant differences in the interests of Paradigm and other potential amici, and given the distinct interests that

Paradigm and the other amici have in this case and the distinct issues they intend to brief, it is impracticable to collaborate in a single brief. Paradigm believes that the Court will benefit from the presentation of multiple perspectives. And, to respect this Court's and the parties' resources, Paradigm has sought to present its arguments in as succinct a fashion as possible. Accordingly, this brief is only 2,705 words, which is well below the 6,500 words allowed by the Federal Rules of Appellate Procedure for an amicus curiae brief.

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in Appellant's Brief.

## Introduction and Summary of Argument

A lot rides on U.S. Congressional elections: countless pieces of legislation, spending provisions, and confirmations of executive and judicial nominees become more, or less, likely. The uncertainty of these potential outcomes creates risks for businesses and individuals. Event contracts—like the ones Plaintiff KalshiEx LLC lists on its exchange—advance at least two public interests. First, they allow parties directly impacted by political outcomes to mitigate risk by hedging. Second, they provide information that the public can use to better predict, and thus plan for, a given outcome.

Consider an entrepreneur who is building a cryptocurrency startup in the U.S. The likelihood that Congress will pass legislation impacting the viability of U.S.-based crypto startups is directly affected by which legislators control Congress and whether control of the Legislative Branch is divided among political parties. The entrepreneur may therefore want to buy an event contract that pays out depending on which party takes control of Congress to hedge its regulatory risk. When market participants hedge substantial sums on a particular event contract, members of the general public—even those who never join the market—get valuable real-time information. Event markets might even be better predictors of electoral outcomes than public opinion polling—precisely because they involve participants who have put their own money on the line.

Event contracts tied to Congressional control are a win-win. The entities who stand to lose most from one political outcome can mitigate their risk. And the public at large gains insight into what industry insiders expect.

The district court was correct to conclude that the U.S. Commodity Futures Trading Commission "exceeded its statutory authority" by issuing an order that prohibited KalshiEx LLC from "offer[ing] event contracts that would allow participants to take positions and trade on the outcome of United States congressional elections." App. 93-94. The district court granted summary judgment because these event contracts "do not involve unlawful activity or gaming." App. 94. The Commission also acted arbitrarily and capriciously by concluding that these contracts are contrary to the public interest. *See* App. 94 (acknowledging this argument but declining to consider it). The public has a strong interest in accessing the event contracts listed on Kalshi's exchange. Allowing Congressional Control Contracts to trade at scale on regulated platforms such as Kalshi's will ensure that these important markets develop with investor protections and systemic integrity. The Court should affirm.

## ARGUMENT

## I. Control Contracts serve the public interest by helping businesses and individuals hedge financial risk.

Congressional power manifests in ways that create risk at aggregate and granular levels. Congressional Control Contracts provide a mechanism for

market participants to mitigate those risks in ways that event contracts tied to specific policy outcomes do not.

### A.   Congressional action or inaction poses inherent financial risk.

The U.S. Congress wields many powers. The uncertainty surrounding how Congress will wield those powers is compounded by the uncertainties of future partisan control. Anyone subject to Congressional action—which is everyone in America—has an interest in mitigating the risks associated with different potential outcomes.

*Legislation.* Congress's duty is to legislate: to create, amend, and repeal laws. Those laws can have drastic financial effects. Consider the "Farm Bill," which is a multiyear law that regulates several agricultural and food programs. The current Farm Bill includes provisions that guarantee that farmers can earn at least a minimum revenue for some crops. *E.g.,* Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490, 4509 (2018); *see* Further Continuing Appropriations and Other Extensions Act, Pub. L. No. 118-22, H.R. 6363, (2024) (extending programs authorized by the 2018 Farm Bill). But there is no guarantee that those provisions will be part of the *next* Farm Bill—or that there will even be such a bill. That uncertainty creates financial risk for any farmer who relies on the Farm Bill's guarantees.

Another example is the potential passage of a crypto market structure bill. Various proposed bills have been introduced on a bi-partisan basis. *See,*

*e.g.*, Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Cong. (2023); Proving Reserves of Others' Funds Act, S.3087, 118th Cong. (2023); Clarity for Payment Stablecoins Act, H.R. 4766, 118th Cong. (2023). But the probability of any bill becoming law is influenced by which party is in control of Congress. Going back to the earlier example of a U.S.-based crypto entrepreneur, the uncertainty as to which party will control Congress will have a direct effect on the probability of market structure regulation being adopted and will have meaningful impact on financial risk for the startup.

*Confirmations.* Beyond legislation, each chamber of Congress has specific power to take independent action. The Senate, for instance, holds the exclusive power to confirm Presidential nominees for the Judicial and Executive branches. For example, certain energy companies face different prospects depending on whether the Senate confirms Interior Department nominees who support or oppose expanded drilling permits. And a private business's ability to be acquired may be meaningfully affected by who the Senate confirms as Chair of the Federal Trade Commission and their views on their scope of antitrust authority. Therefore, anyone with an interest in who serves as the next Chair of the Federal Trade Commission, or as the Secretary of Agriculture, or as the Chair of the Securities and Exchange Commission has an interest in the Senate's composition.

*Taxation.* The House of Representatives has distinct powers, too. Notably, bills for raising revenue must originate in the House. For example,

in 2021, a Democratic-controlled Congress passed the Infrastructure Investment and Jobs Act., Pub. L. No. 117-58, 135 Stat. 429 (2022). This legislation included two tax revenue provisions that specifically address crypto. *See* 26 U.S.C. § 6045-45A (authorizing rulemaking that requires brokers to report sales of digital assets to the IRS); *id.* § 6050I (requiring businesses to treat digital assets as cash in transactions involving over $10,000). But, if implemented, these provisions are likely to cost the crypto industry tens, if not hundreds, of millions of dollars. *See, e.g., Gross Proceeds and Basis Reporting by Brokers and Determination of Amount Realized and Basis for Digital Asset Transactions*, 88 Fed. Reg. 59,576, 59,619 (proposed Aug. 29, 2023) (to be codified at 26 C.F.R. pts. 1, 31, and 301) (estimating that, for reporting requirements under 26 U.S.C. § 6045, "start-up costs" *alone* will reach "$749,925,000").

The likelihood of the next Congress passing any legislative fixes or alterations to these two provisions depends significantly on who controls Congress. Congressional Control Contracts therefore provide a way for affected crypto firms to hedge their exposure to the potential implementation of these provisions.

## B. Control Contracts allow stakeholders to hedge against the aggregate and granular risks that flow from partisan control.

Against that backdrop, Congressional Control Contracts offer the public significant value in at least two respects. First, they allow stakeholders to hedge against the aggregate risks that come with one party's control of

Congress. *Who* wields the powers of Congress matters enormously across innumerable areas of public life. Second, Control Contracts permit hedging against specific policy outcomes. Both major political parties offer legislative agendas. Congressional Control Contracts allow stakeholders to mitigate the risks associated with the implementation of those agendas writ large.

### 1.  Control Contracts allow parties to hedge aggregate risk.

When Congressional power shifts from one party to the other, the financial risks facing businesses and individuals shift too. But each specific risk may not always be knowable beforehand. As described above, changes in Congressional control can create aggregate risk in a myriad of ways, including through legislation, nominations, taxation, and more. That is true even when the change in control does not materially increase the risk of any particular legislative outcome.

Take, for example, a venture capital firm that invests in multiple different types of industries. That firm may be able to mitigate risk through multiple independent hedges—for example, one regarding the EPA's car emission standards, and another about the potential regulation of crypto. That firm can consolidate its risk mitigation by purchasing Congressional Control Contracts. This transaction is more straightforward than purchasing multiple hedges across multiple markets. The single transaction also allows the firm to hedge against risks that it cannot precisely forecast, or for which there is no other hedge available. Such contracts give financial force to the truism that one Congress (or chamber) that seeks to aggressively regulate a

particular industry can use its broad powers to undermine that industry in several ways. So too for a Congress that supports a given industry, because that support may evaporate if Congressional control changes hands.

### 2. Control Contracts allow parties to hedge specific outcomes.

Congressional Control Contracts offer the additional advantage of hedging against more granular outcomes that become more or less likely if control of Congress changes. For example, during the 2002 Congressional election season, the President had specifically called on Congress to "guarantee all senior citizens prescription drug coverage." President's Radio Address (May 18, 2002), https://perma.cc/RCB2-QBSX. After the Senate Majority flipped in 2003—giving a single party control of the Presidency and both chambers—Congress did just that when it passed the Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066 (2003), creating billions in new spending. *See* Jennifer O'Sullivan, Cong. Rsch. Serv., *Overview of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003* (Dec. 6, 2004), https://perma.cc/QWZ7-RVXN. Viewing all this from 2002—before the Senate flipped—any number of businesses could have used Control Contracts to hedge the financial risks associated with that Act's passage.

### C. Control Contracts can also help hedge risks that are independent of official Congressional action.

Congressional control *itself* can also pose direct financial risks to businesses and individuals—even before considering what official action

Congress might take. Consider a startup that knows it will need to raise capital sometime *after* the next Congressional election. If the party that takes (or keeps) power seeks to aggressively regulate the startup's business, then the startup's cost of capital may increase. The cost goes up not because of anything Congress has done, but rather because capital markets view the mere change in control as a meaningful factor affecting the startup's creditworthiness or viability. Control Contracts can help the startup manage that risk.

## II. Event markets for Control Contracts serve the public interest by offering an accurate and useful predictive tool.

Event markets reveal collective wisdom. *See, e.g.*, Michael J. de la Merced, *Political Betting Markets See Vindication in Trump Victory*, N.Y. Times (Nov. 6, 2024), https://tinyurl.com/46hafuf7. The prices for Control Contracts reflect a wide array of informed opinions about which political party will control each house of Congress. So the *price itself* represents the market's real-time prediction about what will happen in an election. By observing these markets, members of the general public can harness the wisdom of crowds to help make better decisions—even without ever buying or selling in the market themselves. That wisdom helps the public make strategic decisions about how to structure their affairs. For these reasons, too, Control Contracts are in the public interest.

8

## A. Event markets give an up-to-the-minute prediction of political outcomes.

Predictions are valuable only if accurate. Even though they do not offer predictive certainty, event markets do have several accuracy-enhancing features. First, event markets are accurate because of their inherent ability to adjust to new information in real time. As events unfold and new data becomes available, market participants swiftly incorporate this information into their hedging strategies. This continuous flow of information—and the immediate response of market actors—ensures that prices of event contracts are always reflective of the most current understanding and expectations regarding, *e.g.*, Congressional control. The "real time" nature of event markets separates them from polling data, which can lag for days.

Second, market participants have a financial stake in whether a particular event comes to pass and are therefore highly motivated to try to accurately forecast event outcomes. In contrast, polling results are based on the potentially uninformed opinions of individuals selected at random. The vested interest of event-market participants leads to more precise and reliable market pricing.

Third, event markets are open to a wide array of buyers and sellers. Each participant brings their own unique preferences, objectives, and experiences to the table. These buyers and sellers can include hedgers seeking to mitigate risk, institutional investors who wish to diversify their portfolios, or even speculators looking to profit from future changes in contract prices. That

9

diversity ensures that the market prices reflect a broad spectrum of perspectives. The interaction between these participants—each employing their own specific strategies and insights—contributes to the depth, liquidity, and efficiency of the market for event contracts, which in turn lowers the cost of hedging. For many event contracts, including Control Contracts, this holistic perspective is unavailable anywhere else.

Unlike polling data, Control Contracts do not suffer from sample bias, recency bias, survey bias, or any of the numerous other complicated pitfalls that weigh down the accuracy of political polling. They are real-time and open to informed individual and institutional participants, unlike polling, which uses retrospective snapshots in time of sampled individual voters. Indeed, professional statistician Nate Silver has recognized that "prediction markets are considerably more accurate than [even] peer reviewed scholarship." @NateSilver538, X (Jan. 13, 2024), https://perma.cc/WD4X-YRGA. And multiple news outlets have touted prediction markets' success in forecasting the outcome of the recent presidential election. *E.g.*, Allison Morrow, *How prediction markets saw something the polls and pundits didn't*, CNN Business (Nov. 8, 2024), https://perma.cc/L398-Y7LN; Kelly Cloonan, *Betting markets nailed Trump's decisive win — and it's a good reminder they can be more accurate than polls*, Business Insider (Nov. 9, 2024), https://perma.cc/4C85-97P6.

## B. Predictions of political outcomes are useful for many purposes.

Reliable predictions of Congressional control play a crucial role in the strategic planning and decisionmaking processes of businesses and individuals. Predictions are an essential tool for navigating the uncertain and volatile political landscape. This foresight allows businesses to stay ahead of the regulatory curve, ensuring they are not caught off-guard by political shifts that could impact their revenue. Even individuals and businesses that do not use event contracts can use the data that event markets provide.

For individuals, accurate predictions of political outcomes can influence a wide range of personal financial decisions. Anticipated changes in government policy regarding taxes, 401ks, and healthcare can have direct implications for individual financial planning. By staying informed about potential political shifts, individuals can adjust their savings strategies and investment portfolios. Likewise, real estate investors and homeowners alike benefit from understanding how political outcomes might affect property values. Data from event markets allows individuals to make more informed decisions in all these areas.

Control Contracts give the public better data about the likelihood of political outcomes. That is why Harvard Professor (and former economic advisor to President Obama) Jason Furman has argued that "a liquid, well-regulated prediction market offering an accurate probability estimate of who

11

is likely to control Congress would thus be highly valuable to price discovery." Jason Furman, *Comment Letter on KalshiEx Proposed Congressional Control Contracts Under CFTC Regulation 40.11*, at 2-3 (Sept. 18, 2022), https://perma.cc/TD76-9HMU. Just so. Business owners must make decisions based on what the economy will look like *in the future*. Individuals must make career and retirement decisions based on how much money they will need *in the future*.

Congress has a large degree of power to influence future financial outcomes. And the party that controls Congress has wide latitude to decide how that power will be used. Control Contracts are in the public interest because they help the public assess and plan for the actions Congress might take.

\* \* \*

Despite all this, the Commission "found that Kalshi's congressional control contracts were contrary to the public interest." App. 104. That finding was arbitrary and capricious. *See* Kalshi Br. 2, 59 n.18. This Court "may affirm summary judgment on any ground supported by the record." *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 911 (D.C. Cir. 2015) (citing *Jones v. Bernanke*, 557 F.3d 670, 676 (D.C. Cir. 2009). Because the Commission's "public interest" finding was arbitrary and capricious, and for the other reasons stated in Kalshi's brief, this Court should affirm the district court's order.

## Conclusion

The Court should affirm.

Respectfully submitted.

/s/ *Scott A. Keller*

Joshua P. Morrow                          Scott A. Keller
LEHOTSKY KELLER COHN LLP        LEHOTSKY KELLER COHN LLP
408 W. 11th St., 5th Floor               200 Massachusetts Ave. NW,
Austin, TX 78701                          Suite 700
                                          Washington, DC 20001
                                          (512) 693-8350
                                          scott@lkcfirm.com

                                          *Counsel for Amicus Curiae*
                                          *Paradigm Operations LP*

13

## CERTIFICATE OF SERVICE

On November 22, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Scott A. Keller*

Scott A. Keller

## CERTIFICATES OF COMPLIANCE

I certify that this brief complies with: (1) the type-volume limitations of Rule 29(a)(5) and D.C. Circuit Rule 32(e)(3) because it contains 2,705 words, excluding the parts of the brief exempted by Rule 32(f) and D.C. Circuit Rule 32(e)(1); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count). *See* Fed. R. App. P. 29(a)(4)(G); Fed. R. App. P. 32(g)(1).

*/s/ Scott A. Keller*

Scott A. Keller