## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

KALSHIEX LLC,

*Plaintiff-Appellee,*

v.

COMMODITY FUTURES TRADING COMMISSION,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Columbia
D. Ct. No. 1:23-cv-03257-JMC
The Honorable Jia M. Cobb, District Judge

## BRIEF OF PROFESSOR JOSEPH A. GRUNDFEST
## AS *AMICUS CURIAE* IN SUPPORT OF
## PLAINTIFF-APPELLEE AND AFFIRMANCE

Adam G. Unikowsky
*Counsel of Record*
Jonathan J. Marshall
JENNER & BLOCK LLP
1099 New York Avenue, NW,
Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

## STATEMENT PURSUANT TO CIRCUIT RULE 29

Pursuant to Circuit Rule 29(b), undersigned counsel represents that all parties have consented to *amicus curiae* Professor Joseph A. Grundfest's participation in this case.

Pursuant to Circuit Rule 29(d), undersigned counsel certifies that this separate brief is necessary because *amicus* is a law professor with an academic interest in the matter that diverges from the pecuniary interests of market participants. *Amicus* files this brief to offer this Court his own unique perspective.

Date: November 22, 2024

*/s/ Adam G. Unikowsky*
Adam G. Unikowsky

*Counsel of Record for Amicus Curiae Professor Joseph A. Grundfest*

# TABLE OF CONTENTS

STATEMENT PURSUANT TO CIRCUIT RULE 29 ................................. i

TABLE OF AUTHORITIES .................................................................. iv

INTEREST OF *AMICUS CURIAE* ......................................................... 1

SUMMARY OF THE ARGUMENT ..................................................... 3

ARGUMENT ..................................................................................... 5

I. The CFTC's Interpretation of "Gaming" Is Inconsistent with the Statute ....................................................................... 5

    A. The CFTC's Logic Violates the Presumption of Consistent Usage ..................................................... 5

    B. Elections Are Not "Games," and Trading Political Event Contracts Is Not "Gaming" ........................... 7

    C. The CFTC Engaged in Policy Analysis, Not Statutory Construction ............................................. 13

II. The CFTC's Public Interest Analysis is Arbitrary and Capricious ..................................................................... 15

    A. The Proposed Contracts Serve Legitimate Hedging Purposes ................................................... 15

    B. The Proposed Contracts Generate Legitimate Non-Hedging Public Benefits ....................................... 18

    C. The Order Fails to Adequately Explain Its Concerns Regarding Manipulation ........................................ 22

III. During the 2024 Presidential Election, KalshiEX's Regulated Prediction Market Worked ........................... 23

CONCLUSION ................................................................................. 29

CERTIFICATE OF COMPLIANCE ......................................................... 30

CERTIFICATE OF SERVICE ................................................................ 31

# TABLE OF AUTHORITIES

## CASES

*Atlantic Cleaners & Dyers, Inc. v. United States*,
  286 U.S. 427 (1932) .......................................................................... 6

*Getty v. Federal Savings & Loan Insurance Corp.*,
  805 F.2d 1050 (D.C. Cir. 1986) ...................................................... 21

*KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) .............. 23-25

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244
  (2024) ................................................................................................ 14

*Motor Vehicle Manufacturers Ass'n of the United States v.
  State Farm Mutual Automobile Insurance Co.*,
  463 U.S. 29 (1983) .......................................................................... 19

## STATUTES

7 U.S.C. § 7d(1) .................................................................................. 26

7 U.S.C. § 7d(2) .................................................................................. 26

7 U.S.C. § 7d(3) ............................................................................ 26, 28

7 U.S.C. § 7d(4) .............................................................................. 26-27

7 U.S.C. § 7d(5) .................................................................................. 26

7 U.S.C. § 7d(5)(A) ............................................................................ 27

7 U.S.C. § 7d(6) .................................................................................. 26

7 U.S.C. § 7d(7) .................................................................................. 26

7 U.S.C. § 7d(8) .................................................................................. 26

7 U.S.C. § 7d(9) .................................................................................. 26

7 U.S.C. § 7d(10) ................................................................ 26

7 U.S.C. § 7d(11) ................................................................ 26

7 U.S.C. § 7d(12) ................................................................ 26

7 U.S.C. § 7d(13) ................................................................ 26

7 U.S.C. § 7d(14) ................................................................ 26

7 U.S.C. § 7d(15) ................................................................ 26

7 U.S.C. § 7d(16) ................................................................ 26

7 U.S.C. § 7d(17) ................................................................ 26

7 U.S.C. § 7d(18) ................................................................ 26

7 U.S.C. § 7d(19) ................................................................ 26

7 U.S.C. § 7d(20) ................................................................ 26

7 U.S.C. § 7d(21) ................................................................ 26

7 U.S.C. § 7d(22) ................................................................ 26

7 U.S.C. § 7d(23) ................................................................ 26

7 U.S.C. § 7a-2(c)(5)(C)(i) ..................................................... 5

7 U.S.C. § 7a-2(c)(5)(C)(i)(II) ............................................... 6

7 U.S.C. § 7a-2(c)(5)(C)(i)(III) .............................................. 6

7 U.S.C. § 7a-2(c)(5)(C)(i)(IV) .............................................. 6

7 U.S.C. § 7a-2(c)(5)(C)(i)(V) ............................................... 6

## RULES AND REGULATIONS

Fed. R. App. P. 29(a)(4)(E) .................................................... 1

17 C.F.R. pt. 38 ............................................................ 26-27

    § 38.250(a) ............................................................. 27

    § 38.250(b) ............................................................. 27

**OTHER AUTHORITIES**

Addoum, Jawad M. & Alok Kumar, *Political Sentiment and Predictable Returns*, 29 Rev. Fin. Stud. 3471 (2016) ................... 17

*American Heritage Dictionary of the English Language* (4th ed. 2000) ................................................................ 10

Baumol, William J. & William G. Bowen, *Performing Arts: The Economic Dilemma* (1966) ...................................... 11

Bond, Philip, Alex Edmans & Itay Goldstein, *The Real Effects of Capital Markets*, 4 Ann. Rev. Fin. Econ. 339 (2012) ................................................................ 8, 19

Buchanan, James M. & Gordon Tullock, *The Calculus of Consent: Logical Foundations of Constitutional Democracy* (1962) .......................................... 11

Claessens, Stijn, Erik Feijen & Luc Laeven, *Political Connections and Preferential Access to Finance: The Role of Campaign Contributors*, 88 J. Fin. Econ. 554 (2008) ............... 17

Grundfest, Joseph A., *Disimplying Private Rights of Action Under the Federal Securities Laws: The Commission's Authority*, 107 Harv. L. Rev. 961 (1994) ....................... 2

Grundfest, Joseph A., *The Limited Future of Unlimited Liability: A Capital Markets Perspective*, 102 Yale L.J. 387 (1992) ................................................................ 2

Grundfest, Joseph A., *The Limits of Delaware Corporate Law: Internal Affairs, Federal Forum Provisions, and Sciabacucchi*, 75 Bus. Law. 1319 (2020) ....................... 3

Grundfest, Joseph A. & Peter H. Huang, *The Unexpected Value of Litigation: A Real Options Perspective*, 58 Stan. L. Rev. 1267 (2006) ................................................................ 2

Grundfest, Joseph A. & A.C. Pritchard, *Statutes with Multiple Personality Disorders: The Value of Ambiguity in Statutory Design and Interpretation*, 54 Stan. L. Rev. 627 (2002) ........................................................................... 2

Hanke, Michael, Sebastian Stöckl & Alex Weissensteiner, *Political Event Portfolios*, 118 J. Bank Fin. 1 (2020) .................... 17

Hanke, Michael, Sebastian Stöckl & Alex Weissensteiner, *Recovering Election Winner Probabilities from Stock Prices*, 45 Fin. Rsch. Letters 102 (2022)............................. 16-17, 20

Hayek, Friedrich, *The Use of Knowledge in Society*, 35 Am. Econ. Rev. 519 (1945) ......................................... 11

Hill, Paula, Adriana Korczak & Piotr Korczak, *Political Uncertainty Exposure of Individual Companies: The Case of the Brexit Referendum*, 100 J. Banking & Fin. 58 (2019) ......... 17

Jayachandran, Seema, *The Jeffords Effect*, 49 J.L. & Econ. 397 (2006) ............................................. 17

Knight, Brian, *Are Policy Platforms Capitalized into Equity Prices?: Evidence from the Bush/Gore 2000 Presidential Election*, 90 J. Pub. Econ. 751 (2006) ............................ 17

Levine, Matt, Opinion, *Prediction Markets Are a Thing Now*, Bloomberg (Nov. 7, 2024), https://www.bloomberg.com /opinion/articles/2024-11-07/prediction-markets-are-a-thing-now ................................................................ 24, 26

Lobo, Bento J., *Jump Risk in the U.S. Stock Market: Evidence Using Political Information*, 8 Rev. Fin. Econ. 149 (1999) ......................................... 17

Matter of the Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the United States Senate and United States House of Representatives (CFTC Sept. 22, 2023) ........................ 9-11, 14-15, 19-20, 23

Osipovich, Alexander, *How the Trump Whale Correctly Called the Election*, Wall St. J. (Nov. 6, 2024, 4:18 PM ET), https://www.wsj.com/finance/how-the-trump-whale-correctly-called-the-election-cb7eef1d ........................................... 25

Parametric Directors and Officers Insurance and Reinsurance Contracts, and Related Financial Instruments, U.S. Patent No. 8,452,620 B1 (issued May 28, 2013) ......................................................................... 1

Scalia, Antonin & Bryan A. Garner, *Reading Law* (2012) .................. 6

Schwartz, Leo, *Exclusive: Election Betting Site Polymarket Gives Trump a 67% Chance of Winning but Is Rife with Fake 'Wash' Trading, Researchers Say*, Fortune Crypto (Oct. 30, 2024, 10:20 AM EDT), https://fortune.com/crypto /2024/10/30/polymarket-trump-election- crypto-wash-trading-researchers ...................................................................... 28

Sethi, Rajiv, *A Failed Attempt at Market Manipulation*, Imperfect Information (Sept. 7, 2024), https://rajivsethi.substack.com/p/a-failed-attempt-at-prediction-market ............................................................................. 28

Snowberg, Erik, Justin Wolfers & Eric Zitzewitz, *Partisan Impacts on the Economy: Evidence from Prediction Markets and Close Elections*, 122 Q.J. Econ. 807 (2007) ............... 17

Sorkin, Andrew Ross et al., *The French Connection to Online Bets on Trump*, N.Y. Times: DealBook (Oct. 24, 2024), https://www.nytimes.com/2024/10/24/business/dealbook /polymarket-trump-trader.html .................................................. 26

Wagner, Alexander F., Richard J. Zeckhauser & Alexandre Ziegler, *Company Stock Price Reactions to the 2016 Election Shock: Trump, Taxes, and Trade*, 130 J. Fin. Econ. 428 (2018) ........................................................... 17

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Professor Joseph A. Grundfest is the W.A. Franke Professor of Law and Business, Emeritus, and Senior Faculty, Rock Center for Corporate Governance, at Stanford Law School. Professor Grundfest is a nationally prominent expert on capital markets, corporate governance, and securities litigation. Before joining the Stanford Law School faculty in 1990, Professor Grundfest was a commissioner of the Securities and Exchange Commission and served on the staff of the President's Council of Economic Advisors as counsel and senior economist for legal and regulatory matters.

Professor Grundfest has expertise specific to the operation of derivatives markets and statutory construction, the primary subject matters of this dispute. He holds U.S. Patent No. 8,452,620 B1, "Parametric Directors and Officers Insurance and Reinsurance Contracts, and Related Financial Instruments" (issued May 28, 2013), which describes the construction of novel derivatives products and markets related to the outcome of litigation events. While serving as an SEC commissioner he was actively involved in legislative and regulatory matters related to the evolution of stock-market-based futures and other derivative products. His

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* states that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than *amicus* or his counsel contributed money that was intended to fund preparing or submitting this brief.

scholarship explores various aspects of derivatives analytics, including a *Yale Law Review* article explaining how derivative instruments could be used to avoid pass-through stockholder liability,[2] and a *Stanford Law Review* article describing how litigation can be modeled as a derivative—more precisely, a real option.[3] He has also taught about the design and operation of derivative markets, particularly in connection with the financial crisis of 2008-2009.

As for statutory interpretation, one of Professor Grundfest's *Harvard Law Review* articles describes a novel form of regulatory constraint and demonstrates the interpretation's consistency with statutory text and legislative intent.[4] Another *Stanford Law Review* article describes the strategic use of textual ambiguities as a mechanism that supports legislative compromise and describes the judicial response to the ensuing interpretive challenges.[5] A recent *Business Lawyer* article addresses the interaction of federal and state law, and the "narrow interpretation"

---

[2] Joseph A. Grundfest, *The Limited Future of Unlimited Liability: A Capital Markets Perspective*, 102 Yale L.J. 387 (1992).

[3] Joseph A. Grundfest & Peter H. Huang, *The Unexpected Value of Litigation: A Real Options Perspective*, 58 Stan. L. Rev. 1267 (2006).

[4] Joseph A. Grundfest, *Disimplying Private Rights of Action Under the Federal Securities Laws: The Commission's Authority*, 107 Harv. L. Rev. 961 (1994).

[5] Joseph A. Grundfest & A.C. Pritchard, *Statutes with Multiple Personality Disorders: The Value of Ambiguity in Statutory Design and Interpretation*, 54 Stan. L. Rev. 627 (2002).

doctrine that is applied to certain forms of securities-fraud litigation.[6]

*Amicus*, with other professors, submitted a comment letter to the Commodity Futures Trading Commission (CFTC) in the underlying administrative proceeding urging the CFTC to permit Plaintiff-Appellee KalshiEX LLC to list the proposed event contracts. *Amicus* respectfully disagrees with the CFTC's order and has an interest in explaining to this Court why that order should be overturned.

## SUMMARY OF THE ARGUMENT

The district court correctly concluded that political event contracts do not "involve" "gaming." "Gaming" refers to playing games, like roulette or slots, or betting on the outcome of games, such as the Super Bowl. But elections are not "games" as that term is used in the Commodity Exchange Act. As the district court explained, the CFTC failed to apply the appropriate canons of statutory construction when it reasoned that, because an election is a type of "contest," participating in political event prediction markets must be "gaming." That logic leads to irrational and unsustainable interpretations of the Act. The CFTC's policy views on prediction markets, whatever their merit, do not authorize the CFTC to take statutory interpretation into its own hands. The CFTC's

---

[6] Joseph A. Grundfest, *The Limits of Delaware Corporate Law: Internal Affairs, Federal Forum Provisions, and* Sciabacucchi, 75 Bus. Law. 1319 (2020).

interpretation of "gaming" is so irreconcilable with the statute's plain text and purpose that it cannot stand.

If this Court disagrees with the district court as to the meaning of the statute, it should still reject the CFTC's public-interest analysis as fatally flawed. The proposed contracts serve an empirically supportable hedging function, and the CFTC's analysis of the utility of hedging was far too narrow. The CFTC also failed to recognize the non-economic benefits of prediction markets. Finally, the CFTC concluded that KalshiEX's prediction markets might lead to election manipulation, but it failed to explain *why* it reached that conclusion in the face of abundant contrary evidence. The CFTC's reasoning is especially troubling because it can extend to many prediction markets that are not related to elections—thus causing a major and unwarranted expansion of the CFTC's regulatory authority in a manner that would, contrary to the statute's plain text, cause multitudes of event contracts to be forbidden by the agency.

Finally, the success of KalshiEX's prediction markets in the recent presidential election confirm both the wisdom of this Court's order denying the CFTC's stay motion and the illogic of the CFTC's public-interest analysis. In short, U.S. voters are inevitably attracted to the information available through these markets, and it is in everyone's best interest that this information be accurate and free from manipulation. The best way to achieve this is for these markets to be regulated under U.S. law.

# ARGUMENT

## I. The CFTC's Interpretation of "Gaming" Is Inconsistent with the Statute.

The CFTC concluded that political event contracts "involve" "gaming" within the meaning of the Commodity Exchange Act, thus authorizing the CFTC to ban them. Indeed, the CFTC's decision to reject the proposed contracts hinges critically on the determination that they "involve" a "game[]": if an election is not a game, or does not "involve" a game, the CFTC has no statutory basis upon which to reject the contract. The definition of "gaming" and of the term "involve" is thus outcome dispositive. But here, the CFTC's decision misreads the statute and gives the CFTC arbitrary and unrestrained authority far exceeding the Act's intended scope. The district court correctly rejected the CFTC's interpretation, and that ruling should be affirmed.

### A. The CFTC's Logic Violates the Presumption of Consistent Usage.

Under the Commodity Exchange Act, the CFTC "may determine" that event contracts "are contrary to the public interest" if the event contracts "involve—(I) activity that is unlawful under any Federal or State law; (II) terrorism; (III) assassination; (IV) war; (V) gaming; or (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

The CFTC concluded that it had authority to ban KalshiEX's proposed political event contracts because they "involve … gaming." As the

district court correctly explained, the CFTC's statutory analysis is wrong. An event contract "involves" an activity only if *the underlying event* constitutes that activity. For example, an event contract "involves" terrorism, assassination, or war if the event *underlying* the event contract is terrorism, assassination, or war.

The CFTC, however, did not assess whether the event underlying KalshiEX's contracts constituted "gaming." Instead, the CFTC assessed whether the act of *trading* KalshiEX's contracts would be "gaming." That reasoning is wrong.

As Justice Scalia has explained, "[a] word or phrase is presumed to bear the same meaning throughout a text," and this presumption "makes sense when applied … pragmatically."[7] As the Supreme Court has put it, "there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932).

The CFTC's statutory analysis, however, violates this canon. The CFTC's analysis requires that the word "involve" mean one thing with respect to 7 U.S.C. § 7a-2(c)(5)(C)(i)(II), (III), and (IV) (contracts that "involve" terrorism, assassination, or war), and something entirely different with respect to Section 7a-2(c)(5)(C)(i)(V) (contracts that "involve" gaming). In Subparagraphs (II), (II), and (IV), a contract "involves" terrorism,

---

[7] Antonin Scalia & Bryan A. Garner, *Reading Law* 170-71 (2012).

6

assassination, or war if the underlying event is or relates to terrorism, assassination, or war. But in subsection (V), under the CFTC's reading, a contract "involves" gaming if the act of buying or selling the contract is itself gaming. The CFTC's interpretation of the word "involve" as bearing two totally different meanings within the same sentence is untenable under the presumption of consistent usage, and it defies common logic. As the district court correctly explained, this error is an independent and sufficient cause to rule for KalshiEX.

## B. Elections Are Not "Games," and Trading Political Event Contracts Is Not "Gaming."

Even if the CFTC were correct that it has the authority to regulate "gaming," it would still lack authority to ban KalshiEX's prediction markets because participating in those markets is not "gaming." As the district court explained, and contrary to the CFTC's view, having a financial stake in the outcome of a future event and playing a "game" are not the same thing. More to the point, congressional elections are not games, and contracts indexed to the outcomes of those elections are also not games and do not "involve" games.

"Gaming" means playing a game. It is what people do at a casino or during their weekly poker night. When people play roulette or the slots, they are "gaming." Likewise, people who *bet* on games—like people who go to a casino and put down money on the Super Bowl—might be said to engage in "gaming."

But an election is not a "game," and putting down money on the outcome of an election is not "gaming." Of course, every person who purchases a political event contract has a financial stake in the outcome of a future event. And often, the person does so for purposes unrelated to hedging. But that is true for *all* financial markets, whether derivative or not. A retail investor who purchases Apple stock, or options on Apple stock, or an S&P 500 mini contract, is not hedging any risk, but that does not mean that the investor is gaming or involved in a game. If that were true, a huge swath of financial contracts that have been blessed for decades by the CFTC would have to be prohibited. The Commission's logic on this point is dramatically overbroad and proves far, far too much. This is an additional, independent reason the Commission's interpretation must fail.

Further, non-hedging traders add exceptional value to secondary markets, including derivative markets. It is commonly understood that "[a] financial market is a place where many speculators with different pieces of information meet to trade, attempting to profit from their information."[8] "Prices aggregate these diverse pieces of information and ultimately reflect an accurate assessment of firm value,"[9] or, in this case, of the probability of an event coming to fruition. The participation of these

---

[8] Philip Bond, Alex Edmans & Itay Goldstein, *The Real Effects of Capital Markets*, 4 Ann. Rev. Fin. Econ. 339, 340 (2012).

[9] *Id.*

non-hedging investors can thus improve market performance, not detract from it.

The CFTC also offered no persuasive explanation of how "gaming" could be transmuted to "all event contracts where the underlying event involves people contesting something." The CFTC's reasoning is as follows: (1) some dictionaries equate "gaming" with "gambling," and (2) "[u]nder most state laws, 'gambling' involves a person staking something of value upon the outcome of a game, contest, or contingent event." Matter of the Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the United States Senate and United States House of Representatives 8 & n.22 (CFTC Sept. 22, 2023) (Order). The CFTC also pointed to a federal statute defining "bet or wager" as "the staking or risking by any person of something of value upon the outcome of a contest of others, a sporting event, or a game subject to chance." *Id.* at 9.

As the district court accurately set forth, this reasoning fails at multiple levels. The fact that some dictionaries use "gambling" and "gaming" in the same breath does not imply that broad statutory definitions of "gambling" always mean the same thing as "gaming." Dictionaries

commonly include multiple definitions of each term, an observation sufficient to prove that the terms are not synonymous.[10]

Likewise, a federal statute defining "bet or wager" sheds little light on what the word "gaming" means.  Indeed, it would be absurd if "gaming" stretched as broadly as the statutes cited by the CFTC.  To the extent the CFTC believes that "staking something of value upon the … contingent event" is enough to make an activity "gaming," *see* Order at 8, all derivatives markets would constitute gaming and therefore be illegal, and the CFTC would put itself out of business.  Anyone who buys wheat futures is "staking something of value"—their money—on a "contingent event"—an increase or decrease in the cost of wheat in the future.  By the CFTC's logic, they are involved in a "corn game" that cannot be permitted on an approved contract market.  The contradiction is obvious.

Recognizing the absurdity of this position, the CFTC suggested that its decision might be limited to prediction markets for *elections* because an election is a type of "contest."  *See* Order at 9 ("To bet or wager on elections is to stake something of value upon the outcome of contests or others, namely, contests between electoral candidates.").  According to the CFTC, limiting "gaming" to "contests" would draw the appropriate

---

[10] *See, e.g.*, *American Heritage Dictionary of the English Language* 721-22 (4th ed. 2000) (providing eight definitions for "gambl[ing]" and two for "gaming").

line because "futures contracts traditionally have not been premised on the outcome of a contest of others." *Id.* at 10 n.25.

This reasoning again fails and is also dramatically overbroad. Even if an election campaign might in some sense be said to be a "contest," that does not mean that purchasing political event contracts is "gaming." Whether something is "gaming" turns on whether it involves playing a game, not on whether the event underlying the event contract is a "contest." Moreover, a substantial literature characterizes the outcome of market processes as equivalent to the results of elections in which market participants vote with currency on a weighted voting basis, rather than through a one-person-one-vote mechanism. Put another way, every market can be reframed as a weighted voting process, or as a contest between buyers (who want lower prices) and sellers (who want higher prices) as to where to set the equilibrium price.[11] Thus, if every market is also a game—and the CFTC offers no principled basis upon which to conclude otherwise—then no derivative on any market could be approved under the CFTC's logic because every derivative would "involve gaming."

---

[11] *See* William J. Baumol & William G. Bowen, *Performing Arts: The Economic Dilemma* (1966) (explaining that markets are akin to electoral processes in which firms compete for consumer "votes" by offering better products and prices); Friedrich Hayek, *The Use of Knowledge in Society*, 35 Am. Econ. Rev. 519 (1945) (analogizing prices to the outcome of voting processes in which consumers express preferences for goods and services instead of candidates); *see also* James M. Buchanan & Gordon Tullock, *The Calculus of Consent: Logical Foundations of Constitutional Democracy* (1962).

Again, this interpretation of the statute makes no sense because it would negate the very existence of the markets that the statute is designed to regulate. But the agency provides no rational basis to prevent that interpretation from being applied to every market process. The agency's interpretation of the statutory language is thus unreasonable at best, and irrational at worst.

The state statutes cited by the CFTC also fail to support its position. At most, those statutes show that the word *gambling* can refer to betting on the outcome of a game *or* a contest—which, in context, is something similar to a "game." So, if one bets on the outcome of the Super Bowl—a "game"—or the Olympic 100-meter dash—which might not qualify as a "game," but is a type of "contest"—then one is engaging in "gambling." These statutes do not show that "gaming" encompasses betting on the outcome of a *contest*, and certainly do not show that "gaming" encompasses participating in a political prediction market. Indeed, these statutes are irrelevant multiple times over—they distinguish between "game" and "contest"; distinguish between "game"—the underlying event (such as a football game)—and "gambling"—the act of betting money (which the CFTC is referring to as "gaming"); and say nothing about whether "contest" encompasses elections.

Under the CFTC's view, playing craps, roulette, poker, blackjack, rummy, and mah-jongg, and entering into positions in political event prediction markets are all "gaming"—the first six because they involve

actual gaming, and the seventh because the underlying event in the event contract involves a kind of competition. Meanwhile, under the CFTC's view, markets that involve predicting anything that *isn't* a "contest"— whether Congress will enact immigration reform, whether Tottenham Hotspur will sack their manager, whether there will be 1 million new COVID cases, or anything else—are *not* gaming because the underlying events are not competitive. It is simply impossible to wring this line from the word "gaming." An event contract turning on whether a candidate will win an election (which the CFTC thinks is "gaming") is clearly more similar to an event contract turning on whether Congress will pass a particular statute (which is not "gaming" under the CFTC's view) than it is to mah-jongg.

Further, the CFTC's interpretation of "gaming" would appear to encompass any event contract turning on the outcome of a process that involves competition—which could give that term an unexpectedly broad scope. For example, the business world is sharply competitive. Would prediction markets turning on, for example, which company would be the market leader in a particular area constitute "gaming" because companies compete against each other?

### C. The CFTC Engaged in Policy Analysis, Not Statutory Construction.

The CFTC also took the view that "the economic impacts of the outcome of contests for Congressional control are too diffuse and

unpredictable to serve the hedging and risk management functions that futures contracts have traditionally been intended to serve." Order at 10 n.25. As explained below, *amicus* respectfully disagrees with the CFTC's assessment of the utility of event prediction markets. But even setting the CFTC's policy views aside, the CFTC's analysis does not support its statutory interpretation of "gaming." Whether an election is a type of "contest"—the statutory standard invented by the CFTC—has little to do with whether a particular event contract would "serve[] … hedging and risk management functions." *Id.* The CFTC would likely deny the hedging utility of a prediction market on whether Congress would pass a *statute*, yet even under the CFTC's view, such a prediction market would not count as "gaming." The CFTC should have interpreted "gaming" as written rather than rewriting it to conform to its policy views on the particular prediction market proposed by KalshiEX. And in any event, the outcome of this case turns on this Court's (not the agency's) interpretation of "gaming," applying traditional statutory-construction techniques, rather than the agency's policy views about prediction markets. Perhaps in the *Chevron* era, the CFTC's policy arguments—misguided as they are—might have been a basis for this Court to hold its nose and defer to the CFTC's efforts to torture the statute. But today, the Court's task is to conduct an ordinary statutory-interpretation—and such an analysis dooms the CFTC's case. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2257-58 (2024).

## II. The CFTC's Public Interest Analysis is Arbitrary and Capricious.

Even if the CFTC's statutory construction were correct—meaning that it had statutory authority to conduct a "public interest" analysis—its order would still be arbitrary and capricious. The CFTC committed three errors:

- It adopted an arbitrary and unsupported view of what "hedging" means and, as a result, ignored the proposed contracts' legitimate hedging purposes.

- It ignored the fundamental point that the "public interest" goes beyond hedging.

- It did not explain *why* it rejected the empirical evidence offered by KalshiEX and its supporters.

### A. The Proposed Contracts Serve Legitimate Hedging Purposes.

First, the CFTC was dead wrong on what qualifies as "hedging utility." The CFTC acknowledged that "control of a chamber of Congress could, following a number of independent intervening events, generally affect a wide variety of personal liabilities and economic factors." Order at 17. But, in the CFTC's view, "that does not establish that the Congressional Control Contracts can be used for specific, identifiable hedging purposes and thus does not establish the hedging utility of the Congressional Control Contracts." *Id.* Thus, according to the CFTC, an event contract has hedging utility only if it "can be used for specific, identifiable hedging purposes." *Id.*

As a matter of basic economics, this reasoning is indefensible. A political event contract plainly *can* be used for "specific, identifiable hedging purposes." Financial market participants routinely consider the probability of a particular candidate winning an election to accurately price assets. It is inevitable that some businesses benefit when Republicans are in charge and other businesses benefit when Democrats are in charge. As those probabilities change, the value of the assets change. For this reason, political event contracts have bona fide hedging utility: they reduce a company's exposure to the risk associated with a particular candidate winning. Suppose a company knows that if one candidate wins, it will likely be able to drill for oil on a particular piece of land, and if that candidate loses, it likely will not. The company's value may swing dramatically depending on the outcome of the election—making it prudent to purchase a political event contract as a hedge. That hedging purpose is both "specific" and "identifiable."

Indeed, significant economic research confirms that "outcomes of elections or referendums have an impact on financial markets."[12] A 2022 article by Michael Hanke, Sebastian Stöckl, and Alex Weissensteiner documents that the probability of the outcome of the 2020 presidential election could be derived from observed stock market prices, meaning

---

[12] Michael Hanke, Sebastian Stöckl & Alex Weissensteiner, *Recovering Election Winner Probabilities from Stock Prices*, 45 Fin. Rsch. Letters 102 (2022).

that election expectations cause stock price changes.[13] The same line of research establishes the existence of "Democratic stocks" and "Republican stocks"—stocks that outperform when Democrats control and stocks that outperform when Republicans control—and that it is possible to construct "long-short portfolios that show a positive return conditional on correctly forecasting the election outcome."[14] Prediction markets are thus "useful both for investors who want to speculate on the election outcome and for those who want to reduce the exposure of their portfolio (or hedge against) the election outcome."[15] Similar research was presented

---

[13] *Id.*; *see also, e.g.*, Jawad M. Addoum & Alok Kumar, *Political Sentiment and Predictable Returns*, 29 Rev. Fin. Stud. 3471 (2016); Stijn Claessens, Erik Feijen & Luc Laeven, *Political Connections and Preferential Access to Finance: The Role of Campaign Contributors*, 88 J. Fin. Econ. 554 (2008); Michael Hanke, Sebastian Stöckl & Alex Weissensteiner, *Political Event Portfolios*, 118 J. Bank Fin. 1 (2020); Paula Hill, Adriana Korczak & Piotr Korczak, *Political Uncertainty Exposure of Individual Companies: The Case of the Brexit Referendum*, 100 J. Banking & Fin. 58 (2019); Seema Jayachandran, *The Jeffords Effect*, 49 J.L. & Econ. 397 (2006); Brian Knight, *Are Policy Platforms Capitalized into Equity Prices?: Evidence from the Bush/Gore 2000 Presidential Election*, 90 J. Pub. Econ. 751 (2006); Bento J. Lobo, *Jump Risk in the U.S. Stock Market: Evidence Using Political Information*, 8 Rev. Fin. Econ. 149 (1999); Erik Snowberg, Justin Wolfers & Eric Zitzewitz, *Partisan Impacts on the Economy: Evidence from Prediction Markets and Close Elections*, 122 Q.J. Econ. 807 (2007); Alexander F. Wagner, Richard J. Zeckhauser & Alexandre Ziegler, *Company Stock Price Reactions to the 2016 Election Shock: Trump, Taxes, and Trade*, 130 J. Fin. Econ. 428 (2018).

[14] Hanke et al., *supra* note 12, at 103.

[15] *Id.*

to the CFTC by multiple commenters.[16] An organized, regulated election prediction market would therefore better allow investors to hedge against the electoral risk that is evidently embedded in stock market prices.

KalshiEX's large position limits and order sizes also reinforce the proposed contracts' value for hedging purposes. These regulatory safeguards reduce the number of casual speculators and increase the number of participants who purchase the contracts for risk-mitigation purposes.

Indeed, today, investors *do* hedge against adverse elections outcomes, but they do so through indirect and inefficient hedging strategies. It would be more efficient and transparent if businesses and investors could simply enter into such hedging arrangements directly.

## B. The Proposed Contracts Generate Legitimate Non-Hedging Public Benefits.

Even assuming that political event contracts lack hedging value, an assumption contrary to evidence, the CFTC failed to consider a basic point: there is more to life than hedging.

The CFTC stated:

[I]n evaluating whether the Congressional Control Contracts are contrary to the public interest, the Commission has considered the contracts' hedging utility and price-basing utility. Additionally, the Commission has considered the potential

---

[16] *See, e.g.*, App. 165 (KalshiEX comment before CFTC discussing evidence of election risk and hedging need and reviewing literature finding that "changes in political control result in changes to the prices of traded assets"); App. 430 (CFTC comment submitting paper discussing benefits and accuracy of prediction markets).

> impact that trading in the Congressional Control Contracts may have on election integrity, or the perception of election integrity—as well as the extent to which permitting trading in the Congressional Control Contracts could require the Commission to assume a role in overseeing the electoral process.

Order at 15 (footnotes omitted). In other words, in assessing the public interest, the CFTC considered: (1) "hedging utility and price-basing utility," and (2) potential harmful outcomes related to election integrity.

This analysis presents a paradigmatic case of an agency "entirely fail[ing] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). There is a crucial aspect of the public interest that the CFTC failed to consider: the non-economic value of prediction markets in predicting the future. Prediction markets assemble the wisdom of crowds to achieve estimates of election outcomes that are superior to predictions by any one pundit alone.[17] In a world with miniscule poll response rates, sky-high polarization, and rampant fake news, prediction markets offer an objective indicator of the probability of particular election outcomes. The public interest supports combatting fake news and providing a better mechanism for the revelation of truth.

Prediction market probabilities also benefit academic research. Some researchers use prediction market probabilities to assess how

---

[17] *See* Bond et al., *supra* note 8.

elections influence economic variables.[18]  For instance, they may analyze whether an increase in the market's assessment of the probability of a particular candidate prevailing is correlated with an increase or decrease in other economic variables.  Alternatively, they may use prediction markets to learn which events actually influence campaigns.  If a particular news story causes a candidate's probability of victory to spike (as measured through prices of political event contracts), researchers can predict that the news story impacted the election rather than attempting to reconstruct the reasons a particular candidate prevailed after the fact.  Legalizing prediction markets will increase participation and make them more liquid and more useful for academic purposes.  The CFTC ignored all of this; it concluded that because prediction markets cannot be used for hedging (a conclusion that was itself wrong), prediction markets *must* be bad.

True, the CFTC stated in passing that it had "considered assertions by KalshiEX and other commenters that the Congressional Control Contracts would serve as a check on misinformation and inaccurate polling, stating that market-based alternatives tend to be more accurate than polling or other methods of predicting election outcomes."  Order at 21.  "Stating that a factor was considered, however, is not a substitute for

---

[18] *See, e.g.*, Hanke et al., *supra* note 12 and citations therein.

considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986).

The CFTC also seems to have ignored the observation that if a person seeks to manipulate election outcomes, manipulating the event market would be a foolish mechanism by which to achieve that result. First off, traders in this market must identify themselves to intermediaries and therefore cannot remain hidden. Manipulators do not rationally gravitate to markets that mandate this level of transparency. Second, contributing to dark-money pools that can purchase advertising and engage in other forms of influence would likely be far more efficient in influencing outcomes than attempting to influence event contract prices. Third, markets can be self-correcting. If a manipulator tries to inflate the prices of a Democratic or Republican victory, the manipulator will only attract traders on the other side of the market. Dark-money contributions have no equivalent offsetting mechanisms because, they are, by definition, hidden and dark, and do not operate in markets that allow for the formation of offsetting positions.

The risk of manipulation is thus rationally analyzed as a comparative phenomenon. From that perspective, the proposed contract is highly unlikely to contribute to electoral manipulation precisely because of the existence of alternative, superior methods of manipulation. Indeed, if anything, the self-correcting nature of the contract suggests that it is more likely to have an anti-manipulative effect.

The CFTC showed no signs of giving meaningful consideration to any of these non-economic benefits. Affirming that reasoning is particularly troubling because it would allow the agency to apply that approach to *any* prediction market, not just congressional control contracts. The Court should not allow the CFTC to extinguish, based on incomplete and unexplained reasoning, a tool of great potential social and academic value.

### C. The Order Fails to Adequately Explain Its Concerns Regarding Manipulation.

Third, the CFTC did not adequately explain its conclusions regarding the risk of manipulation. As *amicus* and other commenters explained to the CFTC, several studies of existing prediction markets have shown that price "pump" attempts are short-lived and, as explained above, disciplined by the market's self-correcting mechanisms. Moreover, the relatively low position limit means any one participant is unlikely to be able to move the market in a meaningful way as traders enter on the other side of the market to profit from the mispricing. As for concerns about manipulation of elections, commenters offered abundant empirical and theoretical evidence suggesting it would not occur.

Of course, the CFTC, as an expert administrative agency, was free to review the evidence and make a predictive judgment as to the risk of manipulation. But it gave no sign of having actually *made* such a predictive judgment.

The CFTC observed: "[T]here is also research suggesting that election markets may incentivize the creation of 'fake' or unreliable information in the interest of moving the market, and a number of commenters also raised this concern."  Order at 22.  But there also is research showing that election markets would *decrease* misinformation—as the CFTC acknowledged.  *Id.* at 21.  With conflicting evidence in the record, the CFTC must show its work.  It did not.  Instead, it merely noted the existence of "research" suggesting that election prediction markets might be harmful, and then leapt to the conclusion that they *must* be contrary to the public interest.  It was incumbent on the CFTC to grapple with the conflicting evidence in the record and give a reasoned explanation of why it reached its conclusion.

## III. During the 2024 Presidential Election, KalshiEX's Regulated Prediction Market Worked.

This Court denied the CFTC's motion to stay the district court's order on the ground that the CFTC had not shown irreparable harm.  *KalshiEX LLC v. CFTC*, 119 F.4th 58, 60 (D.C. Cir. 2024).  Hence, KalshiEX's prediction market operated during the 2024 presidential election.

Subsequent events demonstrate the wisdom of this Court's order.  KalshiEX's prediction market was accurate and useful, and the CFTC's concerns about manipulation did not come to pass.  Further, given the

existence of unregulated prediction markets operating in foreign countries, the public benefited from KalshiEX's regulated market.

In the presidential election, KalshiEX's prediction market delivered on its promise to offer more accurate predictions of the result than traditional polling and polling aggregators. At 6:00 a.m. on the morning of Election Day, KalshiEX set Donald Trump's odds of prevailing at 57.1%, higher than most polls and polling averages, which characterized Trump's odds as 50/50.[19] Although there was extreme interest in the election and radical differences of opinion on who would prevail, Trump's odds remained stable throughout Election Day prior to polls closing, precisely as one would expect from a well-behaved prediction market.[20] As election returns came in, Trump's odds rapidly increased as KalshiEX's prediction market incorporated new information—Trump's odds were 61% at 8:00 p.m., 74.1% at 10:00 p.m., and 92.5% by midnight.[21]

The concerns articulated by the CFTC at the stay stage did not materialize. The CFTC expressed concern about fake polls being used to manipulate prediction markets. *See KalshiEX*, 119 F.4th at 64-65. There is no evidence this happened—indeed, the prediction markets were better than the polls. The CFTC also suggested that KalshiEX's prediction

---

[19] *See* Matt Levine, Opinion, *Prediction Markets Are a Thing Now*, Bloomberg (Nov. 7, 2024), https://www.bloomberg.com/opinion/articles/2024-11-07/prediction-markets-are-a-thing-now.

[20] *See id*.

[21] *Id*.

market might result in the propagation of "misinformation about the upcoming elections," *id.* at 65, but there is no evidence that this happened. Indeed, KalshiEX's prediction market proved a corrective tonic for any misinformation that was spread. The CFTC speculated about traders violating Kalsih's rules, *see id.* at 66, but again, there is no evidence that this occurred at all, much less at the large scale needed to affect the accuracy of KalshiEX's market.

KalshiEX proved to be especially useful given the presence of unrelated election prediction markets operating from outside the United States (such as Polymarket). Even if the CFTC can prohibit these unregulated markets from allowing U.S. residents to trade, it cannot prevent the *information* they purvey from affecting the perceptions and behavior of U.S. voters. If information from prediction markets will penetrate the United States, it is by far preferable that the markets from which U.S. voters obtain information should be regulated by U.S. authorities.

One highly publicized incident involving Polymarket illustrates KalshiEX's benefits. A particular French trader leveraged his own polling methodology to accurately predict that former President Trump would win re-election, simultaneously detecting and exploiting a flaw in traditional polling methodology.[22] On Polymarket, he invested more than

---

[22] *See* Alexander Osipovich, *How the Trump Whale Correctly Called the Election*, Wall St. J. (Nov. 6, 2024, 4:18 PM ET), https://www.wsj.com/finance/how-the-trump-whale-correctly-called-the-election-cb7eef1d.

$30 million in the market for the Presidential election winner based on his knowledge that voters were more honest about their plans when asked who they expected their *neighbors* to vote for, rather than when asked who they *themselves* planned to support.[23] Notably, there was no evidence that he intended to, or did, manipulate the prediction market.[24]

There has been substantial debate as to whether this incident demonstrates the success or the failure of Polymarket. Proponents argue that this incident demonstrates that prediction markets can assemble information that traditional polling aggregators cannot, thus improving the quality of predictions. Detractors argue that the incident demonstrates that prediction markets are prone to manipulation by individual participants who spend disproportionately high amounts.

Crucially, however, to the extent this episode demonstrates the risk of market manipulation, it is also an instructive example of how the CFTC's regulations mitigate such risk. The Commodity Exchange Act includes 23 "core principles" that exchanges must follow, each of which is the subject of regulatory guidance. *See* 7 U.S.C. § 7(d)(1)-(23); 17 C.F.R. pt. 38. Core Principle 4 recites that a designated contract market must have "the capacity and responsibility to prevent manipulation[ and] price

---

[23] *See* Levine, *supra* note 19.

[24] *See* Andrew Ross Sorkin et al., *The French Connection to Online Bets on Trump*, N.Y. Times: DealBook (Oct. 24, 2024), https://www.nytimes.com/2024/10/24/business/dealbook/polymarket-trump-trader.html.

distortion … through market surveillance, compliance, and enforcement practices and procedures." 7 U.S.C. § 7(d)(4). The CFTC's regulations require exchanges to implement "[m]ethods for conducting real-time monitoring of trading" and "[c]omprehensive and accurate trade reconstructions." 17 C.F.R. § 38.250(a)-(b). If a market participant like the French investor had placed a $30 million bet on Trump's victory, KalshiEX would have immediately detected the investment and conducted an investigation as to whether the market participant was attempting to manipulate the market, was trading based on inside information, or was otherwise violating KalshiEX's rules. The CFTC cannot impose those types of restrictions on foreign entities like Polymarket.

Further, if the CFTC is concerned about large positions like the French investor's position, it has the authority to set position limits. Under Core Principle 5, the CFTC has authority to impose position limits on speculators in order to "reduce the potential threat of market manipulation." 7 U.S.C. § 7(d)(5)(A). If the CFTC thinks that investors should not invest $30 million into KalshiEX's market, it is free to exercise its regulatoy authority to ban such investments. Again, the CFTC is powerless to impose such restrictions on Polymarket.

KalshiEX can and will prevent other forms of market manipulation that may arise in unregulated markets. For example, unregulated markets have been plagued with allegations of "wash trading," wherein a single entity buys and sells a large number of shares of a commodity to

create the false impression of significant market activity.[25]  KalshiEX's market surveillance and real-time monitoring capabilities—which exist as a result of the CFTC's regulations—prevent such trading.

As another example, there was news coverage of a manipulation attempt at Polymarket where one or more traders attempted to spike the price in the main market in order to profit off of a secondary market, which asked who would be ahead in the primary market during a particular window of time.[26]  This would never happen on KalshiEX's regulated market: Core Principle 3 recites that exchanges may list "only contracts that are not readily susceptible to manipulation."  7 U.S.C. § 7(d)(3).  In light of that principle, KalshiEX would not and could not list a derivative market of a prediction market, and so this form of attempted manipulation could not occur.

In sum, Americans are intensely interested in elections and will inevitably follow prediction markets in order to predict election odds.  They are better off relying on a well-regulated domestic prediction market that

---

[25] *See, e.g.*, Leo Schwartz, *Exclusive: Election Betting Site Polymarket Gives Trump a 67% Chance of Winning but Is Rife with Fake 'Wash' Trading, Researchers Say*, Fortune Crypto (Oct. 30, 2024, 10:20 AM EDT), https://fortune.com/crypto/2024/10/30/polymarket-trump-election-crypto-wash-trading-researchers.

[26] *See, e.g.*, Rajiv Sethi, *A Failed Attempt at Market Manipulation*, Imperfect Information (Sept. 7, 2024), https://rajivsethi.substack.com/p/a-failed-attempt-at-prediction-market.

has guardrails against manipulation than on an unregulated foreign market that does not.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

Date: November 22, 2024

*/s/ Adam G. Unikowsky*
Adam G. Unikowsky
  *Counsel of Record*
Jonathan J. Marshall
JENNER & BLOCK LLP
1099 New York Avenue, NW,
  Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

*Counsel for Amicus Curiae*
  *Professor Joseph A. Grundfest*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limit set forth in Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains **6,495** words.

I further certify that this brief complies with the typeface requirements set forth in Federal Rule of Appellate Procedure 32(a)(5)(A) and with the type-style requirements set forth in Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using 14-point Times New Roman font in Microsoft Office Word 365.

Date:  November 22, 2024          */s/ Adam G. Unikowsky*
                                                     Adam G. Unikowsky

                                                     *Counsel of Record for Amicus*
                                                       *Curiae Professor Joseph A.*
                                                       *Grundfest*

# CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Colubmia Circuit by using the appellate CM/ECF system, which will send notice to all the parties.


Date: November 22, 2024

*/s/ Adam G. Unikowsky*

Adam G. Unikowsky

*Counsel of Record for Amicus Curiae Professor Joseph A. Grundfest*