ORAL ARGUMENT SCHEDULED FOR JANUARY 17, 2025
No. 24-5205

====================================================

United States Court of Appeals
For the District of Columbia Circuit

_____

KALSHIEX LLC,

Appellee,

v.

U.S. COMMODITY FUTURES TRADING COMMISSION,

Appellant.

====================================================

On Appeal from the U.S. District Court
for the District of Columbia
Case No. 1:23-cv-03257-JMC (Hon. Jia M. Cobb)

====================================================

**APPELLANT'S REPLY BRIEF**

====================================================

Robert A. Schwartz
*General Counsel*
Anne W. Stukes
*Deputy General Counsel*
Raagnee Beri
Margaret P. Aisenbrey
*Senior Assistant General Counsels*
Conor B. Daly
*Counsel*
**U.S. COMMODITY FUTURES
TRADING COMMISSION**
1155 21st Street, N.W.
Washington, D.C. 20581-0001
Phone: (202) 418-5986
Email: rberi@cftc.gov

December 5, 2024

# **TABLE OF CONTENTS**

GLOSSARY ................................................................................................ vii

INTRODUCTION ........................................................................................1

SUMMARY OF THE ARGUMENT .............................................................4

ARGUMENT ................................................................................................5

    A. "Involve" encompasses a variety of connections between contracts or
    transactions and enumerated activities ............................................5

    B. "Gaming" is not limited to "games" .............................................11

        1. "Gaming" and "gambling" are interchangeable. .....................12

        2. There is no basis to confine "gaming" to games or events with no
        outside economic effects. ..........................................................16

        3. Kalshi argues against a strawman construction of gaming. .....................18

        4. Gaming includes wagering on a contest of others...................................21

    C. "Activity that is unlawful under . . . State law" applies to conduct that is
    unlawful under state laws that are not preempted by the CEA .....................23

        1. Kalshi incorrectly asserts that the Commission's reasoning can be
        interpreted to capture "nothing." ...............................................24

        2. Kalshi incorrectly asserts that the Commission's reasoning captures
        "the *universe* of event contracts." ..........................................25

        3. The enumerated categories in Section 5c(c)(5)(C) defer to state interests
        and act as a check on socially destructive activity ...............................27

CONCLUSION ..........................................................................................28

<u>**TABLE OF AUTHORITIES**</u>

<u>Cases</u>

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
  570 U.S. 1 (2013)................................................................28

*\*Bankamerica Corp. v. United States*,
  462 U.S. 122 (1983).........................................................8, 11

*Baystate Franklin Medical Center v. Azar*,
  950 F.3d 84 (D.C. Cir. 2020) ...........................................19

*Clark v. Martinez*,
  543 U.S. 371 (2005)..........................................................8, 9

*Consumer Electronics Association v. FCC*,
  347 F.3d 291 (D.C. Cir. 2003) ...........................................17

*Electric Energy, Inc. v. EPA*,
  106 F.4th 31 (D.C. Cir. 2024) ...........................................19

*Guedes v. ATF*,
  920 F.3d 1 (D.C. Cir. 2019) ................................................6

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995)..............................................................8

*Loper Bright Enterprises v. Raimondo*,
  144 S. Ct. 2244 (2024)....................................................6, 19

*McCullen v. Coakley*,
  573 U.S. 464 (2014)............................................................12

*Mercy Hospital, Inc. v. Azar*,
  891 F.3d 1062 (D.C. Cir. 2018)...........................................22

*Michigan v. Bay Mills Indian Community*,
  572 U.S. 782 (2014)......................................................14, 28

*NLRB v. Bell Aerospace Company Division of Textron, Inc.*,
  416 U.S. 267 (1974)............................................................20

*Oncale v. Sundowner Offshore Services, Inc.*,
  523 U.S. 75 (1998)..............................................................17

*Pinson v. DOJ*,
  964 F.3d 65 (D.C. Cir. 2020) ............................................................................11

*Prison Legal News v. Samuels*,
  787 F.3d 1142 (D.C. Cir. 2015) ........................................................................12

*Reno v. Bossier Parish School Board*,
  528 U.S. 320 (2000) ...........................................................................................8

*Rumsfeld v. Forum for Academic and Institutional Rights*,
  547 U.S. 47 (2006) ............................................................................................12

*\*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ..........................................................................................19

*Southwest Airlines Co. v. Saxon*,
  596 U.S. 450 (2022) ...........................................................................................7

*United States v. Edge Broadcasting Co.*,
  509 U.S. 418 (1993) ..........................................................................................12

*United States v. Radley*,
  632 F.3d 177 (5th Cir. 2011) ............................................................................10

*United States v. Santos*,
  553 U.S. 507 (2008) ...........................................................................................9

<u>U.S. Code</u>

Title 5
  Section 706.........................................................................................................20

Title 7
  Section 1a(15)(A), CEA Section 1a(15)(A) .......................................................11
  Section 2(g), CEA Section 2(g) .........................................................................10
  *Section 7a-2(c)(5)(C), CEA Section 5c(c)(5)(C)....................................6, 11, 27
  Section 7a-2(c)(5)(C)(i), CEA Section 5c(c)(5)(C)(i) ..........................................3
  Section 7a-2(c)(5)(C)(ii), CEA Section 5c(c)(5)(C)(ii)........................................11

Title 25
  Section 2703(6) ..................................................................................................14
  Section 2703(7) ..................................................................................................14
  Section 2703(8) ..................................................................................................14

Title 31
    Section 5362(1)(A) ................................................................15
    Section 5362(10) .................................................................15

Other Authorities

Event Contracts, 89 Fed. Reg. 48,975 (proposed May 10, 2024),
    https://www.cftc.gov/media/10706/votingcopy051024_
    EventContracts/download .....................................................20

156 Cong. Rec. S5906-07, 2010 WL 2788026 (daily ed. July 15, 2010)......3, 17, 27

N.M. Att'y Gen. Op. 17-2, *Regulation of Gambling in the Town of Silver City*
    (Feb. 7, 2017), 2017 WL 1901888 .........................................16

Del. Code Ann. tit. 11, § 1403(1) ..............................................22

Fla. Stat. § 849.14 ....................................................................22

Ky. Rev. Stat. Ann. § 528.010(6)(a).........................................22

La. Stat. Ann. § 14:90(A)(1)(a) ...............................................23

La. Stat. Ann. § 27:205 ...........................................................15

La. Stat. Ann. § 27:205(11)(a) .................................................15

Mass. Gen. Laws ch. 23K, § 2 ................................................15

Miss. Code Ann.  § 75-76-5(l) .................................................16

Mont. Code Ann. § 30-9A-102 ................................................25

Nev. Rev. Stat. § 293.830 ........................................................26

N.J. Stat. Ann. § 12A:9-102 ....................................................25

N.J. Stat. Ann. § 19:34-24.......................................................26, 28

N.Y. Penal Law § 225.00(2) ...................................................21

N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1301(20)............16

Utah Code Ann. § 76-10-1101(8)(a).........................................22

@Kalshi, X (Oct. 28, 2024, 4:31 PM), pic.x.com/lDr2PCEMV1 .............................1

@Kalshi, X (Oct. 23, 2024, 3:03 PM), pic.x.com/BCetey1esB ..............................1

Brant James, *Court Confirms Kalshi Election Betting*, GAMING TODAY
   (Oct. 3, 2024), https://www.gamingtoday.com/news/court-confirms-kalshi-
   election-betting/ ...........................................................................................2

Brant James, *Kalshi Adds Restrictions to Political Betting Markets*, GAMING
   TODAY (Oct. 9, 2024), https://www.gamingtoday.com/news/kalshi-adds-
   restrictions-to-political-betting-markets/ ..................................................2

Dan Mangan, *Kalshi expands Trump, Harris election bet options,*
   *adds Senate races*, CNBC (Oct. 9, 2024),
   https://www.cnbc.com/2024/10/09/kalshi-expands-election-betting-options-
   cftc-complains.html...................................................................................3

Devin O'Connor, *Election Betting Markets Draw Ire of State Gaming*
   *Regulators Ahead of November 5*, CASINO.ORG (Nov. 4, 2024),
   https://www.casino.org/news/election-betting-markets-draw-ire-state-
   gaming-regulators ...............................................................................2, 26

*Election Contracts: Kalshi vs Robinhood*, KALSHI,
   https://kalshi.com/blog/article/election-contracts-kalshi-com-vs-robinhood (last
   visited Dec. 6, 2024) ...................................................................................2

Jess Marquez, *Harris, Trump, everything in between: Kalshi explodes with*
   *political futures*, IGAMING BUSINESS (Oct. 15, 2024),
   https://igamingbusiness.com/finance/kalshi-event-contract-politics ...................2

*Trade Election Parlay Contracts*, KALSHI, https://kalshi.com/live/election-parlays
   (last visited Dec. 5, 2024). ...........................................................................1

*U.S. Election 2024*, KALSHI, https://kalshi.com/events/politics/us-elections (last
   visited Dec. 5, 2024). ...................................................................................1

*U.S. Legal Sports Betting*, FANDUEL, https://www.fanduel.com/legal-sports-
   betting-us-map (last visited Dec. 5, 2024)...................................................1

*Which party will win the House*, KALSHI,
   https://kalshi.com/markets/controlh/house-winner (last visited Dec. 5, 2024) ....3

*Who will win the popular vote*, KALSHI,
   https://kalshi.com/markets/popvote/popular-vote-winner (last visited Dec. 5,
   2024) ..........................................................................................................3

*Contest*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/contest (last visited Dec. 5, 2024)................................21

*Contest*, OXFORD ENGLISH DICTIONARY (2024),
  https://www.oed.com/dictionary/contest_v?tab=factsheet#8440927.................21

*Gaming*, AMERICAN HERITAGE DICTIONARY (5th ed. 2022),
  https://www.ahdictionary.com /word/search.html?q=gaming .............................13

*Gaming*, BLACK'S LAW DICTIONARY (12th ed. 2024) .............................................13

*Gaming*, CHAMBERS DICTIONARY (13th ed. 2014),
  https://www.chambers.co.uk/ search/?query=gaming&title=21st .......................12

*Gaming*, MERRIAM-WEBSTER.COM,
  https://www.merriamwebster.com/dictionary/gaming
  (last visited Dec. 5, 2024) ...................................................................................13

*Gaming*, OXFORD ENGLISH DICTIONARY (2024),
  https://www.oed.com/dictionary/gaming_n?tab=meaning_and
  _use&tl=true........................................................................................................13

*Gamble*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/gamble (last visited Dec. 5, 2024) .................................13

*Gamble*, OXFORD ENGLISH DICTIONARY (2024),
  https://www.oed.com/dictionary/gamble_v?tab=factsheet#3430238 .................14

*Authorities chiefly relied on are marked with an asterisk.

## <u>GLOSSARY</u>

**CEA** – Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*

**CFTC or Commission** – U.S. Commodity Futures Trading Commission

**Contracts** – Congressional Control Contracts

**DCM** – Designated Contract Market

**IGRA** – Indian Gaming Regulatory Act, 25 U.S.C. § 2701, *et seq.*

**Kalshi** – KalshiEx LLC

**Special Rule** – CEA Section 5c(c)(5)(C), 7 U.S.C. § 7a-2(c)(5)(C)

**UIGEA** – Unlawful Internet Gambling Enforcement Act, 31 U.S.C. § 5361, *et seq.*

## INTRODUCTION

Once this Court lifted its administrative stay, Kalshi promptly turned its futures exchange into an online casino.  Almost immediately, Kalshi erected a giant billboard on the Las Vegas strip, declaring that "Kalshi odds are LIVE" and inviting casino-goers to "Bet the election."[1]  After telling the Court that its contracts do not involve gaming because "elections have enormous economic effects" while gaming is "for amusement, for diversion or sport," Stay OA Tr. at 64-65, Kalshi listed scores of election bets that fail its own test, like "Popular vote margin of victory?"; "Tipping point in the presidential election?"; and "Will Nate Silver correctly call the presidential election winner?"[2]  It listed dozens of "Parlay Contracts,"[3] as though its futures exchange were a racetrack.  Kalshi's CEO bragged when Kalshi "lapped FanDuel in the App Store top 100," proclaiming that "[b]etting on politics is now more popular than betting on sports."[4]  All told,

---

[1] @Kalshi, X (Oct. 28, 2024, 4:31 PM), pic.x.com/lDr2PCEMV1.

[2] *U.S. Election 2024*, KALSHI, https://kalshi.com/events/politics/us-elections (last visited Dec. 5, 2024).

[3] *Trade Election Parlay Contracts*, KALSHI, https://kalshi.com/live/election-parlays (last visited Dec. 5, 2024).

[4] @Kalshi, X (Oct. 23, 2024, 3:03 PM), pic.x.com/BCetey1esB.  Perhaps this is because FanDuel's offering is *illegal* in *several* states*,* while the district court stripped all states of their power to regulate Kalshi's gambling operation.  *U.S. Legal Sports Betting*, FANDUEL, https://www.fanduel.com/legal-sports-betting-us-map (last visited Dec. 5, 2024).

Kalshi has listed at least one hundred election gambling contracts.[5]  For its efforts, the company has been covered extensively by *Gaming Today*,[6] *iGamingBusiness.com*,[7] and *Casino.org*.[8]

Kalshi persists in claiming that "[e]lection prediction markets are … for hedging economic risks associated with politics" (Kalshi Br. 2), but its actions show the company has never been serious in that assertion.  The Congressional Control Contracts were a Trojan horse to facilitate Kalshi's transformation into a large-scale election gambling market, with the appearance of federal imprimatur, but without the pretense of any relationship to "hedging economic risks" or consistency with the CEA's purposes.  According to Kalshi's CEO, this expansion

---

[5] *Election Contracts: Kalshi vs Robinhood*, KALSHI, https://kalshi.com/blog/article/election-contracts-kalshi-com-vs-robinhood (last visited Dec. 5, 2024).

[6] Brant James, *Court Confirms Kalshi Election Betting*, GAMING TODAY (Oct. 3, 2024), https://www.gamingtoday.com/news/court-confirms-kalshi-election-betting/; Brant James, *Kalshi Adds Restrictions to Political Betting Markets*, GAMING TODAY (Oct. 9, 2024), https://www.gamingtoday.com/news/kalshi-adds-restrictions-to-political-betting-markets/.

[7] Jess Marquez, *Harris, Trump, everything in between: Kalshi explodes with political futures*, IGAMING BUSINESS (Oct. 15, 2024), https://igamingbusiness.com/finance/kalshi-event-contract-politics.

[8] Devin O'Connor, *Election Betting Markets Draw Ire of State Gaming Regulators Ahead of November 5*, CASINO.ORG (Nov. 4, 2024), https://www.casino.org/news/election-betting-markets-draw-ire-state-gaming-regulators.

"was always the plan."[9]  Meanwhile, Kalshi's record in the 2024 election was

mixed.  For all its bluster, the Contracts at issue failed to accurately predict House

control, and the exchange also missed badly on the popular vote for president.  *See*

*Which party will win the House*, KALSHI,

https://kalshi.com/markets/controlh/house-winner (last visited Dec. 5, 2024).  *Who*

*will win the popular vote*, KALSHI, https://kalshi.com/markets/popvote/popular-

vote-winner (last visited Dec. 5, 2024).  Overall, these markets served no clear

purpose beyond entertainment and speculation.

     Congress never sanctioned any of this.  Concerned with "gambling through

supposed 'event contracts,'" 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010),

Congress granted the CFTC broad discretion to evaluate "agreements, contracts, or

transactions [that] involve" "gaming" or "activity that is unlawful under any . . .

State law," for consistency with the public interest.  7 U.S.C. § 7a-2(c)(5)(C)(i).

The Commission correctly determined that Kalshi's Contracts fit squarely within

these terms.  They involve gaming because they entail gambling on the outcome of

a contest of others; they also involve activity that is illegal under state laws that

prohibit election betting, because they relate closely to that activity.

     This case is less a battle between Kalshi and the CFTC than a struggle

---

[9] Dan Mangan, *Kalshi expands Trump, Harris election bet options, adds Senate races*, CNBC (Oct. 9, 2024), https://www.cnbc.com/2024/10/09/kalshi-expands-election-betting-options-cftc-complains.html.

between Kalshi and the English language: "Involve" does not mean "involve."

"Transaction" does not mean "transaction."  "Contest" does not mean "contest."

And "gaming" carries a definition that Kalshi just made up.

The district court erroneously accepted all of this, ignited an explosion in previously illegal election betting, and left the Commission holding the bag as a new federal gambling regulator and potential election cop.  Kalshi's defense of the decision is meager, and the district court should be reversed.

## SUMMARY OF THE ARGUMENT

At issue are the Commission's interpretations of "involve," "gaming," and "unlawful activity."

*First*, as Kalshi concedes, the term "involve" "carries its typical meaning," *i.e.*, "to relate to, entail, etc.," or "[t]o have as a necessary feature or consequence," and it "can capture a range of relationships between two concepts."  (Kalshi Br. 20, 23, 27.)  Yet the district court erroneously held that there is only *one* relevant relationship between "agreements, contracts, or transactions" and the enumerated activities—that the "underlying" event must be or closely relate to the enumerated activity.  That is not what the statute says.  Taking a position in the Contracts indisputably entails betting or gambling on elections—Kalshi's billboard says so— and betting on elections is unlawful under numerous state laws.

*Second*, the district court erred by holding that "gaming" requires a game.

4

"Gambling" and "gaming" are interchangeable terms.  Ordinary definitions of "gaming" include betting or wagering, without any such limitation.  But the Commission's interpretation was also not boundless.  Contrary to the district court's holding, the Commission did not adopt an unlimited definition of "gaming" that covers betting on any contingency or swallows every event contract.  It determined that the Contracts here involved "gaming" because they constituted a bet or wager on a contest of others, but it did not articulate a broader rule.  The APA did not require that, and the Commission did not need to establish the outer limits of "gaming" to determine the Contracts fell squarely within the plain meaning of the term.

*Third*, Kalshi mischaracterizes the Commission's unlawful-activity analysis as finding that trading an event contract on a DCM is unlawful.  The Commission found that election betting is unlawful under laws that protect state interests separate from regulating trading contingent events generally.  The Commission focused on those state interests because the "unlawful activity" category prevents DCMs from circumventing state laws that do not bar trading event contracts, but prohibit betting on elections.

## ARGUMENT

### A. "Involve" encompasses a variety of connections between contracts or transactions and enumerated activities.

CEA Section 5c(c)(5)(C) applies to "agreements, contracts, [or]

5

transactions" that are "based upon [an event]," if "such agreements, contracts, or transactions involve" an enumerated activity. 7 U.S.C. § 7a-2(c)(5)(C). The plain meaning[10] of this text is straightforward: If the underlying is an event (because the instrument or transaction is "based upon" an event) *and* "the agreement[], contract[] or transaction[] involve[s]" the activity, the Special Rule applies.

Kalshi cannot even decide why that is wrong. On one hand, Kalshi argues that the dispute centers not on the meaning of "involve" but on what are the "subject and object" of the sentence (Kalshi Br. 27) or "what has to involve what," APP. 13-14. In the next breath, however, Kalshi asserts a dispute about the meaning of "involve," claiming the Commission's interpretation violated the "consistent meaning" canon. (Kalshi Br. 28.) Whatever Kalshi is trying to say, none of it is tenable.

As to "what has to involve what," the text is clear: "[T]he agreements, contracts, or transactions [must] involve" an enumerated activity. If the former involves the latter, the Special Rule applies. The only reference to the underlying is earlier in the sentence, where it says that the instrument or transaction must be

---

[10] Insofar as this Court determines any term is ambiguous, it should consider *Skidmore* deference which rests on an agency's expertise and "body of experience and informed judgment," *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2267 (2024), just as it would employ any interpretive canon. *Guedes v. ATF*, 920 F.3d 1, 22-23 (D.C. Cir. 2019).

"based upon" an event.[11]  Kalshi has no direct response except to insist—without

textual support—that the subject of the clause at issue is "the underlying event."[12]

Elsewhere, however, Kalshi *admits* (as it must) that "agreement[ or] contract"

refers to the "instrument itself" (Kalshi Br. 38), *not* the underlying or any other

isolated feature.  Kalshi cannot have it both ways.  The Special Rule applies if, at a

minimum, the "instrument itself" involves an enumerated activity.

As to the definition of "involve," Kalshi concedes that "involve" "carries its

typical meaning," *i.e.*, "to relate to, entail, etc.," or "[t]o have as a necessary feature

or consequence," and that it "can capture a range of relationships between two

concepts," in which "even a loose relationship" will suffice.  (Kalshi Br. 20, 23.)

That is *the Commission's* argument—if the "instrument itself" (Kalshi's words)

and the enumerated activity have "even a loose relationship" (also Kalshi's words),

---

[11] Kalshi admits that "involve" is broader than "based upon" (Kalshi Br. 23), but
has nothing to say about the consequences of that—because Congress used the
narrow term "based upon" to refer specifically to the underlying, it would violate
the "meaningful-variation canon" to hold that "involve" *also* refers only to the
underlying.  *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457-58 (2022).

[12] At the same time, Kalshi suggests that the subject is the enumerated activity,
arguing that the appropriate question is whether "the enumerated activities 'relate
to' the *underlying event*" because this is "the only consistent and contextually
workable" interpretation.  (Kalshi Br. 27.)  This is indecipherable.  Kalshi seems to
be saying, for example, that illegal activity (an enumerated activity) has to involve
illegal activity (an event).

the Special Rule applies.[13]  And the relationships here are not loose—gaming is the purpose or "essential feature or consequence" of the Contracts, and trading them "relates to" illegal activity.  Kalshi, focusing myopically on the underlying, has never refuted that the "instrument[s] [them]sel[ves]" have the proper nexus. (Kalshi Br. 39.)

Instead, Kalshi twists the "consistent meaning" canon articulated in cases that do not apply here.  Each case cited by Kalshi rejected the use of wholly distinct meanings for a single term.  *See Clark v. Martinez*, 543 U.S. 371, 378 (2005) (holding "may be detained" could not "both at the same time" limit detention and authorize unlimited detention); *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 331 (2000) (rejecting use of "fundamentally different meanings"); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 573 (1995) (rejecting that a "single operative word means one thing in one section of the Act and something quite different in another"); *Bankamerica Corp. v. United States*, 462 U.S. 122, 129 (1983) (rejecting "completely different" meanings of same phrase).  In none of these cases did the Supreme Court narrow a term that encompasses a "range of relationships" (Kalshi Br. 27) so that it can apply only to one.

Kalshi attempts to curtail the application of "involve" by arguing that the

---

[13] "Loose" arguably goes further than anything the Commission said, but that is academic because the connections here are not loose.

"interaction" must "remain constant" to avoid "forc[ing] the same word to perform different functions." (Kalshi Br. 25.) But the only "function" that "involve" performs is to capture the "range of relationships" between "agreements, contracts, or transactions" and the enumerated activities. It does so in varying ways, because that is how the word "involve" "function[s]." There is also no "lowest common denominator" canon, as Kalshi insists, empowering a court to narrow broad terms to apply only in limited circumstances. (Kalshi Br. 28.) In *Clark*, the Court held that where a term was read narrowly to avoid constitutional concerns when applied to one class of immigrants, it had the same narrow meaning when applied to another class of immigrants. 543 U.S. at 380. That was the "lowest common denominator" to which the Court referred.

Kalshi's real quibble is with the proposition that one thing can "involve" another in a variety of ways. But that is obviously true—again, it is the term's plain meaning, as Kalshi acknowledges. (Kalshi Br. 27.) In Kalshi's own cited case, *United States v. Santos*, 553 U.S. 507 (2008), the Supreme Court explained that applying a term to "different factual contexts" (here, to different types of contracts) is "worlds apart" from giving it "different meanings." *Id.* at 522. To illustrate: Tennis involves a ball because you hit it back and forth. It also involves viewing stands because you can sit there to watch the match. That you would not sit on the ball or volley the seats does not require "toggling back and forth"

9

between inconsistent meanings of "involve."

Kalshi also fights the ordinary meaning of "transaction."  The statute says it is sufficient if a "transaction" involves, for example, gaming.  If trading the Contracts involves gaming, the Special Rule applies.  Boxed in by this language, Kalshi urges the Court to effectively strike "transactions" from "agreements, contracts, or transactions" by synonymizing "transaction" with "agreement" and "contract."  As Kalshi puts it, a transaction is "the instrument" itself.  (Kalshi Br. 38.)  But no source defines "transaction" that way.  As the Commission has explained (unrebutted by Kalshi), "transaction" appears throughout the CEA using its ordinary meaning.  (CFTC Br. 35-36.); *see also United States v. Radley*, 632 F.3d 177, 182-83 (5th Cir. 2011) (holding that "contracts, agreements or transactions" in former CEA Section 2(g) covers "bids and offers," and to conflate "transaction" with "contract" or "agreement" would "embody the fundamental interpretive error of extending the definition of one term in a three-term series to cover the entire trio").  Kalshi observes that the terms "agreement, contract, or transaction" appear frequently together in the CEA to suggest this means collectively they "refer to a financial instrument itself."  (Kalshi Br. 38.)  But Kalshi offers no support for that interpretation of *any* of the provisions it cites and

ignores Congress's use of "or," which indicates the disjunctive.[14] *Pinson v. DOJ*, 964 F.3d 65, 69 (D.C. Cir. 2020). A transaction is not an "instrument" in this or any other context.[15]

If Congress had intended Section 5c(c)(5)(C) to mean what Kalshi says, "it would not have presented any difficulty to have said so explicitly." *Bankamerica Corp.*, 462 U.S. at 130. It would have limited the Special Rule to "instruments" "based upon [events] *that* involve" an enumerated activity. But it did not. Kalshi may find that bad policy, but "policy must be implemented by Congress, and not by a crabbed interpretation of the words of a statute." *Id.* at 133.

## B. "Gaming" is not limited to "games."

Kalshi disputes that "gaming" can be interpreted by reference to "gambling,"

---

[14] Kalshi's movie hypothetical (Kalshi Br. 29) is no help because the only reasonable interpretation of "any screening that involves science fiction, horror, violence, or drug use" is that it refers to the content of the movie—if a "fight breaks out" or "someone uses drugs" in the theater, it is too late to retroactively accompany the minor. Here, the only reasonable interpretation of the text cuts against Kalshi: "agreements, contracts, or transactions" can only be describing "the instrument" or transactions in the instrument.

[15] The district court incorrectly concluded that "transaction" may refer to the instrument under the flawed rationale that, when the Commission prohibits an event contract under the Special Rule, the instrument may not "be listed" for trading, APP. 114, and transactions are not "listed." But the court overlooked that the statute also says that such a transaction may not be "made available for clearing." 7 U.S.C. § 7a-2(c)(5)(C)(ii). Kalshi argues for the first time that an instrument may also be "made available for clearing." (Kalshi Br. 39 n.11.) While true, so can a transaction: Kalshi cites 7 U.S.C. § 1a(15)(A), which says exactly that.

a word widely recognized, including by the Supreme Court, as interchangeable with "gaming."  Kalshi instead artificially narrows "gaming" to mean "refer[ring] to playing games or playing games for stakes" and "requir[ing] a *game*."  (Kalshi Br. 41, 42.)  This contrived limitation lacks support and contradicts the Special Rule's broad language and purpose.[16]

### 1.  "Gaming" and "gambling" are interchangeable.

Kalshi offers partial dictionary definitions in declaring that "gaming," as opposed to "gambling," refers only to playing of "games of chance for money" (Kalshi Br. 42), and is limited to wagers on outcomes of "a game or game-related event." (Kalshi Br. 41.)  However, when viewed in full, most of these definitions treat "gaming" as interchangeable with "gambling."  *See Gaming*, CHAMBERS DICTIONARY (13th ed. 2014),

---

[16]Amicus ForecastEx argues that the Commission's interpretation raises "serious First Amendment issues" by prohibiting contracts that "express[]" "predictions about elections."  But, the Commission Order proscribed election *gambling* on Kalshi's DCM, which "implicates no constitutionally protected right."  *United States v. Edge Broad. Co.*, 509 U.S. 418, 425 (1993).  Trading the Contracts is not speech any more than trading stocks or betting on football, and the First Amendment does not prevent regulation of trading conduct or commerce, even if "express[ions]" on "predictions about elections" are incidentally burdened.  *See, e.g.*, *Rumsfeld v. Forum for Acad.& Institutional Rights*, 547 U.S. 47, 62 (2006).  Even if trading were expressive conduct, the prohibition here is a permissible time, place, and manner regulation.  *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464 (2014).  In any event, Kalshi never raised this, and an amicus may not do so now.  *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 n.6 (D.C. Cir. 2015).

https://chambers.co.uk/search/?query=gaming&title=21st ("gambling" without

further definition); *Gaming*, MERRIAM-WEBSTER.COM, https://www.merriam-

webster.com/dictionary/gaming (last visited Dec. 5, 2024) ("[T]he practice or

activity of playing games for stakes: gambling"); *Gaming*, OXFORD ENGLISH

DICTIONARY (2024),

https://www.oed.com/dictionary/gambling_n?tab=meaning_and_use-

paywall&tl=true ("The action or practice of playing games, as cards, dice, etc., for

stakes. Cf. gambling."); *Gaming*, AMERICAN HERITAGE DICTIONARY (5th ed. 2022),

https://www.ahdictionary.com/word/search.html?q=gaming ("Gambling, especially

casino gambling."); *see also Gaming*, BLACK'S LAW DICTIONARY, (12th ed. 2024)

(cross-referencing "gambling" without further definition).  That "gaming requires a

game" is a definition invented by Kalshi.

     Acknowledging the dictionaries' cross-references to gambling, Kalshi—now

a self-proclaimed competitor of FanDuel—tries to argue that election betting is not

gambling either, misrepresenting that the Commission's "gambling" definitions

"require an underlying game."  (Kalshi Br. 47.)  The cited definitions say no such

thing.  Merriam-Webster defines "gamble" to mean both "to play a game for

money or property" *and* "to bet on an uncertain outcome."  *Gamble*, MERRIAM-

WEBSTER.COM, https://www.merriam-webster.com/dictionary/gamble.  The Oxford

English Dictionary defines "gamble" to mean "[t]o play games for stakes, as cards,

dice, etc., or bet on the outcome of particular events." *Gamble*, OXFORD ENGLISH DICTIONARY (2024), https://www.oed.com/dictionary/gamble_v?tab=meaning_and_use#3430238. Wagering on elections fits either definition.

The federal statutes cited by Kalshi also do not support an artificial narrowing. Kalshi suggests that because the IGRA "delineates various 'gaming' classes, each of which refers to a different set of games," gaming must mean playing games. (Kalshi Br. 43.) In reality, the IGRA establishes various gaming classes, *some* of which include casino games, but does not define gaming as tethered to "games" to the exclusion of other gambling.[17] And, as the CFTC noted, the Supreme Court recognized in *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014), that "gaming" and "gambling" are interchangeable under the IGRA. *Id.* at 792 ("The 'gaming activit[y]' is (once again) the gambling."). Kalshi's only basis for decoupling the terms is its unsupported thesis that "gaming" excludes bets on events with economic consequences. This appears nowhere in the text of the IGRA or any other source, and is belied by Kalshi's markets offering bets on economically meaningless contingencies like the popular vote totals or how Nate

---

[17] The IGRA outlines three regulatory classes of gaming, two of which include social games and some card games that may involve betting or monetary prizes. 25 U.S.C. § 2703(6)-(7). The third class, "Class III" broadly covers "all forms of gaming that are not class I gaming or class II gaming," without limitation. 25 U.S.C. § 2703(8).

Silver would fare in his predictions.  *See supra* note 2.

Kalshi also maintains that because the UIGEA, 31 U.S.C. § 5362(1)(A), defines "bet or wager" as "staking . . . something of value upon the outcome of a contest of others," Congress would have used "bet or wager" if it wanted the Special Rule to reach betting on contests.  (Kalshi Br. 43.)  But Congress used the term "gaming" which covers betting or wagering.  The UIGEA itself defines "unlawful internet gambling" to mean placing a "bet or wager" on the internet, reinforcing that these terms are used similarly.  31 U.S.C. § 5362(10).

Kalshi asserts that "many [state] statutes define 'gaming operations' and 'gaming activities' as 'the offering or conducting of any game or gaming device,'" (Kalshi Br. 43), but none of the statutes cited is helpful in interpreting "gaming" for purposes of the Special Rule.  Both La. Stat. Ann. § 27:205 and Mass. Gen. Laws ch. 23K, § 2, define gaming to cover "conducting . . . any game," but specifically *exclude* sporting events, the exact activities Kalshi asserts are covered by the Special Rule.  Instead, those statutes cover "banking or percentage games." *See* La. Stat. Ann. § 27:205(11)(a); Mass. Gen. Laws ch. 23K, § 2.  Event contracts involving such games are implausible.

Kalshi cites other statutes that it claims define "gaming" and "gambling" separately.  (Kalshi Br. 43 n.12.)  However, the New York and Mississippi statutes

list the terms interchangeably.[18]  N.Y. Rac. Pari-Mut. Wag. & Breed. Law §

1301(20) ("*'Gaming' or 'gambling'.*  The dealing, operating, carrying on,

conducting, maintaining or exposing for pay of any game.") (emphasis added);

Miss. Code Ann. § 75-76-5(l) ("*'Gaming' or 'gambling'* means to deal, operate,

carry on, conduct, maintain or expose for play any game as defined in this

chapter.") (emphasis added).  And in those statutes, even "gambling" requires a

game, which Kalshi appears to *reject*, as it relates to the Special Rule.  (Kalshi Br.

47 (arguing that employees who bet on "whether their boss will show up" are

"gambling" not "gaming").)  They accordingly shed no light on the meaning of

"gaming" here.  All of this is consistent with ordinary usage in real life:  As the

Commission pointed out, many state agencies that regulate *gambling* are known as

"gaming" commissions, including Nevada's—which has jurisdiction over

prohibited election betting.  (CFTC Br. 41.)  Kalshi has no response to any of this.

### 2. There is no basis to confine "gaming" to games or events with no outside economic effects.

Kalshi notes that examples of gaming discussed in the Senate colloquy

involve sporting events.  But the fact that election gambling or other "gaming"

---

[18] Similarly, the New Mexico state Attorney General has treated "gaming" and "gambling" interchangeably.  *See* N.M. Att'y Gen. Op. 17-2, *Regulation of Gambling in the Town of Silver City*, (Feb. 7, 2017), 2017 WL 1901888, at *1 n.1 (stating "the term 'gambling' refers to the same activities as 'gaming' under" the two statutes).

event contracts were not discussed cannot support their exclusion from coverage. *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003) (evidence of one rationale for the enactment of a broadly worded statute "does not define the outer limits of the statute's coverage"). Even if game betting was the principal activity targeted by Congress, the breadth of the statute covers "reasonably comparable evils," like Kalshi's transformation into an online casino for election betting. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). Further, Kalshi selectively omits that the legislators were concerned with "*gambling* through supposed 'event contracts,'" 156 Cong. Rec. S5907 (emphasis added), which Kalshi admits includes more than just betting on games. (Kalshi Br. 43, 47.) This reinforces that Congress intended the plain meaning of "gaming" as gambling and sought to prevent widespread use of DCMs for gambling, nominally masked as hedging.

Kalshi appears to acknowledge that was Congress's intent (Kalshi Br. 45), but argues it means that "[o]n a policy level" Congress sought to cover "games" that "are unlikely to serve any 'commercial or hedging interest.'" *Id.* This argument, however, fails to account for the fact that sporting events also have economic effects, as do the enumerated categories "terrorism," "war," and "assassination." (CFTC Br. 48.) Kalshi has no response. And, even if "gaming" should be interpreted by reference to hedging utility, Kalshi's Contracts fail its

own test.  As the Commission determined after notice and comment, control of one

chamber of Congress does not, by itself, have sufficiently direct, predictable, or

quantifiable economic consequences for the Contracts to serve an effective

hedging function, and the binary payoff further limited the Contracts' hedging

utility.  APP. 141, 144.  The hedging uses claimed by Kalshi and certain

commenters relate to economic effects of *policy* change enacted by law, which in

turn occur through a series of intervening events:  approval by each chamber of

Congress and then by the President.  APP. 142-143.  Kalshi does not even attempt

to mask its gamification of elections through other offerings, like bets on "Will the

popular vote margin of victory be between -3.00 and -3.99?" or "Will 538 correctly

call 48 states in the 2024 U.S. presidential election?"  For purposes of the Special

Rule, there is no rational distinction among any of these forms of gambling.

### 3.  Kalshi argues against a strawman construction of gaming.

The Commission's Order stated that the Special Rule applies to bets on

contests of others and says nothing about any other kind of betting.  Kalshi does

not disagree about the contents of the Order but says the Commission's "logic"

covers "*every*" event contract.  The faulty logic, however, is Kalshi's because it

rests on a misunderstanding of what it means under the APA to adjudicate an

individual case rather than issue a legislative rule.

The distinction between adjudication and rulemaking is that adjudication is

"fact-specific" and, "[u]nlike rulemaking, which typically announces 'generally applicable legal principles' and 'governs only the future,' adjudication involves 'case-specific determinations' that 'immediately bind parties by retroactively applying law to their past actions.'" *Elec. Energy, Inc. v. EPA*, 106 F.4th 31, 45 (D.C. Cir. 2024).

Nothing in the APA or CEA required the Commission to issue a comprehensive, forward-looking rule in evaluating Kalshi's Contracts, and it did not purport to do so. There is "a very definite place for the case-by-case evolution of statutory standards" in agency adjudication. *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947). Kalshi calls that "nonsense," but courts do it every day. As the Supreme Court recently explained, the founders themselves "anticipated that 'all new laws…' would be 'more or less obscure and equivocal, until their meaning' was settled 'by a series of particular discussions and adjudications.'" *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2257 (2024). In that process, neither courts nor administrative agencies are required to define a statute's outer limits. *See Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 93 (D.C. Cir. 2020) ("While . . . the Secretary's discretion must be bound by some outer limits, we conclude that, whatever those outer limits may be, the Secretary's interpretation . . . falls squarely within them.").

The APA itself limits judicial review to questions of law "[t]o the extent

19

necessary to decision and when presented."  5 U.S.C. § 706.  Kalshi's

hypotheticals regarding contracts that do *not* involve wagering on contests are not

presented.  The Commission's order was "fact-specific," applying only to Kalshi's

Contracts, and is precedential only for similar contracts.  Event contracts with

different characteristics may reach different results.  As the Commission has

emphasized, an expansive definition of "gaming" covering all betting on

contingencies would improperly cover all event contracts and render other Special

Rule categories superfluous.  (CFTC Br. 46, 48.)  In the proposed rule that Kalshi

mocks as "disingenuous," the Commission conformed to exactly this reasoning.

*See* Event Contracts, 89 Fed. Reg. 48,968, 48,975 (proposed May 10, 2024).  If the

Commission transgressed that boundary in some future case, *then* a court would be

right to intervene.  But that has no bearing on the present matter, where Kalshi is

offering bets on the outcome of contests.

  Kalshi's argument seems to be that an adjudicator may not cite definitions

without adopting them wholesale.  But Kalshi *itself* relies on partial definitions of

"gaming" and maintains that the Commission must do so too.  And if Kalshi were

right, a court would err every time it cited a dictionary where even one alternate

definition did not fit.  That is not how statutory interpretation or case-by-case

adjudication work.  The Commission's measured approach shows proper

"caution," *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294

(1974), not "inconsistency."  (Kalshi Br. 50.)

### 4.  Gaming includes wagering on a contest of others.

Kalshi disputes that an election is a "contest" under the Special Rule—this time not even acknowledging that the word *has* a plain meaning.  As described in Kalshi's own preferred dictionaries, "contest" comfortably includes elections.  *See, e.g.*, *Contest*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/contest ("[A] struggle for superiority or victory.").  These definitions do not focus on games.  *See Contest*, OXFORD ENGLISH DICTIONARY (2024), https://www.oed.com/dictionary/contest_n2?tab=meaning_and_use#8440744 (not mentioning "games" or "entertainment").

Ignoring what "contest" actually means, Kalshi claims several state statutes cited in the Commission Order show that elections are not "contests" covered by "gaming."  But Kalshi misreads the Commission's Order.  The Order referenced only one of the seven statutes Kalshi cites, though the other statutes include similar language.  APP. 134-135; (Kalshi Br. 53.)  The New York law that *is* cited, N.Y. Penal Law § 225.00(2), defines "gambling" as wagering "upon the outcome of a contest of chance *or* future contingent event."  (emphasis added).  This broad language suggests no intent to limit a "contest" to a game.

Nor do other state statutes "use the word 'contest' in ways that . . . exclude

elections." (Kalshi Br. 53.) Most of the statutes Kalshi cites define gambling to include "wagers upon the result of any trial or *contest . . .* of skill." Del. Code Ann. tit. 11, § 1403(1) (emphasis added); Fla. Stat. § 849.14; *see also* Ky. Rev. Stat. Ann. § 528.010(6)(a) (defining gambling as "risking something of value upon the outcome of a contest."); Utah Code § 76-10-1101(8)(a) (same). Elections are undoubtedly contests of skill – all else equal, the more skilled candidate wins.

Recognizing these uses of "contest," Kalshi argues "contests" refers only to events that "share key attributes" with games, like being staged for entertainment and carrying no economic significance. (Kalshi Br. 54.) Kalshi's only support is a self-serving comment letter from *a member of Kalshi's own Board of Directors*. APP. 326, 329. And again, this distinction is belied by Kalshi's own behavior since the Court lifted its stay. There simply is no widely embraced exclusion of elections from the meaning of "contest" in the context of gambling.[19]

The remaining statutes cited by Kalshi also would not exclude wagers on contests of others. Delaware's and Florida's statutes define gambling to include "wagers upon the result of any trial or contest . . . of skill," Del. Code Ann. tit. 11, § 1403(1); Fla. Stat. § 849.14, which an election is. The Louisiana statute similarly

---

[19] Kalshi argues that states with gambling laws covering contests and separate bans on election gambling show elections are not "contests." However, overlapping provisions demonstrate comprehensive regulation, not a narrow interpretation of terms. *See Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018).

defines gambling as "conducting . . . any game, contest, lottery, or contrivance whereby a person risks the loss of anything of value . . . to realize a profit." La. Stat. Ann.§ 14:90(A)(1)(a). None of these statutes supports narrowing the word "contest."

Finally, Kalshi remarks that elections are no more "contests" than "jury trials." (Kalshi Br. 54.) Although a contract on a jury trial is not at issue, it is not hard to envision Kalshi's Las Vegas billboard flashing images of Johnny Depp and Amber Heard instead of Kamala Harris and Donald Trump. There is no reason to treat any of this differently from betting on a football game.

## C. "Activity that is unlawful under . . . State law" applies to conduct that is unlawful under state laws that are not preempted by the CEA.

Kalshi mischaracterizes the Commission's unlawful activity analysis as finding that *trading* an event contract on a DCM is unlawful. Kalshi then argues that by this imputed reasoning, the unlawful activity category "either captures *nothing* or the *universe* of event contracts." (Kalshi Br. 30.) The Commission's reasoning does neither, and Kalshi misunderstands the question, which is not whether an DCM-traded event contract is prohibited by state law—it is whether to allow their trading on a DCM in the first place. Submitting the contracts *prior* to listing triggers the Commission's authority to review them. The election-betting contracts relate to non-preempted state laws governing the integrity of elections.

### 1. Kalshi incorrectly asserts that the Commission's reasoning can be interpreted to capture "nothing."

Kalshi asserts that focusing on state laws that purport to ban trading on a DCM means no event contract will be captured under "unlawful activity" "because federal law would preempt any such application of state law (whether broad or narrow)." (Kalshi Br. 31, 36.) But that is not what the Commission did. The Commission agreed that the CEA preempts application of state laws that purport to ban trading on a DCM and, instead, focused on whether the transactions involve some *other* activity that is unlawful. APP. 139. As the Commission observed, *betting on elections* is unlawful, not trading contracts on an exchange. The Commission correctly determined that Kalshi's Contracts involve election betting.

As to federal law, Kalshi argues in circular fashion that "[i]f trading a contract violated a 'federal' law, that instrument would be banned regardless of the Special Rule." (Kalshi Br. 31.) Of course, Congress could ban election contracts from trading on a DCM and remove discretionary review by the CFTC. And if Congress did ban, for example, FanDuel from offering election bets through an online casino, that might be another way Kalshi's event contracts would involve illegal activity. That Congress has not in fact banned election betting does not *exempt* election betting from the Commission's discretionary authority to initiate a review of a contract that relates closely to activity that violates state law.

24

### 2.  Kalshi incorrectly asserts that the Commission's reasoning captures "the *universe* of event contracts."

Kalshi argues that the Commission's reference to state law "proves too much" because some state laws prohibit staking money on any contingent event, which captures all event contracts.[20]  (Kalshi Br. 32.)  This is another strawman because the Commission did not rely on these laws.  Nor would it make sense to do so, where the Special Rule authorizes review of only a subset of event contracts. Instead, the Commission focused on state laws that are "separate and apart" from laws that would apply broadly to every event contract.  APP. 139 n.28.  Kalshi responds that it is irrelevant that the Commission never invoked the broader laws or expressed that it would not be able to under the Special Rule because the Commission cannot disclaim their application.  (Kalshi Br. 34.)  But of course it matters what the Commission actually said and did, and Kalshi offers no principled explanation for its assertion.

Instead, Kalshi suggests that focusing on other state interests will be untenable because of confusion in "discern[ing] the precise interests [that] motivat[e] a state law." (Kalshi Br. 37.)  But, as the Commission stated, the focus

---

[20] Kalshi's cite to Montana and New Jersey laws as broadly capturing trading on a DCM is misplaced.  These states recognize the legality of contracts traded pursuant to the CEA.  Mont. Code Ann. § 30-9A-102 (official comments note that the inclusion of the definitions "provide a clearer legal structure"); N.J. Stat. Ann. § 12A:9-102 (same).

is on "important state interests *expressed in statutes*." APP. 139 n.28; *see*, *e.g.*, Nev. Rev. Stat. § 293.830; N.J. Stat. Ann. § 19:34-24 (specifically prohibiting wagering on elections).  It also defies common sense to urge that specific prohibitions are difficult to distinguish from general betting prohibitions.

Nor can Kalshi refute the Commission's actual position: Determining whether a contract or transactions therein involve activity that is unlawful under state law, because they relate closely and/or entail state-prohibited activity, is a separate question from whether the contracts are themselves unlawful.  The statute requires the Commission to ask the former question, not the latter.  The fact that an event contract relates closely to off-exchange derivatives is not meaningful because the question is whether the contract can trade on exchange.  Here, trading in election betting contracts relates closely to illegal activity because it utterly undermines laws that otherwise have nothing to do with trading derivatives.  Predictably, some state regulators are furious that Kalshi is offering election gambling.  Devin O'Connor, *Election Betting Markets Draw Ire of State Gaming Regulators Ahead of November 5*, CASINO.ORG (Nov. 4, 2024), https://www.casino.org/news/election-betting-markets-draw-ire-state-gaming-regulators/.  The solution is to prohibit these Contracts from trading on a DCM, when that is in the public interest.

Kalshi echoes the district court's findings that the Commission's

interpretation "effectively undo[es]" the CEA's elimination of across-the-board-review.  (Kalshi Br. at 33.)  This view misunderstands statutory history and the Special Rule's significance, which reestablished public interest review for certain *event contracts* only, after an across-the-board review for *all products* had been eliminated.  (CFTC Br. 55.)

### 3. The enumerated categories in Section 5c(c)(5)(C) defer to state interests and act as a check on socially destructive activity.

Kalshi points to three other categories to argue that structure and context confirm a contract can only involve unlawful activity if the underlying event is unlawful or relates to unlawful activity.  Kalshi cites Congress's inclusion of "war," "terrorism," and "assassination" to suggest that that Section 5c(c)(5)(C) is concerned only with "instruments that could incentivize crime or allow traders to gain from socially destructive activity," to the exclusion of state policy interests expressed through laws.  (Kalshi Br. 21, 37.)

This line of argument is misplaced.  First, dozens of states *have* determined that betting on elections is socially destructive activity.  Kalshi offers no reason why Congress would have been concerned only with betting *on* socially destructive events and not with socially destructive *betting* on events on a DCM.  To the contrary, the legislators were concerned with "gambling through supposed 'event contracts.'"  156 Cong. Rec. S5907.

Second, it ignores the "gaming" category, which supports that Congress was

27

mindful of state policy interests because gaming is traditionally regulated by the states. *See, e.g.*, *Bay Mills Indian Cmty.*, 527 U.S. at 794 (referring to state regulatory power over gaming as "capacious"). While the enumerated categories in the Special Rule certainly provide a check on instruments that could be socially destructive, the Special Rule also recognizes important state interests by giving way to policy choices traditionally left to states (*i.e.*, whether to allow gambling, and what types of gambling to allow). Elections are also primarily regulated by states. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). Many states prohibit election gambling under their election statutes, *see, e.g.*, N.J. Stat. Ann. § 19:34-24, which means the Contracts would also allow Kalshi to bypass states' policies for protecting the integrity of elections. Allowing the Commission to review contracts that involve "gaming" and "unlawful activity" provides a backstop to DCMs end-running state laws that express these important policy choices. Kalshi's argument the underlying event must either be unlawful or relate to unlawful activity is therefore without merit.

## CONCLUSION

For the foregoing reasons, and such others as appear just and reasonable, this Court should reverse the judgment below.

Dated: December 5, 2024

Respectfully submitted,

*/s/ Raagnee Beri*

Robert A. Schwartz
 *General Counsel*
Anne W. Stukes
 *Deputy General Counsel*
Raagnee Beri
Margaret P. Aisenbrey
 *Senior Assistant General Counsels*
 Conor B. Daly
  *Counsel*
Commodity Futures Trading
Commission
1155 21st Street, NW
Washington, D.C. 20581-0001
Phone: (202) 418-5986
Emails: rberi@cftc.gov

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(A) and Fed. R. App. P. 32(a)(7)(B), I hereby certify that the Reply Brief of Appellant Commodity Futures Trading Commission complies with the type-volume limitation as set forth in Fed. R. App. P. 32(a)(7)(B) because the Reply Brief contains 6500 words excluding the parts of the Reply Brief exempted by Fed. R. App. P. 32(f).

I further certify that the Reply Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the Reply Brief has been typed in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

/s/  *Raagnee Beri*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 5, 2024, I filed the foregoing Appellant's Reply Brief using the Court's CM/ECF system, which will serve all counsel of record electronically.  I also certify that on December 6, 2014, eight paper copies of the foregoing Appellant's Reply Brief will be delivered to the Clerk's Office, and two paper copies will be dispatched by overnight service to lead counsel for Kalshi.

/s/  *Raagnee Beri*